## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

**KENNETH DURONN WILSON**      *
17505 Cutback Drive     *
Manor, TX 78653     *
    *
     Plaintiff,     *
    *
**KEVIN K. MCALEENAN**, Acting Secretary     *
DEPARTMENT OF HOMELAND SECURITY     *
20 Massachusetts Ave. NW     *
Washington, D.C. 20528     *
    *
<u>Also Serve:</u>     *
Office of the Attorney General     *
United States Department of Justice     *
950 Pennsylvania Avenue NW     *
Washington, DC 20530-0001     *
    *
<u>Also Serve:</u>     *
US Attorney For the District of Columbia     *
555 4th Street N.W.     *
Washington, D.C. 20001     *
    *
     Defendant.     *
    *

Case: 1:20−cv−00100   Jury Demand
Assigned To : Unassigned
Assign. Date : 1/14/2020
Description: Employ. Discrim.   (H Deck)

**RECEIVED**

JAN 14 2020

Clerk, U.S. District and
Bankruptcy Courts

* * * * * * * * * * * * * * * * * * * * * * * * *

## COMPLAINT AND JURY DEMAND

**NOW COMES**, plaintiff KENNETH DURONN WILSON, by and through his undersigned attorneys George A. Rose, Esquire, and Rose Law Firm, LLC, and sues the aforementioned defendant and in support of his cause of action state:

### I. PRELIMINARY STATEMENT

1. This action for declaratory, injunctive, monetary and other appropriate relief is brought by plaintiff to redress intentional violations by defendant of rights secured to plaintiff by the laws of the United States. This action arises under Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. Sections 2000e et seq., ("Title VII"), the Civil Rights Act of 1866 as

amended, 42 U.S.C.§ 1981, ("Section 1981"), 42, U.S.C. § 1983, ("Section 1983), The False Claims Act, 31 U.S.C. § 3730 (FCA) and, 42, U.S.C. § 1985, et seq. ("Section 1985),

## II.   PARTIES

2.     Kenneth Duronn Wilson (hereinafter "Plaintiff" or "Mr. Wilson") is at all times material here a fifty-seven (57) year old African-American male citizen of the United States and the State of Texas. At all times relevant herein Plaintiff has been employed by the defendant's Federal Emergency Management Administration ("FEMA").

3.     Defendant KEVIN K. MCALEENAN, is the acting Security of the U.S. Department of Homeland Security (DHS), an executive agency of the U.S. government, that controls and operates the Federal Emergency Management Administration ("FEMA"). Defendant at all times material to this complaint was required to follow all established statutes, regulations, and constitutional law, as well as local ordinances pertaining to Plaintiff's employment with FEMA.

## III.   JURISDICTION

4.     Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331, 42 U.S.C. § 12117, and 29 U.S.C. § 1132(e), all of which provide for original jurisdiction of Plaintiff's claims arising under the laws of the United States and over actions to secure equitable and other relief. Further, Plaintiff is a citizen of the State of Texas, and Defendant is an Agency of the Federal Government, head quatered and having its principal place of business in the District of Columbia. The amount in controversy exceeds $75,000 exclusive of interest and costs.

## IV.   VENUE

5.      Venue is proper in this district under 28 U.S.C. *§1391* and under 42 U.S.C. §2000e-5(f)(3) Defendant has its principal office in this district and the employment records relevant to the alleged unlawful employment actions are maintained and administered in this district.

## V.      EXHAUSTION OF ADMINISTRATIVE REMEDIES

6.      On or about January 20, 2012, Plaintiff filed an Individual Complaint of Discrimination with Defendant's Equal Rights Office (ERO) alleging employment race discrimination, retaliation, and fraud. (Interdepartmental case number HS-FEMA-21715-2012).

7.      On or about December 20, 2013, Plaintiff requested Plaintiff's right to an EEOC hearing and Plaintiff's ERO case was set for EEOC hearing and proceedings.  (Case No. HS-FEMA-21715-2012/EEOC-520-2019-00029X).

8.      On or about September 18, 2015, Plaintiff filed another Individual Complaint of Discrimination with Defendant's ERO, alleging discrimination and retaliation. The cases were combined before the EEOC under case numbers EEOC-520-2018-00500X/EEOC-520-2019-00029X.

9.      On September 9, 2019, the EEOC issued a Dismissal Order, dismissing the cases with prejudice, pursuant to 29 CFR 1614.107(7), alleging Plaintiff's failure to prosecute the case.

10.      On November 1, 2019, the Agency issued its Final Order in the cases, adopting and implementing the EEOC's September 9, 2019, dismissal of the cases.

11.      Plaintiff files this complaint within (ninety) 90 days after the Agency issued its November 1, 2019, Final Order.  (Attached hereto as "Exhibit A") Plaintiff has therefore exhausted his administrative remedies and has complied with all conditions precedent to maintaining this action.

## VI.    FACTUAL ALLEGATIONS

12.    On or about September 27, 2006, Defendant employed Plaintiff as a Reservist assigned to the Logistics Cadre, home office of RegionIX, 1111 Broadway, Suite 120, Oakland, CA 94607. "Reservists are appointed temporary FEMA employees who are hired to work on specific disasters and emergencies, then are demobilized *(i.e.,* sent home from duty) until they are redeployed to another disaster. Reservists hold time-limited intermittent appointments."

13.    Between August 2011 and February 2012, Plaintiff was deployed to work in New York under  Disaster Declaration FEMA-4020-DR, following Hurricane Irene.  Plaintiff was a Logistics Manager, D-1, working in the Operational Field Office ("OFO") in Long Island, NY. Plaintiff was responsible for facilities, fleet transportation, IT, help desk, mail room, customer service and receiving/distribution. Plaintiff managed contracts and leasing for the building, janitorial, security, off site office equipment, vehicle rental, vending, shredders, domestic postal and UPS and guaranteed accountability and performance for each department.

