UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KENNETH DURON WILSON, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *   Civ. No: 20-0100 (ABJ) |
| | * |
| CHAD WOLF, Acting Secretary, | * |
| Department of Homeland Security | * |
| | * |
| Defendant. | * |

* * * * * * * * * * * * * * * * * * * *

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS,

Plaintiff, by and through his undersigned counsel, files this Plaintiff's Memorandum In Opposition To Defendant's Motion To Dismiss (Dkt. No. 10). Dismissal is improper in this case because Plaintiff's Complaint and Jury Demand set forth claims on which relief can be granted, and state plausible claims "for relief' that 'permit[s] the court to infer more than the mere possibility of misconduct' based upon 'its judicial experience and common sense.'" Coleman v. Maryland Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, ___ U.S.___, 132 S. Ct. 1327, 182 L. Ed. 2d 296 (2012) (citation omitted).

### INTRODUCTION

Plaintiff is Kenneth Wilson and defendant is Chad Wolf, Acting Secretary , Department of Homeland Security ("Defendant"). On January 14, 2020, Plaintiff filed a Complaint and Jury Demand against Defendant for Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. Sections 2000e et seq., ("Title VII"), the Civil Rights Act of 1866 as amended, 42 U.S.C.§ 1981, ("Section 1981"), 42, U.S.C. § 1983, ("Section 1983), The False Claims Act, 31 U.S.C. § 3730 (FCA) and, 42, U.S.C. § 1985, et seq. ("Section 1985). On May 11, 2020 Defendant filed its Motion to Dismiss.

1

**STATEMENT OF FACTS**

Defendant employed Plaintiff as a reservist on or about September 27, 2006. (Compl. ¶12) Between August 2011 and February 2012, Plaintiff was deployed to work in New York as Logistics Manager, D-1, in Long Island, NY. (Compl. ¶13) During this time Plaintiff's supervisors included Timothy Henggeler, Jeffery Cole, Tom Szmyr, Dan Paton, Laura Swedlow, John Alonso and Gary Butkus. (Compl. ¶14)

On or about October 6, 2011, Mr. Alonzo falsely accused Plaintiff of assignment delays and failing to assist other crews. Mr. Alonzo initiated an investigation to justify blaming Plaintiff. Mr. Alonso however refused to accept the statements of two African Americans crew members corroborating that Plaintiff was innocent, and only accepted Plaintiff's innocence, after receiving a statement from a Caucasian American crew member who corroborated Plaintiff. (Compl. ¶16)

On or about October 7, 2011, Plaintiff was notified of his immediate reassignment. Plaintiff was told that Paul Swindells, a Logistics Manager, would replace Plaintiff to save Defendant money, because Mr. Swindells lived less than fifty (50) miles from the Long Island office, and Defendant would not have to pay for lodging and per diem for Mr. Swindells.   (Compl. ¶18) However, Mr. Swindells told Plaintiff that the reassignment involved a scheme to manipulate the route and mileage between Mr. Swindell's home and the Long Island office to show more than fifty (50) miles, and allow Mr. Swindells to be in travel status and receive associated per diem and other benefits. The actual miles between Mr. Swindells home and the Long Island office was less than 50 miles. (Compl. ¶19)

On November 18, 2011, Plaintiff initiated contact with the Defendant's Equal Rights Office ("ERO") and lodged a grievance or complaint that Plaintiff's reassignment to the OFO Binghamton, NY was due to race discrimination and involved a fraudulent scheme to keep Mr. Swindells in travel status.  (Compl. ¶20) On or about January 3, 2012, Plaintiff was demoted in

2

Defendant's FEMA Qualification System (FQS). This virtually denied Plaintiff the ability to secure deployments via Defendant's Disaster Tracking System (DTS) for two and a half years. (Compl. ¶22)

On or about January 20, 2012, Plaintiff filed am Individual Complaint of Employment Discrimination with Defendant's ERO, against the actions of Mr. Alonzo, alleging that the October 7, 2011 reassignment was racially discriminatory, and not to save Defendant money as was claimed. Plaintiff also alleged and asserted that Mr. Alonzo had conspired with Mr. Swindells to commit fraud to keep Mr. Swindells in travel status by falsely claiming and reporting that Mr. Swindells had to travel more than 50 miles from Mr. Swindells' home to the Long Island OFO, which allowed Mr. Swindells to collect per diem and other benefits and defraud Defendant out of thousands of dollars. (Agency Case No: HS-J 1-FEMA-21715-2012) (Compl. ¶23)