14.    During Plaintiff's New York deployment between August 2011 and February 2012, Plaintiff's superiors' were Timothy Henggeler, Hewlett OFO Logistics Group Supervisor and Jeffery Cole, Kirkwood OFO Logistics Group Supervisor;  second-line Supervisors; Tom Szmyr, External Support Branch Director, Dan Paton, Pete Connelly and Laura Swedlow, Deputy Logistics Section Chiefs, and John Alonso and Gary Butkus, Logistics Section Chiefs. All these Plaintiff's superiors are Caucasian Americans, except for Mr. Alonso, who claims to be both a Hispanic and African American.

15.    On or about October 6, 2011, Plaintiff was one of six of Defendant's employees, tasked with breaking down three (3) Disaster Recovery Centers (DRC) located in Queens,

4

Brooklyn and Bronx, New York. The group was divided into three crews, and were responsible for helping at all three locations. During execution of the breaking down assignments, discrepancies arose pertaining to communications, delays, and lack of coordination among the crews.

16.     In response to the breaking down assignments' discrepancies, Mr. Alonso, convened a conference call, where he laid blamed on Plaintiff for the delays and accused Plaintiff of not assisting the other crews. Mr. Alonso urged Plaintiff to "confess". Mr. Alonso and Mr. Butkus subsequently directed an investigation to justify blaming Plaintiff. However, Mr. Alonso refused to accept the statements of two African Americans crew members corroborating that Plaintiff was not responsible for the discrepancies, and only accepted Plaintiff's denial of blame, after receiving a statement from a Caucasian American crew member that corroborated Plaintiff's denial of blame for the discrepancies.

17.     On the evening of October 6, 2011, Mr. Szmyr sent an email to Mr. Cole and Mr. Henggeler and copied Mr. Paton, Mr. Alonzo, Mr. Butkus, Ms. Swedlow, and others, directing that: "Ken Wilson and Paul Swindells switch positions effective Saturday October 8th (Ken to move to Kirkwood and Paul to move to Hewlett) and retain their positions." At the time, Mr. Szmyr reported to Gary Butkus, John Alonso, Dan Paton, Laura Swedlow and Pete Connelly. Mr. Szmyr said he was just "following orders" when he gave the email directive that, "Ken Wilson and Paul Swindells switch positions".

18.     On or about October 7, 2011, Plaintiff was notified by Mr. Henggeler that Plaintiff was being reassigned from the Long Island OFO to the OFO in Binghamton, NY. Plaintiff was told to check out of Plaintiff's hotel the morning of October 8, 2011 and travel to Binghamton, NY on that day. Plaintiff was told that Plaintiff would be replaced by Paul

5

Swindells, a Logistics Manager, to save money, because Mr. Swindells lived less than fifty (50) miles from the Long Island OFO, and Defendant would not have to pay for lodging and per diem for Mr. Swindells.

19.     On the night of October 7, 2011, Plaintiff called Mr. Swindells, and Mr. Swindells told Plaintiff of a scheme by Mr. Alonso and Ms. Swedlow to find a route from Mr. Swindells' home to the Long Island OFO that would give Mr. Swindells fifty (50) or more in travel miles between Mr. Swindell's home and the Long Island OFO, and therefore allow Mr. Swindells to be in travel status and receive associated per diem and other benefits. Mr. Swindells told Plaintiff that Mr. Swindell's home was actually less than 50 miles from the Long Island OFO.

20.     On November 18, 2011, Plaintiff initiated contact with the Defendant's Equal Rights Office ("ERO") and lodged a grievance or complaint that Plaintiff's reassignment to the OFO Binghamton, NY was due to race discrimination and involved a fraudulent scheme to keep Mr. Swindells in travel status. On November 30, 2011, Plaintiff was interviewed by the ERO regarding the ERO complaint that Plaintiff's reassignment to the OFO Binghamton, NY was discriminatory and involved a scheme with his replacement, Mr. Swindells.

21.     On or about January 3, 2012, Mr. Alonso was interviewed by the ERO regarding Plaintiff's complaint that Plaintiff's reassignment to the OFO Binghamton, NY was discriminatory. Mr. Cole and Mr. Henggeler were interviewed by the ERO in December 2011 about Plaintiff's ERO complaint that the October 7, 2011 reassignment was discriminatory.

22.     On or about January 3, 2012, Defendant demoted Plaintiff in the FEMA Qualification System (FQS). Plaintiff was demoted from Logistics Manager and reassigned the position of Logistics System Specialist Trainee. This virtually denied Plaintiff the ability to secure deployments via Defendant's Disaster Tracking System (DTS). This adversely affected

6

Plaintiff deployment opportunities for two and a half years, until Plaintiff was hired for a full-time four (4) year appointed position in FEMA, Region VII, Response Division, 9221 Ward Parkway, Suite 300, Kansas City, MO 64114, as an Cadre On-Call Response/Recovery (CORE) IMAT Support Branch Director II, on June 29, 2014.

23.     On or about January 20, 2012, Plaintiff filed am Individual Complaint of Employment Discrimination with Defendant's ERO, against the actions of Mr. Alonzo, alleging that the October 7, 2011 reassignment was racially discriminatory, and not to save Defendant money as was claimed. Plaintiff also alleged and asserted that Mr. Alonzo had conspired with Mr. Swindells to commit fraud to keep Mr. Swindells in travel status by falsely claiming and reporting that Mr. Swindells had to travel more than 50 miles from Mr. Swindells' home to the Long Island OFO, which allowed Mr. Swindells to collect per diem and other benefits and defraud Defendant out of thousands of dollars. (Agency Case No: HS-J 1-FEMA-21715-2012)

24.     On or about February 10, 2012, Plaintiff was contacted by the Logistics Group Supervisor, Jeffrey Cole, and told that Plaintiff's position was part of a twenty percent cut back of personnel mandated by the FCO in Albany, NY for all departments within the DR-4020/4031-NY disasters. Mr. Cole informed Plaintiff that Mr. Cole tried to persuade Mr. Butkus of the need for Plaintiff's position at the OFO Binghamton (Kirkwood) facility, but Mr. Butkus responded that the position was being terminated due to budget cuts and there would be no replacement.