On or about February 10, 2012, Plaintiff notified by Logistics Group Supervisor, Jeffrey Cole, that Mr. Butkus was eliminating Plaintiff's position, and demobilizing Plaintiff.  ¶24 On or about February 14, 2012, Mr. Cole instructed Plaintiff that Mr. Butkus wanted Plaintiff out of New York February 15, 2012.  Plaintiff asked Mr. Butkus to honor the original demobilization date of February 24, 2012, set by Philip E. Parr, the Field Coordinating Officer (FCO).  However, Mr. Butkus refused and allowed Plaintiff to delay Plaintiff's departure until Friday, February 17, 2012 for Plaintiff to take care of a medical appoinment.   (Compl. ¶27)

On or about March 23, 2012, Plaintiff supplemented his ERO's Individual Complaint of Discrimination against Defendant, alleging retaliation, discrimination, waste, fraud, and abuse of power and Federal funds. Plaintiff alleged that Mr. Swindells was improperly collecting rental car, hotel, daily M&I, toll charges and gas reimbursement expenses, and this was done with the knowledge, agreement and approval of Plaintiff's superiors' including: Mr. Paton, Mr.  Connelly,

3

Ms. Swedlow, Mr. Alonso and Mr. Butkus, who used their 'signature authority' to improperly validate Mr. Swindells' travel vouchers. (Compl. ¶28)

The February 2012 demobilization and January 2012 demotion of Plaintiff in Defendant's FQS, from Logistics Manager to Logistics System Specialist Trainee, left Plaintiff without work and deprived of an income for most of the next two years. During this time, Plaintiff lost his house, suffered physical and mental health symptoms and was unable to financially support Plaintiff's self and family.  (Compl. ¶30)

On May 5, 2014, Defendant hired Plaintiff for the East-2 IMAT, Services Branch Director I position.  However, shortly thereafter, Plaintiff received a letter rescinding the position offer. ¶32 On or about Monday, June 16, 2014, Mr. Justo Hernandez, Field Coordinating Officer (FCO) and IMAT East hiring authority advised that Mr. Paton, intervened and interfered to rescind the Service Branch Director I position offered to Plaintiff. Mr. Paton was alleged in Plaintiff's ERO Individual complaint to have improperly signed off on Mr. Swindells' fraudulent travel vouchers. (Compl. ¶34)

On or about June 29, 2014, Plaintiff was hired by Defendant as an IMAT Support Branch Director II assigned to Region VII, Kansas City, MO in a full-time position with the Incident Management Assistant Team (IMAT). (Compl. ¶35) Plaintiff's First line supervisor was, Mr. Ralph B. Meyers, IMAT Logistics Section Chief and second line supervisor was, IMAT, Team Lead, and Deputy Federal Coordinating Officer, Mr. DuWayne W. Tewes.  Both Mr. Meyers and Mr. Tewes are Caucasian Americans. (Compl. ¶36)

On or about July 6, 2014, Plaintiff attended a ten-and-a-half-week IMAT training course, which was also attended by Dan Paton and Justo Hernandez. The experience of closely interacting with Dan Panton and Justo Hernandez caused Plaintiff to experience serious anxiety and suffer a

4

panic attack. Consequently, Plaintiff notified Mr. Meyers and Mr. Tewes about Plaintiff's ongoing EEOC case involving Mr. Paton, Mr. Alonzo and others, and about Mr. Paton's intervention to rescind a job offer that was given to Plaintiff in May 2014, and about Plaintiff's related medical and mental health conditions involving anxiety and depression pertaining to the ongoing EEOC case. (Compl. ¶37) In March 2015, after Plaintiff received notice of a weeklong exercise in which Plaintiff and Mr. Panton would have to interact closely, Plaintiff developed anxiety and spoke to his supervisor about the situation. (Compl. ¶38) On or about May 4, 2015, Plaintiff's was required to attend and participate the weeklong training exercise, interacting closely with Mr. Paton. As a result, Plaintiff experience severe chest pain during the time. (Compl. ¶41)