25.     Immediately after the February 10, 2012 communication from Mr. Cole, Plaintiff called Mr. Paton who said that Plaintiff's demobilization date was set for February 24, 2012. Plaintiff then contacted Mr. Henggeler and asked if Mr. Swindells' Logistics Manager Position was also being terminated for the same reason as Plaintiff's. Mr. Henggeler responded that Mr. Swindells' position was not being terminated. Later that evening, Plaintiff expressed Plaintiff's

7

concerns separately to both the Operations Director, Mark Bezou, and Teresa Berry from Alternate Dispute Resolution (ADR), that the actions to demobilize Plaintiff were in retaliation for Plaintiff's January 2012 Individual Complaint of Discrimination.

26.     On or about, February 13, 2012, Plaintiff was advised that Mr. Bezou contacted Plaintiff's supervisor in Albany and expressed concerns over the termination of Plaintiff's position. Later that evening, Mr. Bezou called Plaintiff and updated Plaintiff that the decision to demobilize Plaintiff could be reversed and based on Mr. Bezou's conversation with Mr. Paton, things looked favorably for Plaintiff.

27.     On or about February 14, 2012, Mr. Cole approached Plaintiff and instructed Plaintiff that Mr. Butkus wanted Plaintiff out of New York the following day. Plaintiff was told to take the remainder of the day off to gather Plaintiff's personal belongings and return home the following day. After going through Plaintiff's schedule and things at the hotel, Plaintiff determined that it was impossible for Plaintiff to travel the next day. Plaintiff called Mr. Butkus and informed Mr. Butkus of a doctor's appointment that Plaintiff had scheduled for the following Monday. Plaintiff asked Butkus to honor the original demobilization date of February 24, 2012, set by Philip E. Parr, the Field Coordinating Officer (FCO). Mr. Butkus stated that Mr. Butkus was concerned with saving FEMA money. Mr. Butkus then allowed Plaintiff to delay Plaintiff's departure until Friday, February 17, 2012. Plaintiff then reported the actions of Mr. Butkus to Plaintiff's original ERO representative, Florence Nelson, who stated that Mr. Butkus' actions appeared to be in retaliation for Plaintiff's ERO complaint and that the claim about saving money for FEMA was an excuse.

28.     On or about March 23, 2012, Plaintiff supplemented his ERO's Individual Complaint of Discrimination against Defendant, alleging retaliation, discrimination, waste, fraud,

and abuse of power and Federal funds. The complaint detailed a scheme where John Alonso, acting Logistics Section Chief, instructed Laura Swedlow, Deputy Logistics Section Chief to find a way using Google maps to place the distance from Mr. Swindells' home to the OFO Hewlett in Long Island over the 50 mile mark, so Mr. Swindells would be in travel status during Mr. Swindells' reassignment to the OFO Long Island. Plaintiff alleged that Mr. Swindells was improperly collecting rental car, hotel, daily M&I, toll charges and gas reimbursement expenses, and this was done with the knowledge, agreement and approval of Plaintiff's superiors' including: Mr. Paton, Mr. Connelly, Ms. Swedlow, Mr. Alonso and Mr. Butkus, who used their 'signature authority' to improperly validate Mr. Swindells' travel vouchers.

29.     On April 10, 2012, the Federal Emergency Management Agency (FEMA) accepted Plaintiff's EEO complaint of discrimination based on race (African American) and retaliation in relation to Defendant's October 6, 2011 reassignment of Plaintiff, and Defendant's February 24, 2012, demobilization of Plaintiff and the acceleration of Defendant's February 24, 2012 demobilization of Plaintiff to February 17, 2012. (Agency Case No: HS-J 1-FEMA-21715-2012)

30.     The February 2012 demobilization and January 2012 demotion of Plaintiff in Defendant's FQS from Logistics Manager to Logistics System Specialist Trainee, left Plaintiff without work and deprived of an income for most of the next two years, before Plaintiff was hired by Defendant in June 2014. During this time, Plaintiff lost his house, suffered physical and mental health symptoms and was unable to financially support Plaintiff's self and family.

31.     In April 2014, Defendant (DHS/FEMA) posted ninety-six (96) Incident Management Assistant Team (IMAT) Positions through the USAJOBS website. A record number of sixteen thousand, three hundred and forty-four for (16,344) applicants applied for

9

these positions.  That number was later pared to 300 selectees, including Plaintiff, who took part in a pre-screening telephone interview.  Plaintiff was subsequently invited to travel to the Center for Disaster Preparedness (CDP) in Anniston, AL, for a final and formal interview scheduled on May 5, 2014.

32.     On May 5, 2014, Plaintiff interviewed against two other individuals for the East-2 IMAT, Services Branch Director I position.  Later that evening, Plaintiff received a phone call from April Benson, one of Plaintiff's interviewers, who indicated that the position was offered to Plaintiff.  About an hour later, Plaintiff received a letter rescinding the position offer.

33.     On or about June 8, 2014, Plaintiff arrived at a week-long Incident Support Base (ISB) Exercise in Denton, Texas.  At that exercise, Plaintiff saw Bryon D. Grable, a GS-14 Chief, Logistics Branch for Region VII, Response Division, located in Kansas City, Missouri, who Plaintiff knew from past disaster deployments.  Plaintiff told Mr. Grable about the May 5, 2014, job offer and subsequent rescission.

34.     On or about Monday, June 16, 2014, Mr. Grable called Mr. Justo Hernandez, Field Coordinating Officer (FCO) and IMAT East hiring authority and inquired about the May 2014 rescission of the job offer to Plaintiff.  After the call with M. Hernandez, Mr. Grable told Mr. Wilson that Mr. Grable was advised that Mr. Paton, who was recently selected as Logistics Section Chief for IMAT East, did not want to work with Mr. Wilson, and interfered to have the position offered to Plaintiff rescinded.  Mr. Paton was alleged in Plaintiff's ERO Individual complaint to have improperly signed off on Mr. Swindells' fraudulent travel vouchers.