Sometime in March 2015, Plaintiff began asking Mr. Meyers about telework for Plaintiff and a coworker, because since January 2015, only Plaintiff and this coworker, of a twelve (12) member IMAT team for Region VII, were not allowed to telework. Plaintiff and the coworker were the only two minorities on the twelve (12) member IMAT team for Region VII. Mr. Myers however, without valid reasons denied the Plaintiff's request to telework. (Compl. ¶43) In May 2015, Plaintiff again approached Mr. Meyers about the request to telework and the bias in denying only Plaintiff and another minority employee telework. Plaintiff notified Mr. Meyers that Plaintiff would complain and report the denial of telework up the chain of command, which Plaintiff did. (Compl. ¶42 )

On or about June 11, 2015, Mr. Meyers issued Plaintiff an Official Letter of Reprimand ("LOR"), alleging failure to follow instructions and lack of candor against Plaintiff. (Compl. ¶43) On or about September 21, 2015, Plaintiff filed another Individual Complaint of Employment Discrimination and Retaliation against Defendant's through the ERO alleging race discrimination

5

and retaliation by Mr. Meyers in denying Plaintiff's telework requests and June 11, 2015 LOR issued to Plaintiff. (Agency under case No.: HS-FEMA-24518-2015). (Compl. ¶46)

From September 2015 to October 2015, on two occasions, Mr. Meyers and Mr. Tewes denied Plaintiff the ability to utilize Purchase Card (P-Card), a function of Mr. Wilson's position. ¶47 From August 2015 to March 2016, Mr. Myers and or Mr. Tewes denied Plaintiff the opportunity to become Disaster Alternative Approving Official (DAAO) despite Plaintiff completing the required training several months before the start of Plaintiff's deployment to the disaster. (Compl. ¶48)

In Early 2016, Mr. Meyers briefed Jacquelyn Seymour, Equal Rights Advisor, that Patricia Glenn, Equal Rights Advisor, had counseled Mr. Meyers and Ms. Sheila Turnis regarding their treatment of their African American logistics staff, (Compl. ¶50) On one occasion, Mr. Meyers remarked to Ms. Seymour that Plaintiff was "lazy", which Ms. Seymour immediately understood the statement as a racial derogatory reference and stereotyping of Plaintiff as an African American man. In response to Ms. Seymour's inquiry if training could help Mr. Wilson, Mr. Tewes told Ms. Seymour that Mr. Wilson would not be receiving any training. (Compl. ¶51)

On February 19, 2016, Mr. Myers gave Plaintiff an unsatisfactory performance evaluation. (Compl. ¶53) During February 2016, Mr. Meyer and or Mr. Tewes denied Plaintiff the job duty and privilege of providing signature authority to his staff for both WebTA and Concur Solutions, (For travel vouchers). (Compl. ¶54) On or about March 31, 2016, Plaintiff was directed to demobilize on April 1, 2016. (Compl. ¶55)

During April 2016, Mr. Meyers improperly ordered Mr. Wilson to singularly lift equipment requiring two person to lift, and physically carry equipment that was assigned to the office for inspections and accountability. (Compl. ¶56)

On April 25, 2016, Mr. Meyers and or Mr. Tewes denied Mr. Wilson training for the E/L 06011-FEMA Incident Workforce Academy (FIWA), Tier II for Command and General Staff at the Emergency Management Institute (EMI) scheduled for September 12-16, 2016. (Compl. ¶57)

On May 19, 2016, Mr. Meyers and or Mr. Tewes denied Mr. Wilson work duties and opportunity to train, mentor, or sign off on Plaintiff's staff Position Task Books (PTBs). All of Plaintiff's other 10 coworkers, Caucasian males and females, were allowed to have their PTBs signed off as completed. (Compl. ¶ 58)

On May 19, 2016, Mr. Meyers and or Mr. Tewes denied Mr. Wilson the opportunity to have a coach evaluator for disaster FEMA-DR-4238-MO.  (Compl. ¶59)

On May 20, 2016, Mr. Meyers and or Mr. Tewes fired Mr. Wilson from his appointment as a Core Supply Management Specialist, AD-2003-00, Region VII, Response Division.  (Compl. ¶60)

Mr. Wilson was the only African American, along with a Hispanic coworker, who were minorities on the twelve (12) member IMAT team for Region VII. The other team members were Caucasian Americans, males and females.  Mr. Myers and Mr. Tewes treated the Caucasian American team members more favorably than Mr. Wilson, with respect to the allegations in paragraphs 47-48 and 53-60, incorporated herein by reference.  (Compl. ¶61)