35.     On or about June 29, 2014, Plaintiff was hired by Defendant as an IMAT Support Branch Director II assigned to Region VII, Kansas City, MO in a full-time position with the

Incident Management Assistant Team (IMAT), as a Support Branch Director, Cadre On-Call Response/Recovery (CORE) employee. Plaintiff's appointment was for four (4) years.

36.     Plaintiff's First line supervisor was, Mr. Ralph B. Meyers, IMAT Logistics Section Chief and second line supervisor was, IMAT, Team Lead, and Deputy Federal Coordinating Officer, Mr. DuWayne W. Tewes. Both Mr. Meyers and Mr. Tewes are Caucasian Americans.

37.     On or about July 6, 2014, Plaintiff attended a ten-and-a-half-week IMAT training course at the CDP in Anniston, AL. During this training course Plaintiff had to interact everyday with Dan Paton and Justo Hernandez, attending the same classroom courses and participating in group exercises. This caused Plaintiff to experience serious anxiety, causing Plaintiff to have a panic attack when the entire team participated in a physical activity. Consequently, Plaintiff notified Mr. Meyers and Mr. Tewes about Plaintiff's ongoing EEOC case involving Mr. Paton, Mr. Alonzo and others, and Mr. Paton's intervention to rescind a job offer that was given to Plaintiff. Plaintiff also disclosed Plaintiff's related medical and mental conditions involving anxiety and depression pertaining to the ongoing EEOC case.

38.     In March 2015, Plaintiff received notification that Region VII IMAT and Mr. Paton's East-2 IMAT Team would participate in a week long Nuclear Detonation Exercise in Jefferson City, Missouri. Plaintiff developed anxiety about the exercise after getting notification, and remained anxious for the two months leading up to the exercise. In response, Plaintiff again updated Mr. Meyers of Plaintiff's mental health conditions coping with stress, depression and severe anxiety attacks relating to Plaintiff's unresolved EEOC, involving Mr. Paton, and about Mr. Paton's intervention to rescind a May 2014, job position that was offered to Plaintiff.

39.     Sometime in March 2015, Plaintiff began asking Mr. Meyers if Plaintiff and a coworker could telework. Since January 2015, only Plaintiff and this coworker, of the twelve (12) member IMAT team for Region VII, were not allowed to telework. Plaintiff and the coworker were the only two minorities on the twelve (12) member IMAT team for Region VII. Mr. Myers however, without valid reasons denied the Plaintiff's request to telework.

40.     In April 2015, Plaintiff received an exceed expectations performance evaluation rating from his first and second-line supervisors.

41.     On or about May 4, 2015, Plaintiff's Region VII IMAT and Mr. Paton's East-2 IMAT Teams participated in a weeklong Nuclear Detonation Exercise in Jefferson City, MO, where Plaintiff was required to attend. During the exercise, Plaintiff was forced to sit at the same table as Mr. Paton which caused Plaintiff to experience severe chest pain during the time.

42.     In May 2015, Plaintiff again approached Mr. Meyers about the request to telework and the bias in denying only Plaintiff and another minority employee telework. Plaintiff notified Mr. Meyers that Plaintiff would complain and report the denial of telework to the Second-Line Supervisor, IMAT, Team Lead, DuWayne W. Tewes, and up the chain of command, which Plaintiff did.

43.     On or about June 11, 2015, Mr. Meyers issued Plaintiff an Official Letter of Reprimand ("LOR"), alleging failure to follow instructions and lack of candor against Plaintiff.

44.     On or about July 17, 2015, Plaintiff made Initial Contact with Defendant's ERO registering a complaint that the denial of telework and the issuing of the LOR were discriminatory and retaliatory respectively.   On July 29, 2015 Defendant's ERO interviewed Plaintiff about Plaintiff's claim of discrimination and retaliation.

45.     On August 26, 2015, Defendant' EEO Counselor contacted Mr. Meyers and Mr. Tewes and notified they of "Plaintiff request for EEO Counseling alleging discrimination and retaliation based on his race as an African American and sex as a male, pertaining to the denial of Plaintiff's telework request and the June issuance of the LOR.

46.     On or about September 21, 2015, Plaintiff filed another Individual Complaint of Employment Discrimination and Retaliation against Defendant's through the ERO alleging race discrimination and retaliation by Mr. Meyers in denying Plaintiff's telework requests and June 11, 2015 LOR issued to Plaintiff. (Agency under case No.: HS-FEMA-24518-2015).

47.     From September 2015 to October 2015, on two occasions, Mr. Meyers and Mr. Tewes denied Plaintiff the ability to utilize Purchase Card (P-Card), a function of Mr. Wilson's position.

48.     From August 2015 to March 2016, Mr. Myers and or Mr. Tewes denied Plaintiff the opportunity to become Disaster Alternative Approving Official (DAAO) despite Plaintiff completing the required training several months before the start of Plaintiff's deployment to the disaster.

49.     In November 2015, Mr. Wilson communicated with Mr. Meyers, and other superiors about Ms. Rosa Thomas, an African American subordinate, for who Mr. Wilson was the first line supervisor.  Mr. Meyers initially incorrectly and inappropriately designated Ms. Thomas as a Supply Manager on the organizational chart dated, November 4, 2015. Then on November 16, 2015, he corrected her official title to "Supply Unit Lead (SPUL)" with no oversight over the Accountable Property Officer (APO) Component. Mr. Wilson requested that Mr. Myers follow guidelines "mandated by the current FEMA Qualifications System (FQS) and the 2013 FEMA Incident Management Handbook (IMH) for a Supply Unit Lead", and allow Ms.

Thomas "a fair opportunity to manage, supervise and mentor the APO Component of our Logistics Section on this disaster." However, Mr. Meyers refused to correct the egregious action. Consequently, on or about November 25, 2015, Ms. Thomas filed a complaint with Defendant's ERO.   Subsequently, Mr. Wilson participated in the investigation of Ms. Thomas' ERO complaint, where he supported Ms. Thomas' allegation of discrimination regarding the designation and restrictions imposed on her position.