Following Plaintiff's July 2014 disclosure to Mr. Meyers and Mr. Tewes about Mr. Wilson's ongoing EEOC case, involving Mr. Paton, and Plaintiff's subsequent advocacy and or initiation of ERO complaint on behalf of African American employees, and Plaintiff's own behalf, alleging race discrimination and retaliation, Mr. Meyers and Mr. Tewes took actions to harass, bully and humiliate Mr. Wilson in the conduct and function of his position.  This includes the

7

actions by Mr. Tewes and or Mr. Meyers as alleged in paragraphs 47-48 and 53-60, incorporated herein by reference. (Compl. ¶63)

Furthermore, Mr. Meyers employed tactics of intimidation and verbal assaults in his interactions and supervision of Mr. Wilson, as Mr. Wilson's first line supervisor. Almost on a daily basis, Mr. Meyers would demean and belittle Mr. Wilson, while Mr. Tewes would have discussions with Ms. Seymour raising issues about Mr. Wilson. The constant attack and actions undermining Mr. Wilson job performance, aggravated Mr. Wilson's mental health conditions and resulted in Mr. Wilson having repeated or long absences from work. (Compl. ¶64)

On or about August 30, 2018, Defendant's issued a report, stating in part that: "The agency fully substantiated Mr. Wilson's allegations. FEMA's investigation determined that Mr. Swindells, in coordination with his supervisors, John Alonzo, Logistics Chief, and Laura Swedlow, Deputy Logistics Chief, conspired to generate a false driving route that made Mr. Swindells seem eligible for travel reimbursement during FEMA's disaster response to Hurricane Irene. The falsified documents submitted by Mr. Swindells created the appearance that his home address was sufficiently distant from his FEMA duty station to meet agency reimbursement eligibility requirements. Mr. Swindells fraudulent driving route resulted in approximately $31,500 in reimbursed temporary duty location expenses." (Compl. ¶65)

## STANDARD OF REVIEW

To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (internal citations and alterations omitted). Thus, the plaintiff's obligation is to set forth sufficiently the "grounds of his entitlement to relief," offering more than "labels and conclusions." Id. (internal quotation marks and alterations omitted).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).

The Court may, under Rule 12(b)(6), and without converting the Motion to Dismiss into a Motion for Summary Judgment, consider exhibits insofar as they are "integral to and explicitly relied on in" the Complaint and to the extent that their authenticity is not challenged by the plaintiff. *Am. Chiropractic v. Trigon Healthcare*, 367 F.3d 212, 234 (4th Cir. 2004) (internal citation removed); *see also Tellabs, Inc. v. Makor Issues & Rights, LTD*, 551 U.S. 308, 322, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) (court may consider "documents incorporated into the complaint by reference").

In the employment discrimination context, a plaintiff need not establish a *prima facie* case in order to survive a motion to dismiss. *McDonnell Douglas Corp v. Green,* 411 U.S. 792, 802 (1973); *See also Sweierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002) (concluding that "the prima facie case…is an evidentiary standard, not a pleading requirement."). The standard to be applied when evaluating a motion to dismiss for failure to state a claim is very liberal in favor of the party opposing the motion. *Westlake v. Lucs*, 537.F.2d 857, 858 (6th Cir. 1976). Even if the plaintiff's chances of success are remote or unlikely, a motion to dismiss should be denied. *Scheuer v. Rhodes*, 416 U.S. 232, 236 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)."

## ARGUMENT

I. PLAINTIFF'S CLAIM UNDER THE FALSE CLAIMS ACT MAY PROCEED ON THE BASIS OF EQUITABLE TOLLING

### 1. EQUITABLE TOLLING

The Supreme Court has ruled that the "rebuttable presumption of equitable tolling…

apply to suits against the United States" where Congress has made… a waiver" to sovereign immunity; reasoning that "making the rule of equitable tolling applicable to suits against the Government… amounts to little, if any, broadening of the congressional waiver." *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95–96, 111 S. Ct. 453, 457–58, 112 L. Ed. 2d 435 (1990).

Here, the FCA allows for claim to be brought against the government. *See generally* US Office of Special Counsel, *DI -18-5321 - Letter to the President* (Apr 9, 2020).

A litigant must establish two elements to prove an entitlement to equitable tolling: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way and prevented timely filing." Holland v. Florida, 560 U.S. 631, 649 (2010); see also Zerilli-Edelglass v. New York City Transity Auth., 333 F.3d 74, 80-81 (2003). The two elements are separate prongs, and a litigant must establish both. Menominee Indian Tribe of Wisconsin v. U.S., 136 S.Ct. 750, 756 (2016). The "extraordinary circumstances" prong can include an "external obstacle"—i.e., "some extraordinary circumstances [that] stood in his way." Id. at 756 (emphasis added) (quoting Holland, 560 U.S. at 649).