50.     In January 2016, Jacquelyn Seymour, Equal Rights Advisor, was deployed to Jefferson City, MO (DR 4238/4250). Upon deployment Ms. Seymour was brief by Mr. Tewes that Patricia Glenn, Equal Rights Advisor, had counseled Mr. Meyers and Ms. Sheila Turnis regarding their treatment of their African American logistics staff, including Ms. Thomas and Ms Cedeno.

51.     On one occasion, before Mr. Wilson's May 2016 termination, Mr. Tewes asked Ms. Seymour if Mr. Wilson had talked with Ms. Seymour about Mr. Wilson's EEOC complaint. Mr. Tewes then discussed Mr. Wilson EEOC allegations with Ms. Seymour and stated that Mr. Wilson was "lazy". Ms. Seymour immediately understood the statement as a racial derogatory reference and stereotyping of Mr. Wilson as an African American man. In response to Ms. Seymour's inquiry if training could help Mr. Wilson, Mr. Tewes told Ms. Seymour that Mr. Wilson would not be receiving any training.

52.     In January 2016, Mr. Wilson contacted Ms. Seymour on behalf of Ms. Carrie Cedeno, an African American, for who Mr. Wilson was first line supervisor. Mr. Wilson believed that Ms. Cedeno was treated discriminatorily, because a deployment which was confirmed for Ms. Cedeno, was given to a Caucasian Reservist. Before contacting Ms. Seymour,

Mr. Wilson had been advocating for Ms. Cedeno to his superiors. Ms. Cedeno subsequently spoke to Ms. Seymour about the deployment issues and filled out an ERO complaint form.

53.     On February 19, 2016, Mr. Myers gave Plaintiff an unsatisfactory performance evaluation.

54.     During February 2016, Mr. Meyer and or Mr. Tewes denied Plaintiff the job duty and privilege of providing signature authority to his staff for both WebTA and Concur Solutions, (For travel vouchers).

55.     On or about March 31, 2016, Plaintiff was directed to demobilize on April 1, 2016.

56.     During April 2016, Mr. Meyers improperly ordered Mr. Wilson to singularly lift equipment requiring two person to lift, and physically carry equipment that was assigned to the office for inspections and accountability.

57.     On April 25, 2016, Mr. Meyers and or Mr. Tewes denied Mr. Wilson training for the E/L 06011-FEMA Incident Workforce Academy (FIWA), Tier II for Command and General Staff at the Emergency Management Institute (EMI) scheduled for September 12-16, 2016.

58.     On May 19, 2016, Mr. Meyers and or Mr. Tewes denied Mr. Wilson work duties and opportunity to  train, mentor, or sign off on Plaintiff's staff Position Task Books (PTBs). All of Plaintiff's other 10 coworkers, Caucasian males and females, were allowed to have their PTBs signed off as completed.

59.     On May 19, 2016, Mr. Meyers and or Mr. Tewes denied Mr. Wilson the opportunity to have a coach evaluator for disaster FEMA-DR-4238-MO.

60.     On May 20, 2016, Mr. Meyers and or Mr. Tewes fired Mr. Wilson from his appointment as a Core Supply Management Specialist, AD-2003-00, Region VII, Response Division.

61.     Mr. Wilson was the only African American, along with a Hispanic coworker, who were minorities on the twelve (12) member IMAT team for Region VII. The other team members were Caucasian Americans, males and females. Mr. Myers and Mr. Tewes treated the Caucasian American team members more favorably than Mr. Wilson, with respect to the allegations in paragraphs 47-48 and 53-60, incorporated herein by reference.

62.     Additionally, similarly situated Caucasian American female team members, including Janilyn R. Falconer, Finance & Administration Section Chief, Female, Caucasian, and Michaela Koverman, Individual Assistance Branch Director, were allowed to Telework, given EL06011 Training Course and other training, allowed Position Task Book Signed Off, given Coach Evaluator, and given WebTA & Concur Solutions Signature Authority, all of which were denied to Mr. Wilson.

63.     Following Plaintiff's July 2014 disclosure to Mr. Meyers and Mr. Tewes about Mr. Wilson's ongoing EEOC case, involving Mr. Paton, and Plaintiff's subsequent advocacy and or initiation of ERO complaint on behalf of African American employees, and Plaintiff's own behalf, alleging race discrimination and retaliation, Mr. Meyers and Mr. Tewes took actions to harass, bully and humiliate Mr. Wilson in the conduct and function of his position. This includes the actions by Mr. Tewes and or Mr. Meyers as alleged in paragraphs 47-48 and 53-60, incorporated herein by reference.

64.     Furthermore, Mr. Meyers employed tactics of intimidation and verbal assaults in his interactions and supervision of Mr. Wilson, as Mr. Wilson's first line supervisor. Almost on a

daily basis, Mr. Meyers would demean and belittle Mr. Wilson, while Mr. Tewes would have discussions with Ms. Seymour raising issues about Mr. Wilson. The constant attack and actions undermining Mr. Wilson job performance, aggravated Mr. Wilson's mental health conditions and resulted in Mr. Wilson having repeated or long absences from work.

65.     On or about August 30, 2018, Defendant's issued a report, stating in part that: "The agency fully substantiated Mr. Wilson's allegations. FEMA's investigation determined that Mr. Swindells, in coordination with his supervisors, John Alonzo, Logistics Chief, and Laura Swedlow, Deputy Logistics Chief, conspired to generate a false driving route that made Mr. Swindells seem eligible for travel reimbursement during FEMA's disaster response to Hurricane Irene. The falsified documents submitted by Mr. Swindells created the appearance that his home address was sufficiently distant from his FEMA duty station to meet agency reimbursement eligibility requirements. Mr. Swindells fraudulent driving route resulted in approximately $31,500 in reimbursed temporary duty location expenses."

## VII.    COUNT ONE
### Employment Race Discrimination
### In Violation of Title VII, Section 1981 & Section 1983

66.     Plaintiff incorporates all paragraphs as though fully set forth herein and further alleges that at all times relevant hereto the Plaintiff suffered disparate treatment discrimination because of his race as an African American.