### a. Plaintiff Pursued His Right Diligently.

This element can be established by filing a claim with the correct officials. In Taylor v. Perry St. Preparatory Pub. Charter Sch. (D.D.C. 2017) the defendant claimed that he filed a gender discrimination claim with EEOC, but the EEOC had lost the complaint. 242 F. Supp. 3d 1, 2. In that case the court determined that Plaintiff "pursued his rights diligently with respect to his claim of discrimination by timely filing an EEOC charge." Id. at 4. Here Plaintiff timely filed with the EEOC and pursued his case through various delays.

As early as January 20, 2012, Plaintiff filed an Individual Complaint of Discrimination with Defendant's Equal Rights Office (ERO) alleging employment race discrimination,

retaliation, and fraud. (Interdepartmental case number HS-FEMA-21715-2012). ¶6 On or about December 20, 2013, Plaintiff requested Plaintiff's right to an EEOC hearing and Plaintiff's ERO case was set for EEOC hearing and proceedings. (Case No. HS-FEMA-21715-2012/EEOC-520-2019-00029X). ¶7 On or about September 18, 2015, Plaintiff filed another Individual Complaint of Discrimination with Defendant's ERO, alleging discrimination and retaliation. The cases were combined before the EEOC under case numbers EEOC-520-2018-00500X/EEOC-520-2019-00029X. ¶8 On September 9, 2019, the EEOC issued a Dismissal Order, dismissing the cases with prejudice, pursuant to 29 CFR 1614.107(7), alleging Plaintiff's failure to prosecute the case. ¶9 On November 1, 2019, the Agency issued its Final Order in the cases, adopting and implementing the EEOC's September 9, 2019, dismissal of the cases. ¶10 Plaintiff files this complaint within (ninety) 90 days after the Agency issued its November 1, 2019, Final Order. ¶11

### b. Plaintiff Suffered Extraordinary Circumstance that Caused Delay

Although the EEOC did not lose Plaintiff's Complaint, as in Taylor, the EEOC process created "extraordinary circumstance" in extraordinary delays throughout the hearing process where were beyond the control of Plaintiff." *Menominee Indian Tribe of WI v. U.S.*, 136 S. Ct. 750, 752, 193 L. Ed. 2d 652 (2016). The EEOC issued a dismissal order in Plaintiff's case, seven years after it was initially filed allegedly because Plaintiff had failed to prosecute the case for "personal reasons". However, the personal reason pertains to Plaintiff mental health condition during this time, when Plaintiff was destitute, deprived of an income, lost his house, and was unable to financially support Plaintiff's self and family. ¶30

11

### 2. Plaintiff Has Sufficiently Stated a Plausibly Claim for Hostile Work Environment

"Employers may not create or condone a hostile or abusive work environment. Such an environment exists"'[w]henthe workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Oncale v. Sundowner Offshore Servs., Inc ., 523 U.S. 75, 78, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998) (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)); Singletary v. Dist. of Columbia, 351 F.3d 519, 526, 359 U.S. App. D.C. 1 (D.C. Cir. 2003). The key terms, then, are "severe," "pervasive," and "abusive," as not just any offensive or discriminatory conduct rises to an actionable hostile work environment. Under Faragher v. City of Boca Raton, 524 U.S. 775, 787-88, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998), in determining whether a work environment is sufficiently hostile to be actionable, a court should consider: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or merely offensive; and (4) whether the conduct unreasonably interferes with the employee's performance. Nurriddin v. Bolden, 674 F. Supp. 2d 64, 93 (D.D.C. 2009)

#### a. The discriminatory harassment Was Frequent

The complaint set forth facts satisfactory to show that the discriminatory harassment of Plaintiff extended throughout the period of Plaintiff's employment with Defendant. It began as early as October 2011 when Plaintiff was summarily reassigned and then demobilize in February 2012 and blocked from employment opportunities and deployment for over two years. This continued when in May 2014 Mr. Panton intervene to rescind an appointment that Plaintiff had earned on merit. Defendant's discriminatory harassment of Plaintiff escalated in frequency and severity after Plaintiff was employed by Defendant in June 2014 and particularly after Plaintiff

disclosed to his supervisors information about Plaintiff EEOC case against Defendant and related mental health issues and after Plaintiff confronted Mr. Myers about denial of telecommuting to only Plaintiff and a co-worker, the only two minorities on the IMAT team. ¶63 Plaintiff's pleading set forth several discriminatory racially motivated harassment conduct against Plaintiff, including:

1. The July 6, 2014, ten-and-a-half-week IMAT training course, with Dan Paton and Justo Hernandez where Plaintiff suffered a Panic attack. ¶37

2. The March 2015 notice of a weeklong training exercise scheduled for May 2015, with Mr. Paton. ¶38 An event where Mr. Wilson experience severe chest pain as he sat beside Mr. Paton. ¶41

3. The denial of telework from January 2015, without valid reasons denied the Plaintiff's request to telework. ¶39

4. In April 2015, Plaintiff received an exceed expectations performance evaluation rating from his first and second-line supervisors. ¶40

5. June 11, 2015, Mr. Meyers issued Plaintiff an Official Letter of Reprimand ("LOR"), alleging failure to follow instructions and lack of candor against Plaintiff. ¶43

6. Between September and October 2015, Plaintiff's supervisors denied Plaintiff the duty to utilize Purchase Card (P-Card), a function of Mr. Wilson's position. ¶47

7. From August 2015 to March 2016, Plaintiff's supervisors denied Plaintiff the opportunity to become Disaster Alternative Approving Official (DAAO) despite Plaintiff completing the required training several months before the start of Plaintiff's deployment to the disaster. ¶48

8. In Early 2016, Mr. Meyers briefed an Equal Rights Advisor, that a previous Equal Rights Advisor, had counseled Mr. Meyers and Ms. Sheila Turnis regarding their treatment of their African American logistics staff, ¶50

9. In early 2016, Mr. Meyers remarked to an Equal Right Advisor that Mr. Wilson was "lazy", which the Advisor immediately understood as a racial derogatory reference and stereotyping of Plaintiff as an African American man. In response to the Advisor's inquiry if training could help Mr. Wilson, Mr. Tewes said Mr. Wilson would not be receiving any training. ¶51

10. During February 2016, Mr. Meyer and or Mr. Tewes denied Plaintiff the job duty and privilege of providing signature authority to his staff for travel vouchers. ¶54

11. On February 19, 2016, Mr. Myers gave Plaintiff an unsatisfactory performance evaluation. ¶53

12. On or about March 31, 2016, and April 1, 2016, Plaintiff was inappropriately directed to demobilize. ¶55

13. During April 2016, Mr. Meyers improperly ordered Mr. Wilson to singularly lift equipment requiring two person to lift, and physically carry equipment that was assigned to the office for inspections and accountability. ¶56

14. On April 25, 2016, Mr. Meyers and or Mr. Tewes denied Mr. Wilson training for the E/L 06011-FEMA Incident Workforce Academy (FIWA), Tier II for Command and General Staff at the Emergency Management Institute (EMI) ¶57

15. On May 19, 2016, Mr. Meyers and or Mr. Tewes denied Mr. Wilson work duties and opportunity to train, mentor, or sign off on Plaintiff's staff Position Task Books (PTBs). ¶58

16. On May 19, 2016, Mr. Meyers and or Mr. Tewes denied Mr. Wilson the opportunity to have a coach evaluator for disaster FEMA-DR-4238-MO.  ¶59

17. On May 20, 2016, Mr. Meyers and or Mr. Tewes fired Mr. Wilson from his appointment as a Core Supply Management Specialist, AD-2003-00, Region VII, Response Division.  ¶60

### b. The discriminatory Harassment was Severe

Clearly the discriminatory conduct here does not pertains to "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." Nurriddin v. Bolden, 674 F. Supp. 2d 64, 93 (D.D.C. 2009) The discriminatory conduct here went to the heart of Plaintiff's employment in form and effect to belittle and ultimately deprive Plaintiff of his employment.  The discriminatory action eviscerated Plaintiff's duties and responsibilities, belittled Plaintiff before his direct reports, and humiliated Plaintiff.  Plaintiff complaint sets forth allegations that Mr. Meyers employed tactics of intimidation and verbal assaults in his interactions and supervision of Mr. Wilson, as Mr. Wilson's first line supervisor. Almost on a daily basis, Mr. Meyers would demean and belittle Mr. Wilson, while Mr. Tewes would have discussions with Ms. Seymour raising issues about Mr. Wilson. ¶64