67.     Defendant intentionally, with malice and reckless indifference to federal, state, and local laws prohibiting race discrimination in employment, treated the Plaintiff adversely, while similarly situated Caucasian American employees were treated more favorably in the terms and conditions of employment including deployment, reassignment, mobilization and

17

demobilization, hiring, performance evaluation, duties and assignments, pay raise, disciplinary action and termination of employment. Including, but not limited to, for example:

      a.    Mr. Swindells was treated more favorably than Plaintiff, when in October 2011, Mr. Alonzo agreed to conspire with Mr. Swindells to defraud Defendant with the pretext to reassign Mr. Swindells to Plaintiff's position. This was also true in the matter of Plaintiff's February 2012 demobilization, where Mr. Swindells was kept deployed, based on a scheme to defraud Defendant of thousands of dollars, while claiming Plaintiff's demobilization was to save Defendant money.

      b.    Plaintiff and a Hispanic coworker were the only members of the IMAT team for Region VII, that were denied the opportunity to telework. The team has twelve (12) members, with only Plaintiff the Hispanic coworker as minorities.

68.    Between September 2015 and Plaintiff's May 2016 termination, Plaintiff was denied several work privileges, and benefits as alleged in paragraphs 47-48 and 53-60, incorporated herein by reference.

69.    The race discrimination suffered by the Plaintiff adversely affected the terms, conditions, and privileges of his employment.

70.    Defendant had actual and/or constructive knowledge about the race discrimination and disparate treatment and not only failed to take prompt and adequate remedial action, but participated in the racially motivated discriminatory conduct and disparate treatment of the Plaintiff.

71.    As a direct and proximate result of this employment race discrimination and disparate treatment, the Plaintiff has suffered the loss of employment, loss of income and

benefits, and has suffered injury to his reputation, injury to his career, pain, mental anguish, and humiliation; and, faces irreparable harm and future losses.

## VIII.   COUNT TWO
### Employment Sex and Gender Discrimination
### In Violation of Title VII, Section 1981 & Section 1983

72.     Plaintiff incorporates all paragraphs as though fully set forth herein and further alleges that at all times relevant hereto the Plaintiff suffered disparate treatment discrimination because of his sex and gender as a male.

73.     Defendant intentionally, with malice and reckless indifference to federal, state, and local laws prohibiting gender discrimination in employment, treated the Plaintiff adversely, while similarly situated female employees were treated more favorably in the terms and conditions of employment, including team members, Janilyn R. Falconer, Finance & Administration Section Chief, and Michaela Koverman, Individual Assistance Branch Director, who were allowed to Telework, given EL06011 Training Course and other training, allowed Position Task Book Signed Off, given Coach Evaluator, and given WebTA & Concur Solutions Signature Authority, all of which were denied to Mr. Wilson.

74.     The gender discrimination suffered by the Plaintiff adversely affected the terms, conditions, and privileges of his employment.

75.     Defendant had actual and/or constructive knowledge about the disparate treatment gender discrimination and not only failed to take prompt and adequate remedial action, but participated in the discriminatory conduct and disparate treatment of the Plaintiff.

76.     As a direct and proximate result of this disparate treatment sex discrimination, the Plaintiff has suffered the loss of employment, loss of income and benefits, and has suffered

19

injury to his reputation, injury to his career, pain, mental anguish, and humiliation; and, faces irreparable harm and future losses.

## IX.    COUNT THREE
### Retaliation in Violation of Title VII, Section 1981 & Section 1983

77.     Plaintiff incorporates all paragraphs as though fully set forth herein and further alleges that at all times relevant hereto the Plaintiff suffered retaliation in violation of the provisions of Title VII, for engaging in the protected activity of reporting the illegal and discriminatory actions of Mr. Alonzo, Mr. Butkus, Mr. Paton, Mr. Myers, Mr. Tewes and others, and for filing and participating in the investigation of the internal and external ERO and EEO complaints for Plaintiff and other African American Employees, including Ms. Thomas and Ms. Cedeno.

78.     Defendant intentionally, with malice and reckless indifference to federal, state, and local laws prohibiting retaliation against employees who complain against discrimination in employment, retaliated against the Plaintiff for filing internal and external EEO/EEOC complaints and for pursuing race discrimination and retaliation claims against Defendant.

79.     The retaliatory conduct the Plaintiff was subjected to, detail in the foregoing paragraphs, constituted adverse employment actions, against Plaintiff, and was causally linked to Plaintiff filing and participating in the EEO investigation and pursuing race discrimination and retaliation complaints against Defendant.

80.     The retaliatory actions taken against the Plaintiff constituted adverse employment actions and altered the terms, conditions and privilege of Plaintiff's employment with Defendant inter alia, the following manner:

a. In October 8, 2011, Defendant abruptly and illegally reassigned and replaced Plaintiff with Mr. Wilson's Caucasian American counterpart Mr. Swindells.

20

b.  In February 17, 2012, Defendant abruptly and illegally demobilized Plaintiff from deployment.

c.  In May 2014 Defendant maliciously rescinded a East-2 IMAT Services Branch Director II position that Defendant offered to Plaintiff, after Mr. Paton, who was a subject in Plaintiff's ongoing EEOC case objected.

d.  In June 2015, Mr. Meyers issued Plaintiff a LOR, which was subsequently used as pretext to fire Plaintiff.

e.  In February 2016, Mr. Meyers gave Plaintiff an unsatisfactory performance rating, which was later used as a pretext to fire Plaintiff.

f.  Following Mr. Wilson's July 2014 disclosure to Mr. Meyers and Mr. Tewes about Mr. Wilson's ongoing EEOC case, involving Mr. Paton, and Plaintiff's subsequent advocacy and or initiation of ERO complaint on behalf of African American employees, and Plaintiff's own behalf, alleging race discrimination and retaliation, Mr. Meyers and Mr. Tewes took a series of actions against Mr. Wilson as alleged in paragraphs 47-48 and 53-60, incorporated herein by reference.

g.  In May 2016 Mr. Meyers and Mr. Tewes terminated Plaintiff's employment.

81.    The adverse actions against Plaintiff are casually related to Plaintiff's protected activities, in that the adverse actions occurred in days and weeks and few months after Plaintiff's protected activities.