### c. The discriminatory Conduct was Physically Harmful & Offensive

The complaint further alleged that "the constant attack and discriminatory conduct of Mr. Meyers and Mr. Tewes, aggravated Mr. Wilson's mental health conditions and resulted in Mr. Wilson having repeated or long absences from work." Id. Furthermore, Plaintiff alleged that he suffer anxiety attacks and sever chest pains when he was forced to interact closely with one of his tormentor, Mr. Paton, during weeks of training exercise in 2014 and 2015 ¶¶ 37, 38, 41.  To use verbal assault, intimidation and manipulation of Plaintiff's job duties, motivated by racial animus,

15

in the supervisor of a subordinate was subjectively offensive to Plaintiff and would be harmful and offensive to an employee in Plaintiff's position.

### d. The discriminatory Conduct unreasonably interfere with Plaintiff's performance and job attendance.

The discriminatory conduct unreasonably interfered with Plaintiff's work performance. Could not sign off on staff position tasks books ¶58; Plaintiff could not perform his functions regarding Purchase Card, ¶48 and as a DAAO Officer ¶47. Plaintiff could not sign vouchers for staff; ¶54 and Plaintiff suffered frequent absences from work due to mental health conditions resulting from the discriminatory treatment. ¶64

### 3. The Discriminatory Conduct were Not Discrete Acts:

"The same acts may "simultaneously support different types of Title VII claims" such that "plaintiffs are free to plead alternative theories of harm that might stem from the same allegedly harmful conduct." Baird I, 662 F.3d at 1252. Thus, a "hostile environment consists of several individual acts that 'may not be actionable on [their] own' but become actionable due to their 'cumulative effect.'" Baird v. Gotbaum (Baird II), 792 F.3d 166, 168-69 (D.C. Cir. 2015) (quoting AMTRAK v. Morgan, 536 U.S. 101, 115, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002)). Nonetheless, "acts giving rise to a hostile work environment claim must collectively meet the independent requirements of that claim (i.e., be sufficiently [*85] severe or pervasive), and must be adequately connected to each other (i.e., all acts which constitute the claim are part of the same unlawful employment practice), as opposed to being an array of unrelated discriminatory or retaliatory acts." Baird I, 662 F.3d at 1252 (internal citations, alterations, and quotations omitted). For example, they might "involve the same type of employment actions, occur relatively frequently, and [be] perpetrated by the same managers." Baird II, 792 F.3d at 169 (quoting Baird I, 662 F.3d at 1251) (alterations omitted in

original). Burton v. District of Columbia, 153 F. Supp. 3d 13, 83-85 (D.D.C. 2015)

In this case, many of the discriminatory action by Defendant consisted of several individual acts that may not be actionable on their own. These included all of the alleged discriminatory actions of Plaintiff's supervisors, except the demobilization in February 2012, the rescinding of the position offered to Plaintiff in May 2014, the Mach 2015 LOR issue to Plaintiff, and the termination of Plaintiff's employment in May 2016. The discriminatory individual acts of supervisors, carried out with the aggression, verbal abuse and intimidation that characterize racial animus, were sever and pervasive throughout Plaintiff's employment, giving raise to continuing action of hostile work environment.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Plaintiff Retaliation Claim pursuant to the False Claim Action and Plaintiff's Hostile Work Environment Claims, should not be dismissed.

Respectfully Submitted,

*/s/ George A. Rose*

———————————————
George A. Rose, Esq., (Bar No. 26086)
Rose Law Firm, LLC
200 E. Lexington Street, Suite 1305
Baltimore, MD.  21202
Telephone #: 410-727-7555
Facsimile #: 443-320-0962
Email: grose@roselawfirm.net
Attorney for *Plaintiff Kenneth Wilson*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day of August 2020, a copy of the foregoing Plaintiff Memorandum in Opposition to Defendant's Motion to Dismiss, and Proposed Order,

was electronically filed and served upon, and/or mailed to: Timothy J. Shea, United States Attorney; Daniel F. Van Horn, Chief, Civil Division; Jeremy S Simon, (jsimon@usa.doj.gov) at the United States Department of Justice, 555 4th Street, N.W. Washington, D.C. 20530, Assistant United States Attorney

                                           */s/ George A. Rose*
                                           _____
                                           George A. Rose, Esq.