82.    Defendant were fully aware of the retaliatory acts against the Plaintiff detailed in the foregoing paragraphs and were deliberately indifferent by disregarding the known or obvious conduct toward the Plaintiff, and actually participated in the retaliation against the Plaintiff.

83.     As a direct and proximate result of the discriminatory retaliation, the Plaintiff has

suffered the loss of income and benefits, and has suffered injury to his reputation, injury to his

career, pain, mental anguish, and humiliation; and, faces irreparable harm and future losses.

## X.     COUNT FOUR
### Retaliation In Violation of The False Claims Act, 31 U.S.C. § 3730(H)

84.     FCA Section 3730(h)(1) ("Relief From Retaliatory Actions") states "Any

employee, contractor, or agent shall be entitled to all relief necessary to make that employee,

contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted,

suspended, threatened, harassed, or in any other manner discriminated against in the terms and

conditions of employment because of lawful acts done by the employee, contractor, or agent on

behalf of the employee, contractor, or agent or associated others in furtherance of other efforts to

stop 1 or more violations of this subchapter." "Section 3730(h) of the False Claims Act

("FCA"), of the 'whistleblower provision,' provides a relief mechanism to employees subjected

to an adverse employment action by employers for their efforts to prevent the employer from

engaging in fraud on the federal government." Layman v. Met Laboratories, Inc., 2013 U.S.

Dist. LEXIS 71038, at *18-19 (D. Md. May 20, 2013) (internal quotes and citations omitted).

To state a claim for retaliatory discharge, a Claimant must show (1) he engaged in activity

protected under the statute; (2) his employer knew he engaged in protected activity; and (3) that

he was discharged because he engaged in this protected activity. United States ex rel. Patton v.

Shaw Servs., L.L.C., 418 F. App'x 366, 371-72 (5th Cir. 2011).

85.     Starting in November 2011, Plaintiff initiated a complaint with Defendant's ERO

alleging employment discrimination pertaining to Plaintiff's October 2011 reassignment, where

Plaintiff also alleged that his superiors were replacing Plaintiff with Mr. Swindells based on a

fraudulent scheme to keep Mr. Swindells in travel status, although Mr. Swindells did not qualify or was eligible to be in travel status.

86.    On or about January 20, 2012, Plaintiff filed an Individual Complaint of Employment Discrimination against the action of Mr. Alonzo alleging that Mr. Wilson's October 2011 reassignment was racially discriminatory. The complaint included allegations of a conspiracy between Mr. Swindells and Mr. Alonzo to commit fraud to keep Mr. Swindells in travel status so that Mr. Swindell could improperly get per diem and other benefits from Defendant.

87.    On or about March 23, 2012, Plaintiff supplemented his ERO complaint against Defendant, alleging retaliation, discrimination, waste, fraud, and abuse of power and Federal funds. The complaint detailed a scheme where John Alonso, acting Logistics Chief instructed Laura Swedlow, Deputy Logistics Chief to find a way using Google maps to place the distance from Mr. Swindells' home to the OFO in Long Island over the 50 mile mark, so that he remain in travel status, while claiming rental car, hotel, daily M&I, toll fees and gas reimbursement expenses improperly.

88.    Defendant was directly and or indirectly motivated, to demobilize Plaintiff on February 24, 2012 because of Plaintiff's engagement in protected conduct by reporting the conspiracy and fraudulent scheme between Mr. Alonzo and Mr. Swindells in Plaintiff's November 2011 initial ERO complaint and Plaintiff's January 20, 2012, formal Individual Complaint of Employment discrimination. These protected activities, along with filing of the March 2012 supplement detailing and offering proof of Mr. Alonzo's and Mr. Swindells' fraud and conspiracy to keep Mr. Swindells in travel status, further motivated Defendant to demote Plaintiff on January 3, 2012, in the FEMA Qualification System (FQS), from Logistics Manager

23

to the position of Logistics System Specialist Trainee, virtually denying Plaintiff the ability to secure deployments via Defendant's Disaster Tracking System (DTS) for two and a half years. Furthermore, Defendant May 2014, revocation of a job offer to Plaintiff was ordered or directed by Mr. Paton, who was directly or indirectly implicated in the Plaintiff's EEO fraud allegations against Mr. Alonzo and Mr. Swindells, for signing Mr. Swindells travel vouchers.

89.     As a direct and proximate result of the discriminatory retaliation, the Plaintiff has suffered the loss of income and benefits, and has suffered injury to his reputation, injury to his career, pain, mental anguish, and humiliation; and, faces irreparable harm and future losses.

## XI.     COUNT FIVE
### Hostile Work Environment
### In Violation of Title VII, Section 1981 & Section 1983

90.     Plaintiff incorporates all paragraphs as though fully set forth herein and further alleges that at all times relevant hereto the Plaintiff suffered hostile work environment because of Plaintiff's race as an African American.

91.     A prima facie case of racial harassment alleging hostile work environment normally consists of five elements: (1) the employee belongs to a protected group; (2) the employee was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term condition or privilege of employment; (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 353 (5th Cir. 2001).

92.     Following Plaintiff's July 2014 disclosure to Mr. Meyers and Mr. Tewes about Mr. Wilson's ongoing EEOC case, involving Mr. Paton, and Plaintiff's subsequent advocacy and or initiation of ERO complaint on behalf of African American employees, and Plaintiff's own

24

behalf, alleging race discrimination and retaliation, Mr. Meyers and Mr. Tewes took actions to harass, bully and humiliate Mr. Wilson in the conduct and function of Mr. Wilson's job duties. This includes the actions by Mr. Tewes and or Mr. Meyers as alleged in paragraphs 47-48 and 53-60, incorporated herein by reference.

93.     Furthermore, Mr. Meyers employed tactics of intimidation and verbal assaults in his interactions and supervision of Mr. Wilson, as Mr. Wilson's first line supervisor. Almost on a daily basis, Mr. Meyers would demean and belittle Mr. Wilson, while Mr. Tewes would have discussions with Ms. Seymour raising issues about Mr. Wilson.   The constant attack and actions undermining Mr. Wilson job performance, aggravated Mr. Wilson's mental health conditions and resulted in Mr. Wilson having repeated or long absences from work.

94.     The hostile work environment discrimination suffered by the Plaintiff adversely affected the terms, conditions, and privileges of his employment.

95.     Defendant had actual and/or constructive knowledge about the hostile work environment discrimination and not only failed to take prompt and adequate remedial action, but participated in the hostile work environment discrimination against the Plaintiff.

96.     As a direct and proximate result of this hostile work environment discrimination, the Plaintiff has suffered the loss of employment, loss of income and benefits, and has suffered injury to his reputation, injury to his career, pain, mental anguish, and humiliation; and, faces irreparable harm and future losses.

## XII.   COUNT SIX
### Conspiracy in Violation of 42 U.S.C. § 1985(3)

97.     Plaintiff incorporates all paragraphs hereto, as though fully set forth herein, and further alleges that at all times relevant hereto Defendant conspired for the purposes of depriving Plaintiff of the equal protection of the laws in violation of 42 U.S.C. § 1985(3).

98.     To maintain a claim of conspiracy under Section 1985(3), plaintiff must allege "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the *United States.*" *Brown v. City of Oneonta*, 221 F.3d 329, 341 (2d Cir. 2000) (quotation omitted). The conspiracy must be motivated by "some racial or perhaps otherwise class-based, invidious discriminatory animus." *Palmieri v. Lynch*, 392 F.3d 73, 86 (2d Cir. 2004) (internal quotation marks omitted).

99.     Plaintiff's superiors, including Ms. Swedlow and Mr. Alonzo, conspired to reassign Plaintiff in October 2011 and demobilize Plaintiff in February 2012.

100.     Defendant conspired for the purpose of depriving plaintiff of the equal protection and privileges and privileges with respect to Plaintiff's employment and deployment, when Defendant reassigned and demobilized Plaintiff in October 2011 and February 2012, respectfully, revoked a job offered to Plaintiff in May 2014, and fired Plaintiff in May 2016.

101.     Defendant conduct in these regard were motivated impermissibly by Plaintiff's race, by retaliatory malice against the plaintiff for reporting actions of fraud, waste, abuse and conspiracy between Mr. Alonzo, Ms. Swedlow and other Plaintiff's superiors.

102.     In furtherance of the object of this conspiracy to deprive Plaintiff of the equal protection of the laws and his equal privileges and immunities under the laws, the Defendants have done or caused to be done the acts set forth in this complaint which resulted in Plaintiff being reassigned in October 2011, demobilized in February 2012, denied a job offer in May 2014, been given a poor performance evaluation in February 2016 and been terminated in May 2016.

103.    Plaintiff has suffered injury and damages in his person and property, with the loss of income and employment and development of emotional or mental health issues. Plaintiff's allegations as to damages in paragraph 74 are incorporated herein by reference.

## XIII.  DAMAGES

104.    As a direct and proximate result of Defendant's conduct, Mr. Wilson suffered injuries and damages, including but not limited to:

a.    Plaintiff was reassigned in October 2011 resulting in a loss of pay, benefits and stipends;

b.    Plaintiff was demobilized in February 2012 resulting in a more than 2-year lack of deployment or minimal deployment as a Reservist with resulting loss of income and benefit.

c.    Plaintiff was in January 2012, demoted in the FEMA Qualification System (FQS) from Logistics Manager to the position of Logistics System Specialist Trainee, denying Plaintiff the ability to secure deployments via Defendant's Disaster Tracking System (DTS) for two and a half years, with resulting loss of income and benefits.

d.    Denied employment offer in May 2014, with resulting loss of income and benefits.

e.    Reprimanded and given an unsatisfactory evaluation with adverse impact on income and benefits.

f.    Fired in May 2016 with resulting loss of income.

g.    Legal and medical bills and expenses incurred.

h.    Loss of family, home, reputation, and credit.

i.      Plaintiff eventually suffered severe mental anguish and emotional distress

in the form of depression, stress, anxiety, panic attacks, low self-esteem, inability to

sleep, weight gain, inability to socialize with others, lack of enjoyment from activities

Plaintiff used to like, upset stomach, headaches, migraines, skin rashes, indigestion,

bowel troubles, anger, frustration, feelings of hopelessness, shortness of breath, hot

flashes, poor concentration, difficulty making decisions, repeated and uncontrollable

thoughts about the way Plaintiff was treated at work, low energy, and fatigue.

## XIV.    ATTORNEY FEES

105.    Plaintiff is entitled to an award of attorney fees and costs under Title VII, 42
U.S.C. §2000e-5(k) and pursuant to other statutes under which this suit is brought.

## XV.    PRAYER

106.    WHEREFORE, Plaintiff prays that this Court enter judgment for him and against
the Defendant, and that this Court award Plaintiff such relief needed to make Plaintiff whole and
remedy the violations; hold the Defendant liable, and to award all legal and equitable relief the
law may allow; such as but not limited to:

a)      Declaratory and injunctive relief that declare the acts or policy of the Defendant's
unconstitutional;

b)      Compensatory damages to compensate for the actual harm sustained

c)      Statutory damages such as back pay and interest on back pay;

d)      Consequential damages for the natural consequential damages flowing from the
harm;

f)      Nominal damages;

g)      An award of reasonable attorney fees and litigation cost; and,

h)      Such other and further relief as may be deemed just and proper.

## XVI.   JURY TRIAL PRAYER

107.    Plaintiff asserts his rights under the Seventh Amendment to the U.S. Constitution

and demands, in accordance with Federal Rule of Civil Procedure 38, a trial by jury on all issues.

Respectfully Submitted,

George A. Rose, Esq.
Federal Bar # 26086
THE ROSE LAW FIRM, LLC
200 E. Lexington Street, Suite 1305
Baltimore, Maryland 21202
Phone: 410-727-7555 F: 443-320-0962
Email: grose@roselawfirm.net
*Counsel for Plaintiff Kenneth Duronn Wilson*