# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

KENNETH DURONN WILSON,

          **Plaintiff,**

v.

KRISTI NOEM,

          **Defendant.**[1]

_____

   )
   )
   )   **Case No. 20-cv-100 (GMH)**
   )
   )
   )
   )
   )
   )
   )
   )

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Kenneth Duronn Wilson alleges that he was discriminated against on the basis of race and gender and retaliated against for engaging in protected activity in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, and other federal statutes during his approximately ten-year tenure at the Federal Emergency Management Agency ("FEMA"), a component of the Department of Homeland Security.[2]  Defendant[3] has filed a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, which Plaintiff largely opposes (although he concedes some points as discussed below).[4]  For the reasons that follow, Defendant's motion is GRANTED IN PART and DENIED IN PART.

---

[1] Secretary of Homeland Security Kristi Noem is substituted as Defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

[2] As discussed below in Section I.B.2, many of the claims included in the Complaint have already been dismissed. *See Wilson v. Wolf*, No. 20-cv-100, 2021 WL 230136, at *8 (D.D.C. Jan. 22, 2021).

[3] Because "[a]n official-capacity suit against an agency or agent of the federal government is the equivalent of a suit against the United States of America[,]" *Davis v. Mukasey*, 669 F. Supp. 2d 45, 49 (D.D.C. 2009), the Court sometimes refers to Defendant as "the government."

[4] The following docket entries are relevant to this Memorandum Opinion: (1) Defendant's Motion for Summary Judgment, including its Statement of Material Facts not in Genuine Dispute ("Defendant's Statement of Undisputed Facts") and other exhibits, ECF Nos. 45 through 45-49; (2) Plaintiff's Opposition, including his Statement of Material Facts and other exhibits, ECF Nos. 49 through 49-21; (3) Defendant's Reply, including its Response to Plaintiff's Statement

## I.    BACKGROUND

Plaintiff's claims of discrimination and retaliation focus on thirteen allegedly adverse employment actions.  Four of those occurred between October 2011 and May 2014, when he was working as a Reservist at FEMA: (1) on October 7, 2011, Plaintiff was transferred from the Hewlett, New York Operations Field Office ("Hewlett Field Office") on Long Island, New York, to the Kirkwood, New York Operations Field Office ("Kirkwood Field Office") in Binghamton, New York; (2) on January 3, 2012, Plaintiff was designated a Trainee for the position of Logistics System Specialist, allegedly a demotion from his prior position as Logistics Manager; (3) on February 17, 2012, Plaintiff was demobilized from the Kirkwood Field Office; and (4) on May 5, 2014, FEMA rescinded a job offer to Plaintiff for the position of Logistics Management Specialist. The remaining ten actions occurred between March 2015 and May 2016, when Plaintiff was employed as a Support Branch Director as part of FEMA's Cadre On-Call Response/Recovery ("CORE") program: (5) in March 2015, Plaintiff's supervisor twice denied his requests to telework; (6) on June 11, 2015, Plaintiff's supervisor issued Plaintiff a letter of reprimand; (7) in September and October 2015, Plaintiff's supervisors twice disallowed Plaintiff from using a FEMA-issued credit card he had been issued to make work-related purchases; (8) in September 2015 and March  2016, supervisors denied Plaintiff's request to become a "Disaster Alternative Approving Official,"[5] although Plaintiff had completed the required training for that position; (9) supervisors did not delegate authority for Plaintiff to sign his staff's time cards and travel vouchers;

---

of Material Facts and other exhibits, ECF Nos. 59 through 59-6.  Page numbers cited herein are those assigned by the Court's CM/ECF system.

Plaintiff was represented by counsel from the inception of this case through the briefing on the motion for summary judgment.  Approximately two months after that briefing was completed, the Court granted Plaintiff's counsel's motion to withdraw, and Plaintiff now proceeds *pro se*.  *See* ECF No. 60; Minute Order (June 28, 2024).

[5] It appears from the record that a Disaster Alternative Approving Official "authorize[s] the acquisition, receipt, and payment for goods and services during a disaster response."  ECF No. 45-43 at 3.

(10) supervisors denied Plaintiff the opportunity to sign off on his staff's Position Task Books;[6]

(11) on February 19, 2016, Plaintiff received an unfair performance rating;(12) in 2015

through2016, on a deployment to Jefferson City, Missouri, supervisors denied Plaintiff access to

a coach evaluator who could sign off on his Position Task Book; and (13) on May 20, 2016, Plain-

tiff was terminated from his position.[7]

Plaintiff filed a complaint with FEMA's Office of Equal Rights[8] on January 18, 2012,

which was amended on March 23, 2012 (the "First EEO Complaint"). *See generally* ECF No.

59-3. He filed another complaint with the Office of Equal Rights on September 18, 2015, which

was amended multiple times (the "Second EEO Complaint"). *See generally* ECF No. 45-6.

---

[6] Position Task Books are issued to FEMA trainees and include tasks related to a trainee's job qualifications. *See* ECF No. 45-2, ¶¶ 65, 67.

[7] Plaintiff's Complaint incudes allegations that Plaintiff's supervisor ordered Plaintiff alone to lift equipment that required two people to lift and refused to approve Plaintiff's request to attend a FEMA training course. *See* ECF No. 1, ¶¶ 56–57. The record also includes allegations that Plaintiff was improperly ordered by his supervisor to bring in equipment that was assigned to his office for inventory and inspection, *see* ECF No. 45-6 at 15, and to demobilize from a deployment in Jefferson City, Missouri, and return to Kansas City, Missouri, on April 1, 2016, *see* ECF No. 45-17 at 14. Defendant's opening brief argues that the order to lift equipment, the order to bring in equipment, and the denial of training were not adverse employment actions (and indeed that Plaintiff's request to attend the training was not denied, but approved); that any claim based on the order to lift equipment is unexhausted; and that Plaintiff cannot establish that discrimination or retaliation motivated any of the alleged conduct. *See* ECF No. 45-1 at 36–41, 43–44, 49–51. Plaintiff's opposition does not counter any of those arguments. *See generally* ECF No. 49-1; *see also* ECF No. 59 at 13–14, 34 (noting that Plaintiff does not address Defendant's arguments as to those actions). "It is well understood in this Circuit that when a plaintiff files an opposition . . . addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) (citing *FDIC v. Bender*, 127 F.3d 58, 67–68 (D.C. Cir. 1997)); *see also, e.g.*, *Saleh v. Mayorkas*, No. 23-cv-409, 2024 WL 3400261, at *3 (D.D.C. July 12, 2024) (treating an argument raised in the defendant's dispositive motion as conceded where the plaintiff "opted not to respond to [the] argument"); *Williams v. Savage*, 569 F. Supp. 2d 99, 107 (D.D.C. 2008) (finding that, where plaintiffs "demonstrate[d] that they knew of their right to respond to the defendants' arguments" by filing an opposition to a dispositive motion but "chose not to" address those arguments, "[i]t is a concession of the point"). Such a rule is consistent with the "principle of party presentation," by which courts "rely on the parties to frame the issues for decision" and assume that "the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1109 (D.C. Cir. 2019) (quoting *Greenlaw v. United States*, 554 U.S. 237, 244 (2008)). The Court therefore deems Defendant's arguments that it is entitled to summary judgment as to those four actions conceded and does not address them further here.

[8] An affidavit from that office's director identifies it as the "Office of Equal Rights" or "OER." ECF No. 45-3 at 1. Defendant, on the other hand, refers to an "Equal Rights Office" or "ERO." *See, e.g.*, ECF No. 59-1 at 9. The Court assumes the offices are the same.

### A.    Factual Background[9]

1.    Plaintiffs' Tenure as a Reservist—September 2006 to June 2014

Plaintiff is an African American[10] male who worked at FEMA as a Reservist assigned to the Logistics Cadre from September 27, 2006, to June 28, 2014.  ECF No. 45-2, ¶ 13.  Reservists

---

[9] The requirements for summary judgment briefing are set out in Rule 56, this district's Local Civil Rule 7(h), and this Court's Procedures and Scheduling Order filed at ECF No. 22.  Rule 56(c) requires "[a] party asserting that a fact cannot be or is genuinely disputed [to] support the assertion" either by citing "particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Rule 56(e) provides that, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," a court may "consider the fact undisputed for the purposes of the motion" and "grant summary judgment if the motion and supporting materials—including facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ. P. 56(e).  This district's Local Civil Rule 7(h)(1) provides that "[e]ach motion for summary judgment shall be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue, which shall include references to the parts of the record relied on to support the statement." LCvR 7(h)(1).  Oppositions are to be "accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement."  *Id.*  Further, "the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."  *Id.*  The undersigned's Procedures and Scheduling Order cautions that this Court "strictly adheres to the dictates of Local Civil Rule 7(h)" and additionally requires the party opposing summary judgment to "file a separate document" responding to each paragraph of the movant's statement of undisputed material facts "with a correspondingly-numbered paragraph indicating whether that paragraph is admitted or denied."  ECF No. 22 at 3.  That order also provides, like Local Civil Rule 7(h)(1), "[t]he Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such facts are controverted in the statement filed in opposition to the motion."  *Id.*

The government filed a Statement of Undisputed Facts that complies with Rule 56(c), Local Civil Rule 7(h), and this Court's Scheduling and Procedures Order.  *See* ECF No. 45-2.  Plaintiff, however, did not respond to that filing as required by those rules and that Order.  Instead, he filed a document entitled "Plaintiff's Statement of Material Facts" that purports to set forth "material facts as to which there is a genuine dispute" but also includes some facts that are undisputed.  *See generally* ECF No. 49-2.  That document fails to address the facts that Defendant asserts are undisputed.  *See id.*  In accordance with the Federal Rules of Civil Procedure, the Local Civil Rules, the Scheduling and Procedures Order, and prior precedent, the Court deems the properly supported assertions of fact contained in Defendant's Statement of Undisputed Facts to be admitted.  *See, e.g., Booker v. D.C. Gov't*, No. 19-cv-2639, 2023 WL 4156684, at *1 n.3 (D.D.C. June 23, 2023); *Ladd v. Chemonics Int'l, Inc.*, 603 F. Supp. 2d 99, 105 (D.D.C. 2009) (noting that, if the party opposing summary judgment does not properly controvert a factual assertion by the movant, the Court should treat the movant's "factual assertions [that] are properly supported by the record . . . as admitted").

As to Plaintiff's Statement of Material Facts, in many cases it attempts to support its assertions with citations to pages in exhibits—most often to Exhibit 1 to his Opposition, which is an affidavit by Plaintiff created on December 3, 2023, after the Motion for Summary Judgment was filed, *see* ECF No. 49-3 (the "December 2023 Wilson Affidavit")—that do not support the facts alleged.  Defendant often responds by stating, "This statement is unsupported by the record cited.  Thus, the Court need not consider it for purposes of determining whether Defendant's Statements are contested"—without controverting or otherwise challenging the fact alleged.  *E.g.*, ECF No. 59-1 at 6 (emphasis omitted).  Although the D.C. Circuit acknowledges that when a party fails to properly support a fact at the summary judgment stage, "the district court is under no obligation to sift through the record" to find such support, *Jimenez v. Mayorkas*, No. 21-5193, 2023 WL 2607385, at *2 n.2 (D.C. Cir. Mar. 23, 2023) (quoting *SEC v. Banner Fund Int'l*, 211 F.3d 602, 616 (D.C. Cir. 2000)), in some instances support for the fact alleged by Plaintiff is readily discernable from a quick review of some other page in the thirteen-page affidavit.  In those cases, provided the fact alleged by Plaintiff is not directly contradicted by the facts deemed admitted in Defendant's Statement of Undisputed Facts and

4

are hired for appointments of up to 24 months to work "as required in support of disaster operations," although a Reservist's appointment can be terminated "at any time prior to the not-to-exceed date[] based on performance, conduct, or mission-related needs." *Id.*, ¶¶ 1–3, 5. Reservists are paid only when they are "activated, called-up, deployed, or mobilized to an appointment"; Plaintiff's deployments as a Reservist "typically lasted from two to seven months." *Id.*, ¶¶ 4, 6.

### a.    Deployment in Region 2[11]—August 2011 to February 2012

At the end of August 2011, Plaintiff was deployed to the Hewlett Field Office on Long Island as a Logistics Manager to assist with the response to Hurricane Irene. *Id.*, ¶ 33. His first-line supervisor was Logistics Group Supervisor Timothy Henggeler, a Caucasian male; his second-line supervisor was Logistics Chief John Alonso, a Hispanic and African American male. *Id.*, ¶ 34; *see also* ECF No. 59-1 at 5. Plaintiff asserts that, on October 6, 2011, when he was part of a team ordered to break down three disaster recovery centers in different boroughs of New York City, "discrepancies arose pertaining to communications, delays, and lack of coordination among the crews"; Alonso then convened a telephone call during which he blamed Plaintiff for the discrepancies and, later, would not credit Plaintiff's denial of responsibility until a Caucasian team

---

is either material to the issues to be decided or provides useful context, the Court has included those assertions this section and cites the record supporting them. The Court declines Defendant's invitation to strike Plaintiff's Statement of Material Facts for failure to comply with the Local Civil Rules. *See* ECF No. 59 at 10.

For an exploration of the difficulties presented by the citations in Plaintiff's opposition brief, see note 52, *infra*.

[10] Throughout the briefing, the parties use the descriptors "African American" and "Caucasian." The Court therefore adopts that usage.

[11] FEMA "consists of ten regions in the continental United States and territories." *Regions, States and Territories*, FEMA (Aug. 29, 2022), https://www.fema.gov/about/organization/regions [https://perma.cc/8Z48-9ZAP]. Region 2, which is headquartered in New York City, includes New Jersey, New York, Puerto Rico, and the U.S. Virgin Islands. *Region 2*, FEMA (Jan. 23, 2025), https://www.fema.gov/about/organization/region-2 [https://perma.cc/2QD4-QBBV].

member corroborated it during an investigation.  ECF No. 49-2 at 2–3; *see also* ECF No. 49-3, ¶¶ 5–6.

At some point Alonso decided to move Plaintiff to the Kirkwood Field Office near Binghamton, New York, and have Logistics Manager Paul Swindells of the Kirkwood Field Office move to the Hewlett Field Office, which was closer to Swindells' home.[12, 13]  ECF No. 45-2, ¶ 36. Alonso explained that moving Swindells to the Hewlett Field Office would allow him to work without charging the government a *per diem* allowance or lodging charges.  *Id.*, ¶ 37.  On October 6, 2011, after the call during which Alonso blamed Plaintiff for the delays and lack of coordination during the breakdown of the disaster recovery centers, Plaintiff was instructed to switch places with Swindells and Plaintiff reported to the Kirkwood Field Office shortly thereafter.  *Id.*, ¶¶ 38–39; *see also* ECF No. 59-3 at 17.  A subsequent investigation based on Plaintiff's whistleblower

---

[12] Defendant mistakenly states that the Kirkwood Field Office was in "Birmingham, New York," rather than Binghamton, New York.  ECF No. 45-2, ¶ 36; *see* ECF No. 45-18 at 4 (noting that Swindells was working at "the Binghamton office").  Defendant also asserts that the decision to transfer Plaintiff was made "*prior to* October 6, 2011." ECF No. 45-2, ¶ 36 (emphasis added).  However, the evidence it cites says nothing about when the decision was made—it could have been made on October 6 itself, the day it was communicated to Plaintiff.  *See* ECF No. 45-5 at 15, 17; ECF No. 45-33 at 5; ECF No. 45-18 at 4; ECF No. 45-8 at 11–12.  The Court therefore does not credit the statement about the timing of the transfer decision.  *See, e.g.*, *Ladd*, 603 F. Supp. 2d at 105 (noting that, even if the party opposing summary judgment does not properly controvert a factual assertion by the movant, the Court need not treat the fact as admitted where the court's independent review shows that the fact is not properly supported).

[13] In the December 2023 Wilson Affidavit, Plaintiff asserts that his second-line supervisors also included External Support Branch Director Tom Szmyr and Deputy Logistics Section Chiefs Dan Paton, Pete Connelly, and Laura Swedlow, all of whom are Caucasian.  ECF No. 49-3, ¶ 4.  Defendant contends that, "[t]o the extent that Plaintiff relies on th[e] new affidavit to create an inference that someone other than [] Alonso made the decision to transfer him," the Court should disregard the statements expanding the universe of supervisors under the sham affidavit doctrine.  ECF No. 59 at 11.  Under that doctrine, a party may not "creat[e] an issue of material fact by contradicting prior sworn testimony unless the 'shifting party can offer persuasive reasons for believing the supposed correction' is more accurate than the prior testimony.'"  *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007) (quoting *Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1123 (D.C. Cir. 1991)).  The doctrine does not apply, however, "[i]f the supplemental affidavit does not contradict but instead clarifies the prior sworn statement." *Id.*  Here, Defendant points to Plaintiff's deposition testimony that Alonso was his second-line supervisor at the time of the transfer and that Alonso made the decision to transfer him.  *See* ECF No. 45-8 at 10–12.  More, Plaintiff did not attempt to controvert Defendant's assertion that Alonso made the transfer decision, *see* ECF No. 45-2, ¶ 36, and Plaintiff's Opposition does not assert that someone other than Alonso did so.  Therefore, to the extent that Plaintiff's identification of other second-line supervisors is a subtle attempt to undermine his sworn testimony that Alonso ordered the transfer, the Court will disregard it.

allegations of travel violations found that Swindells, Alonso, and other FEMA personnel provided misleading information about the distance from Swindells' home to the Hewlett Field Office, which allowed Swindells to wrongfully receive over $31,000 in hotel, car rental, and *per diem* payments from the government.[14]  ECF No. 45-2, ¶¶ 41–44; *see also* ECF No. 45-1 at 10–11.

On January 3, 2012, Plaintiff received notice that that a panel of subject matter experts from Plaintiff's disaster cadre had reviewed Plaintiff's FEMA employee records to determine his status under the FEMA Qualification System, which set performance and training standards for positions within FEMA and was to be implemented in Spring 2012.  *See* ECF No. 45-2, ¶¶ 63, 69; *see also* ECF No. 45-35 at 2.  Under that system, an employee is certified as either "Qualified" or as a "Trainee" in a particular position.  ECF No. 45-2, ¶ 64.  An employee identified as a Trainee for a position is issued a Position Task Book, which outlines trainings and tasks associated with that job; Trainees are nonetheless eligible for deployment in that job.  *See id.*, ¶¶ 65–66.  To become fully qualified, a Trainee must engage in the required training and must—while deployed to a specific incident—perform the required tasks in the Position Task Book to the satisfaction of a coach evaluator assigned to the Trainee.  *See id.*, ¶¶ 66–68.  Plaintiff was designated a Trainee

---

[14] In his Statement of Material Facts, Plaintiff (apparently relying on the December 2023 Wilson Affidavit, *see* ECF No. 49-3, ¶ 9) asserts that Swindells revealed to Plaintiff in an October 7, 2011, phone call that Logistics Chief Alonso and Deputy Logistics Chief Swedlow cooked up the scheme to allow Swindells to move back to his home and still collect benefits provided to those in "travel status."  *See* ECF No. 59-1 at 8–9.  The government contends that the statement from Swindells to Plaintiff is hearsay.  *See id.* at 9.  The Court agrees.  Although the statement could be considered a statement against interest—after all, the investigation of the incident resulted in referral to various FEMA and DHS components to recommend disciplinary actions against the participants, as well as a basis "for consideration as to whether to refer to the Attorney General for civil and/or criminal prosecution,"  ECF No. 45-34 at 4–5—that exception to the hearsay rule applies only when the proponent of the statement establishes that the witness is unavailable, *see* 9A Charles Alan Wright *et al.*, Federal Practice and Procedure § 6963 (2024 ed.), a task neither party has taken up here.  And so, to the extent it is offered for its truth, it is inadmissible and "counts for nothing on summary judgment."  *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 969 (D.C. Cir. 2016) (quoting *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007)).

Logistics System Specialist; his prior title had been Logistics Manager.  *See id.*, ¶¶ 33, 46, 69.

Plaintiff's salary was not reduced because of this designation.  *Id.*, ¶ 71.

Also in January 2012, the Federal Coordinating Officer[15] for the disaster recovery center

to which Plaintiff was deployed announced a twenty percent downsizing of personnel to reduce

costs.  *Id.*, ¶ 48.  On February 10, 2012, Plaintiff's first-line supervisor at the Kirkwood Field

Office, Logistics Group Supervisor Jeffrey Cole, a Caucasian, notified Plaintiff that he would be

part of a group scheduled to demobilize on February 24, 2012.[16]  *Id.*, ¶ 49; *see also* ECF No. 59-1

at 5.  The group to be demobilized included out-of-region employees being paid a *per diem*, like

Plaintiff,[17] and included at least one Caucasian.  *See* ECF No. 45-2, ¶¶ 51, 54, 56.  Plaintiff then

called Operations Director Mark Bezou, an individual outside of Plaintiff's chain-of-command,

who confirmed that out-of-region employees were being demobilized.  *See id.*, ¶¶ 52–54.  Plaintiff

also spoke to his second-line supervisor, Logistics Chief Gary Butkus, also a Caucasian, who also

asserted that out-of-region employees were being demobilized to save FEMA money.  *See id.*, ¶

56; *see also* ECF No. 59-1 at 5.  Butkus decided to release Plaintiff early for breaking his chain of

command and confirmed his decision with FEMA employee relations staff.  *See* ECF No. 45-2,

¶¶ 58–59.  Plaintiff asserts that he complained to a representative from FEMA's Office of Equal

---

[15] The Federal Coordinating Officer, or FCO, is appointed by the President "[i]mmediately upon [the] declaration of a major disaster or emergency" to appraise the situation, establish field offices, and coordinate the administration of relief.  42 U.S.C. § 5143(a)–(b).  The parties occasionally refer to a "Field Coordinating Officer (FCO)."  *See, e.g.*, ECF No. 59-1 at 16–17, 22.  The Court assumes that the positions are the same.

[16] Defendant mistakenly states that the demobilization date was February 24, 2018.  *See* ECF No. 45-2, ¶ 49.  The context and the supporting documents make clear that the proper year is 2012.  *See, e.g.*, ECF No. 45-16 at 4.

[17] Plaintiff's home region as a FEMA Reservist was Region 9, headquartered in Oakland, California.  *See* ECF No. 45-17 at 2; *Region 9*, FEMA (Jan. 23, 2025), https://www.fema.gov/about/organization/region-9 [https://perma.cc/8TVJ-FTDT].  It is undisputed that Plaintiff was an out-of-region Reservist being paid a *per diem* at the time of his demobilization from the Kirkwood Field Office.

Rights, who told him that "Mr. Butkus' actions appeared to be in retaliation" for Plaintiff's protected activity "and that the claim about saving money for FEMA was an excuse."[18]  ECF No. 49-3, ¶ 17.  Plaintiff was demobilized on February 17, 2012.  ECF No. 45-2, ¶ 60.  Swindells, who was not out-of-region, was not demobilized.  *See* ECF No. 59-1 at 14–15.

On March 23, 2012, Plaintiff amended the First EEO Complaint to add allegations that Butkus discriminated against him based on race and prior EEO activity when Plaintiff was ordered to demobilize on February 24, 2012, a date that was later accelerated to February 17, 2012.[19]  *See* ECF No. 45-2, ¶¶ 17–19.

   b. Post-New York Deployments and Events—February 2012 to May 2014

After being demobilized from the Kirkwood Field Office on February 17, 2012, Plaintiff was deployed to Denton, Texas, on August 27, 2012, and then to Baton Rouge, Louisiana, for a period of approximately nine months, ending in May 2013.  *Id.*, ¶ 62; ECF No. 45-33 at 4–5.

Thereafter, Plaintiff applied and was interviewed for a four-year, full-time position as a "Logistics Management Specialist (Service Branch Director)" for FEMA's Office of Response and Recovery, Response Directorate.  ECF 45-36 at 2; *see also* ECF No. 45-2, ¶ 72.  The record

---

[18] Defendant contends that the statement of the representative from Office of Equal Rights is hearsay.  *See* ECF No. 59-1 at 17.  However, under Rule 801(d)(2)(D) of the Federal Rules of Evidence, a "statement made by [an opposing] party's agent or employee on a matter within the scope of that relationship and while it existed" is not hearsay when "offered against [the] opposing party."  Fed. R. Evid. 801(d)(2)(D).  The statement at issue appears to fall into that category.  *See, e.g.*, *Ritchie v. Napolitano*, 196 F. Supp. 3d 54, 64–65 (D.D.C. 2016) (admitting, in a Title VII case, statements by an EEO counselor offered against the defendant under Rule 801(d)(2)(D)); *Nair v. Columbus State Cmty. College*, No. 02-cv-595, 2008 WL 483333, at *2, *2 n.4 (S.D. Ohio Feb. 19, 2008) (same).

[19] Plaintiff asserts that his March 23, 2012, amendment to the First EEO Complaint alleged that the scheme by which Swindells wrongfully collected hotel, car rental, and *per diem* payments was "done with the knowledge and approval" of, among others, Deputy Logistics Chief Paton.  There is no indication in the record before the Court that the First EEO Complaint accused Paton of participation, approval, or even knowledge of that scheme, including in the records related to that complaint Plaintiff has submitted in support of his Opposition.  *See* ECF No. 49-4.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  The Court therefore does not credit the allegation that Paton was involved in or had knowledge of the scheme.

establishes that on May 5, 2014, FEMA sent a letter "tentatively offer[ing]" him the position "contingent upon a favorable suitability rating which is determined through a fingerprint check with the FBI and the completion of the Declaration for Federal Employment." ECF No. 45-36 at 2; *see also* ECF No. 45-2, ¶ 72. Later that day, he was informed that "management decided to rescind [the] offer."[20] ECF No. 45-36 at 4; *see also* ECF No. 45-2, ¶ 72. As detailed below in Section I.B, Plaintiff attempted unsuccessfully to add a claim of retaliation to the First EEO Complaint based on the rescission of the tentative job offer. *See* ECF No. 45-2, ¶¶ 73–80.

2. Tenure as a CORE Employee in Region 7[21]—June 2014 to May 2016

On June 29, 2014, Plaintiff began working as a Support Branch Director in the Cadre of On-Call Response/Recovery Employees—or CORE—with the Region 7 Incident Management Assistance Team ("IMAT"),[22] headquartered in Kansas City, Missouri. *Id.*, ¶ 83. Plaintiff was appointed for a renewable four-year term of employment. *See id.*, ¶¶ 8–9, 84. As Logistics Sup-

---

[20] Plaintiff asserts that Logistics Branch Chief Bryon Grable (Defendant spells the name "Grabel," but that appears to be an error, *see, e.g.*, ECF No. 59-5 at 2 (email from "Bryon D. Grable")), whom Plaintiff "knew from past disaster deployments[,]" told Plaintiff that Justo Hernandez, the hiring authority for the position that Plaintiff had been tentatively offered, told Grable that Paton, who had recently been selected as Logistics Section Chief for the relevant Incident Management Assistance Team, "did not want to work with [Plaintiff][] and interfered to have the position offered to [him] and subsequent[ly] resci[nded]." ECF No. 49-3, ¶¶ 23–24; *see also* ECF No. 49-8 at 13. There are three potential levels of hearsay in this statement: the statement of Paton to Hernandez, the statement of Hernandez to Grable, and the statement of Grable to Plaintiff. Even if the statement from Grable to Plaintiff could be considered non-hearsay under Rule 801(d)(2)(D)—which is unlikely, because there is no indication that inquiries about hiring were "within [Grable's] general duties and responsibilities," 30B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 6776 (2024 ed.)—there does not appear to be any exception that would apply to the communication between Paton and Hernandez or between Hernandez and Grable. *See* Fed. R. Evid. 805 (providing that hearsay within hearsay "is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule"). The Court therefore does not consider these assertions as evidence that Paton interfered with Plaintiff's hiring.

[21] Region 7 comprises Iowa, Kansa, Missouri, and Nebraska and is headquartered in Kansas City, Missouri. *Region 7*, FEMA (Jan. 23, 2025), https://www.fema.gov/about/organization/region-7 [https://perma.cc/643K-TVM5].

[22] IMATs comprise "full-time and pre-identified collateral duty personnel[,]" who "are always on standby to deploy before and after an incident occurs and will remain deployed until the response phase is complete, until they are redeployed to another incident, or until they are demobilized to home station." ECF No. 45-2, ¶¶ 10–11.

port Branch Director, Plaintiff was responsible for supervising and overseeing tasks such as re-

ceiving, storing, processing, and distributing supplies; ensuring accountability for equipment and

materials in accordance with federal law; and ordering and ensuring that funds were available for

procurement.  *See id.*, ¶¶ 86–87.  He was still "in training status" for that position while with the

Region 7 IMAT.[23]  *See id.*, ¶ 137.  Plaintiff's first-line supervisor was Logistics Section Chief

Ralph B. Meyers, and his second-line supervisor was Team Lead DuWayne W. Tewes, both of

whom are Caucasian.  *See id.*, ¶ 85; ECF No. 45-23 at 2; ECF No. 45-24 at 2.  Until September

2015, Meyers supervised only Plaintiff and one other employee, Edwin Maldonado, a Hispanic

male.  *See* ECF No. 45-2, ¶ 90; ECF No. 45-25 at 4.

In July 2014, Plaintiff attended a training course that included Paton and Hernandez (whom

Plaintiff believed were involved in the rescission of his tentative job offer, *see* note 20, *supra*);

because of the anxiety caused by interactions with those individuals, Plaintiff informed Meyers

and Tewes about his prior EEO activity and about the May 2014 job rescission and later—in March

2015—updated Meyers about those events.  ECF No. 49-3, ¶¶ 27–28.

        *a.*    *Telework Requests*

Beginning in March 2015, Plaintiff began asking if he and Maldonado could telework.

ECF No. 45-2, ¶ 91.  To do so, he had to get permission from Meyers.  *Id.*, ¶ 89.  Meyers initially

denied the request, explaining that he could not ensure that Plaintiff and Maldonado had enough

work that could be performed virtually to occupy an eight-hour day.  *Id.*, ¶ 91.  Plaintiff alleges

that Caucasian members of the Region 7 IMAT were allowed to telework, but it is undisputed that

---

[23] The precise title for which Plaintiff was in training was "Support Branch Director II."  ECF No. 45-47 at 2.  Plaintiff was deemed "Qualified" for the apparently lower position of Logistics Section Chief III.  *See id.* FEMA classifies incidents into levels based on complexity, with Type 1 being the most complex, Type 2 being less complex, etc. *Incident Types*, https://emilms.fema.gov/is_0200c/groups/518.html [https://perma.cc/HUQ4-NB9W].  The record reflects that the numeral after a job title corresponds to the level of incident for which the employee is (or will be) qualified.  *See* ECF No. 45-13 at 16.  Thus, a Support Branch Director II could be deployed to a level 2 incident.

they had supervisors other than Meyers.  *See* ECF No. 49-3, ¶ 29; ECF No. 45-2, ¶ 90.  At the end

of April 2015, when it became clear that Plaintiff could perform a full day of work on telework

days, Meyers gave permission for him to telework every other Monday.[24]  ECF No. 45-2, ¶ 92.

On July 6, 2015, Meyers approved Plaintiff's request to telework every Wednesday.  *See id.*, ¶ 93;

ECF No. 45-39.

                    *b.     Letter of Reprimand*

        On May 20 and 21, 2015, Meyers communicated with employee relations staff about four

work-related incidents involving Plaintiff that had occurred earlier that month and asked that a

letter of reprimand be issued to Plaintiff.  *See* ECF No. 45-2 at 15, ¶ 94; ECF No. 45-7 at 9–10;

ECF No. 49-3, ¶ 33; ECF No. 59-1 at 29.  A FEMA human resources specialist agreed that three

of the four incidents merited such a letter.  ECF No. 45-2, ¶ 95.  On June 11, 2015, Meyers issued

Plaintiff a letter of reprimand for failure to follow instructions and lack of candor outlining those

three incidents: Plaintiff (1) had failed to register for a training class that Meyers had sought fund-

ing for and directed Plaintiff to attend, (2) had failed to provide proof of pending purchases and

proof of required training completion as directed by Meyers, and (3) was dishonest to Meyers

regarding a request Plaintiff made to have a Reservist deployed to the Region VII offices.  *See id.*,

---

[24] Plaintiff asserts that he complained to Meyers again in May 2015 "about the request to telework and the bias in denying only [Plaintiff] and another minority employee telework" and thereafter "report[ed] the denial of telework to . . . Tewes [] and up the chain of command."  ECF No. 49-3, ¶ 32.  He does not say, however, that he was denied the opportunity to telework in May 2015 and it is undisputed that by May 2015 he was allowed to telework every other Monday.  *See* ECF No. 45-2, ¶ 92; ECF No. 45-7 at 8.

¶¶ 97–98; *see also* ECF No. 45-7 at 11–13. The letter was placed in Plaintiff's personnel file.[25] ECF No. 45-2, ¶ 98.

        c.     *Jefferson City Deployment—August 30, 2015, to April 12, 2016*

From August 30, 2015, to April 12, 2016, Plaintiff was deployed to Jefferson City, Missouri, in connection with a flood, which FEMA classified as a "Type 3" incident.[26] *See* ECF No. 45-2, ¶¶ 99, 147; ECF No. 45-33 at 2. During that deployment, Plaintiff's direct supervisors included Logistics Section Chief Meyers and Deputy Logistics Section Chief Sheila Turnis. ECF No. 45-2, ¶ 99. And as noted, Team Lead Tewes was Plaintiff's second-line supervisor during his employment in Region 7. *See id.*, ¶ 85. Plaintiff claims that he was discriminated against during this deployment when supervisors twice denied him the ability to use his purchase card, twice denied his requests to become a Disaster Alternative Approving Official, denied his request for authority to sign off on timecards and travel vouchers, did not provide him a coach evaluator to sign off on tasks in his Position Task Book, gave him an unsatisfactory performance evaluation, and ordered him demobilized to Region 7's Kansas City headquarters in April 2016 with little

---

[25] Defendant asserts that "no further action [was] taken" regarding the reprimand, ECF No. 45-1 at 42; however, its evidence for a lack of further action is merely the reprimand itself, which is not evidence that no consequences followed from the reprimand. Indeed, the letter of reprimand itself states that it could "be used as evidence that [Plaintiff was] on notice about the conduct in question" and that "any future acts of misconduct may result in more severe disciplinary action being taken against [Plaintiff], up to and including . . . removal from the Federal service." ECF No. 45-7 at 12. And, as discussed below in Section III.B.1.a.v, it appears to have been used in precisely that manner. The Court does not, therefore, credit Defendant's unsupported statement that "no further action was taken" because of the reprimand.

[26] As noted, FEMA classifies incidents into levels based on complexity. *See* note 23, *supra*. A Type 3 incident is less severe than a Type 2 incident, which is less severe than a Type 1 incident.

notice.  Plaintiff also alleges that during the deployment, he became involved in the investigation

of a discrimination complaint against Meyers made by one of Plaintiff's subordinates.

i.    Purchase Card

In May 2015, Plaintiff became authorized to use a government credit card to make pur-

chases for official government business; in connection with that authorization, he agreed, among

other things, to ensure written approval was obtained and sufficient funds were available prior to

making any purchase, to screen the requirements for required sources of supply prior to making a

purchase and document the results, to maintain a purchase card ordering log, and to retain copies

of receipts and similar documents for six years and three months.  *Id.*, ¶ 103; *see also* ECF No. 45-

40 at 2–3.  He further acknowledged that such authority could be revoked "for cause or no cause."

ECF No. 45-2, ¶ 104 (quoting ECF No 45-40 at 4).  While deployed to Jefferson City, Meyers and

Turnis refused to sign off on paperwork allowing Plaintiff to make a purchase with his government

credit card on September 21, 2015, and October 21, 2015.[27]  *See id.*, ¶¶ 100–101.  Plaintiff asserts

(and Defendant does not dispute) that Tewes was involved in the denial.[28]  ECF No. 49-3, ¶ 37.

---

[27] Plaintiff asserts that the ability to make purchases with the government credit card was "integral to the efficient execution" of his duties as Support Branch Director.  *See* ECF No. 59-1 at 31.  As support, he points merely to the letter appointing him as a cardholder, a document that says nothing about his duties as Support Branch Director.  *See id.* (citing ECF No. 49-13 at 2).  The Court therefore does not credit this statement.

[28] The government states that Plaintiff's assertion in his Statement of Material Facts that Meyers and Tewes denied him the ability to use the card is undisputed, pointing to the assertion in Defendant's Statement of Undisputed Facts that Meyers and *Turnis* were involved in the denial.  *See id.* (citing ECF No. 45-2, ¶ 100).  Because the government has not disputed that Tewes was involved, the Court credits Plaintiff's statement despite the apparent typo.

Meyers explained that permission was denied because Plaintiff had not demonstrated that he understood the ordering and receiving process, failed to maintain copies of transaction information, and failed to ensure that receiving reports for all shipments were completed.  ECF No. 45-2, ¶ 102.

### ii. Disaster Alternative Approving Official

At some point prior to his deployment to Jefferson City, Plaintiff completed training to become a Disaster Alternative Approving Official at the direction of Meyers.  *Id.*, ¶ 106.  Then, at the beginning of the Jefferson City deployment, Plaintiff asked Meyers to approve his request to become a Disaster Alternative Approving Official; Meyers stated that he denied the request for the same reasons he denied Plaintiff's request to use his government credit card—because Plaintiff lacked understanding of the ordering and receiving processes and failed to maintain proper records.  *See id.*, ¶¶ 107–08.  Then, on March 30, 2016, Plaintiff asked Turnis to approve his request to become a Disaster Alternative Approving Official.  *Id.*, ¶¶ 109–110.  She denied Plaintiff's request, asserting that he lacked judgment and did not follow directions.  *Id.*, ¶ 110.  Separately, Tewes explained to Plaintiff in March 2015 that there were already sufficient Disaster Alternative Approving Officials for the Jefferson City deployment.  *Id.*, ¶ 111.

Later, acting on a tip from Plaintiff, the Department of Homeland Security investigated alleged wrongdoing "in the requisition of supplies, equipment, and services" during the Jefferson City deployment.  ECF No. 45-43 at 3.  The investigation found that three FEMA officials authorized 67 payments totaling more than $450,000 prior to completing the training required to become a Disaster Alternative Approving Official.  ECF No. 45-2, ¶ 112.  However, the investigation concluded that those officials did not knowingly or intentionally violate FEMA procedures; rather, they were unaware of newly implemented requirements for Disaster Alternative Approving Officials because an HR representative detailed to the disaster response office failed to inform them

and because the procurement documents used were ambiguous about whether Disaster Alternative Approving Official certification was necessary. *See* ECF No. 45-43 at 3–4; *see also* ECF No. 45-2, ¶ 113. The agency found that "no improper debt obligations occurred." ECF No. 45-43 at 4.

### iii.    Timecards and Travel Vouchers

Because of the small contingent of personnel deployed to the Logistics Section during the Jefferson City response, Logistics Chief Meyers and Deputy Logistics Chief Turnis had the authority to approve timecards and travel vouchers for that section. *See* ECF No. 45-2, ¶¶ 114–15, 117. When Meyers was demobilized in February 2016, Turnis retained that authority. *Id.*, ¶ 118. Thereafter, Plaintiff asked Turnis for authority to sign timecards and travel vouchers. *Id.*, ¶ 119. Turnis denied the request because those tasks were already being handled by others. *Id.*, ¶ 120.

### iv.    Coach Evaluator

Coach evaluators are FEMA personnel authorized to observe Trainees demonstrate performance of tasks in the Trainee's Position Task Book during deployments. *See id.*, ¶¶ 67–68. Coach evaluators are not deployed solely to perform evaluations; rather, a coach evaluator can observe a Trainee's performance only when deployed in the coach evaluator's regular employment capacity to the same disaster as the Trainee. *See id.*, ¶¶ 140, 144. Satisfactory completion of those tasks allows a Trainee for a position become Qualified for that position. *Id.*, ¶ 67. At the beginning of the Jefferson City deployment, Logistics Branch Chief Grable was assigned as Plaintiff's coach evaluator; IT Branch Chief Kevin Fitts was assigned as coach evaluator for Maldonado. *Id.*, ¶ 139. Neither Grable nor Fitts were able to be deployed immediately to Jefferson City, however, so Meyers asked for other coach evaluators to be deployed to observe Plaintiff and Maldonado. *Id.*, ¶¶ 141–42. None were available, due, in part, to the fact that fewer than one percent of FEMA staff are coach evaluators. *Id.*, ¶¶ 142–43. Because Plaintiff lacked a coach evaluator to sign off

on tasks in his Position Task Book, his lack of progress on that front was not held against him in his evaluation. *Id.*, ¶ 145. At some point, Turnis served as coach evaluator working with Plaintiff. *Id.*, ¶ 146. However, because Plaintiff's Position Task Book was for Type 2 events, which are more complex than Type 3 events like the Jefferson City disaster; tasks falling under Type 2 events could not have been observed or signed off on during the Jefferson City deployment.[29] *See id.*, ¶¶ 147–48.

v.    February 2016 Performance Evaluation

Plaintiff asserts that, on February 19, 2016, Meyers gave him an unsatisfactory performance evaluation, presumably for the year 2015. ECF No. 49-3, ¶ 43; *see also* ECF No. 45-23 at 6. It is undisputed, however, that Plaintiff ultimately received a rating of "Achieved Expectations" on his 2015 annual performance evaluation.[30] ECF No. 45-2, ¶ 121; *see also* ECF No. 45-7 at 16–17. Meyers asserted that Plaintiff received a low score—within the "unacceptable" range—on his "'deployed' performance evaluation," which is factored into the annual performance rating. *See* ECF No. 45-23 at 6 (Meyers asserting that Plaintiff "received a rating of 1.7 on his 'deployed' performance evaluation"); ECF No. 45-7 at 17 (identifying a score of less than 2.5 as in the unacceptable range). Meyers' supervisors instructed him to "zero out" the deployment rating, which resulted in an adjusted rating of "Achieved Expectations." *See* ECF No. 45-23 at 6; ECF No. 45-7 at 16 (reflecting that the deployment rating was given a weight of zero percent). Meyers asserted that to achieve a higher rating, Plaintiff needed to complete assigned tasks, adhere to deadlines,

---

[29] The record reflects that Plaintiff had been issued a Position Task Book for the position of Support Branch Director II. ECF No. 45-47. As noted, the "II" represents level of incident for which the employee is (or will be) qualified. *See* note 23, *supra*.

[30] The scale reflected on the evaluation form established four ratings: unacceptable, achieved expectations, exceeded expectations, and achieved excellence. *See* ECF No. 45-7 at 17.

and demonstrate professionalism.[31]  ECF No. 45-2, ¶ 124.  Maldonado also received an "Achieved

Expectations" rating on his 2015 annual performance evaluation.  *Id.*, ¶ 123.

vi.    EEO Official Jacquelyn Seymour, Ph.D.

In January 2016, Jacquelyn Seymour, Ph.D., an official from FEMA's Office of Equal

Rights, was deployed to Jefferson City.  *See* ECF No. 59-1 at 35.  At some point during the de-

ployment, Tewes also told Seymour that Plaintiff was "lazy."  ECF No. 49-17 at 2–3.  In her sworn

---

[31] Plaintiff asserts that in April 2015, he received a rating of "Exceeded Expectations" from his supervisors.  ECF No. 59-1 at 28.  However, the document Plaintiff cites does not support that assertion.  It is a document titled "Employee Performance Plan and Appraisal Form," it states that it is a performance plan for the period between April 1, 2015, and December 31, 2015, it does not reflect a particular performance rating, and it was signed by Meyers on July 24, 2015.  *See generally* ECF No. 49-10; *see also* ECF No. 59-1 at 28.  Accordingly, the Court does not credit Plaintiff's assertion that he received a rating of "Exceeded Expectations" in 2015.

affidavit, Seymour asserts that she interpreted that comment as "a racial reference as historically black men have been called lazy and other negative adjectives."[32]  *Id.* at 3.

### d.    Subordinates' Position Task Books

Plaintiff was in Trainee status during his tenure in Region VII; as such, he was not authorized to sign off on his subordinates' Position Task Books.[33]  ECF No. 45-2, ¶ 137.

### e.    Termination on May 20, 2016

On May 20, 2016, FEMA terminated Plaintiff for failure to follow instructions and negligent performance of duties.  *Id.*, ¶ 157.  The termination letter provided six instances of failure to follow directions and three instances of negligent performance:

(1)    On November 3, 2015, Meyers instructed Plaintiff to put missing FEMA form 143s in the Common Drive by the end of the week and failed to do so.

(2)    On December 3, 2015, Meyers instructed Plaintiff to generate paperwork associated with the lease of specific office space by December 4, 2015, and Plaintiff failed to do so.

---

[32] Defendant asserts that Tewes' comment that Plaintiff was lazy is hearsay to the extent that it is intended to prove the assertion that the comment was racially derogatory.  *See* ECF No. 59-1 at 36.  It is not.  Defendant could (but does not) argue that the statement is hearsay to the extent that it is offered as evidence that *Tewes said Plaintiff was lazy*.  Such an argument might or might not succeed.  But Seymour's sworn testimony that she interpreted the comment as racially derogatory does not implicate the rule against hearsay.

Plaintiff includes details about allegations of discrimination against supervisors by two of his subordinates—Rosa Thomas and Carrie Cedeno.  ECF No. 49-3, ¶¶ 39, 42.  Plaintiff asserts that he advocated on their behalf.  *See id.*  There is no indication how any EEO complaints regarding these individuals were resolved.  *See id.*  Plaintiff does allege that Seymour was told by Tewes that an advisor from the Office of Equal Rights had counseled Meyers and Turnis "regarding their treatment of their African American logistics staff," including Thomas and Cedeno.  *Id.*, ¶ 40.  Seymour includes in her affidavit an assertion that "[a]s I understand it," that advisor had counseled Meyers and Turnis on their treatment of Cedeno and another "black female who is around 70 years old," ECF No. 49-17 at 2, but there is no indication of how she came to "understand" that such counseling had occurred.  Assuming that an advisor told Tewes of the counseling, Tewes told Seymour, and Seymour told Plaintiff, it is possible that each of those statements—advisor to Tewes; Tewes to Seymour; Seymour to Plaintiff—would be non-hearsay under Rule 801(d)(2)(D), but there are insufficient facts for the Court to make that determination.  The Court therefore does not credit those statements.  *See, e.g.*, *United States v. Fuller*, __ F. Supp. 3d __, __, 2025 WL 511112, at *2 (D.D.C. 2025) (noting that the proponent of potential hearsay must establish that it falls into an exception by a preponderance of the evidence).

[33] Plaintiff conceded at his deposition that he was not permitted to sign off on his subordinates' Position Task Books and asserted that he never requested permission to do so.  *See* ECF No. 45-8 at 28–29.  Nevertheless, Plaintiff presses this claim in his Opposition.  *See* ECF No. 49-1 at 21, 28–29.

(3)    On December 7, 2015, Meyers instructed Plaintiff to provide an electronic copy of his completed deployed evaluation report by close of business on December 11, 2015, and Plaintiff failed to do so.

(4)    On December 8, 2015, Meyers instructed Plaintiff to send a current listing of all IMAT site code items by close of business that day, and Plaintiff failed to do so.

(5)    On December 8, 2015, Meyers instructed Plaintiff to establish procedures and directives regarding contacting vendors, contracted service providers, and property management by January 7, 2016, and Plaintiff failed to do so.

(6)    On January 23, 2016, Meyers instructed Plaintiff to correct his hours in WebTA and Plaintiff failed to do so.

(7)    On February 2, 2016, Plaintiff issued an iPhone to a Public Assistant Specialist without a barcode or serial number, which broke with Agency Policy.

(8)    On February 25, 2016, Plaintiff initiated a Mission Assignment despite lacking authority to do so.

(9)    On April 11, 2016, Plaintiff failed to return IMAT equipment to the Region VII Office in Kansas City.

*Id.*, ¶¶ 158–59.  On June 10, 2016, Plaintiff submitted a rebuttal to that termination that responds to each of the specifications.  *See* ECF No. 49-9 at 75–81.

**B.    Procedural History**

This case has a long and complicated procedural history, particularly during administrative proceedings at FEMA and the Equal Employment Opportunity Commission ("EEOC").

1.    Administrative Proceedings

Plaintiff initiated EEO counseling with FEMA's Office of Equal Rights on November 18, 2011, after his transfer to the Kirkwood Field Office.  ECF No. 45-2, ¶ 15–16.  He filed the First

EEO Complaint on January 18, 2012, and amended it on March 23, 2012.  *Id.*, ¶¶ 15, 17.  In its final form, the First EEO Complaint alleged that

> (1)    Plaintiff was discriminated against on the basis of race when Henggeler and Alonso reassigned him to the Kirkwood Field Office on October 7, 2011;
>
> (2)    Plaintiff was discriminated against based on race and prior EEO activity when Butkus ordered him demobilized from the Kirkwood Field Office on February 24, 2012; and
>
> (3)    Plaintiff was discriminated against based on race and prior EEO activity when Butkus demobilized him on February 17, 2012, rather than February 24, 2012.

*See id.*, ¶¶ 16, 18–19.  FEMA sent its report of the investigation to Plaintiff in November 2013 and Plaintiff requested a hearing before an EEOC administrative judge.  *See id.*, ¶¶ 20–21; *see also* ECF No. 45-27.[34]

Although Defendant asserts that FEMA's Office of Equal Rights "has no record of receiving [a] request by Plaintiff to [again] amend his First EEO Complaint to add a retaliation claim related to the rescission of [his] tentative job offer in [May] 2014," it nonetheless admits that he sent such a request on June 16, 2014.  ECF No. 45-2, ¶¶ 73–74.  However, at that time, the agency's investigation was complete, so it no longer had the authority to accept an amendment.  *See id.*, ¶ 75; *see also* 29 C.F.R. § 1614.106(d) (providing that a complainant may seek permission from the agency to amend a complaint "to include issues or claims like or related to" the claims already raised "at any time prior to the conclusion of the investigation" but that after a hearing has been requested, the complainant must file a motion to amend with the administrative judge).  Defendant also admits that the next day Plaintiff sought to amend his complaint with the EEOC to add the

---

[34] Defendant's Statement of Undisputed Facts contains a typographical error as to the date FEMA's report was sent to Plaintiff: it asserts that occurred in 2023; it is clear from the record, however, that it occurred in 2013.  *See* ECF No. 45-27.

claim related to the May 5, 2014, rescission. *See* ECF No. 45-2, ¶ 77. As discussed below, that attempt was ultimately unsuccessful.

On July 17, 2015, Plaintiff initiated EEO counseling regarding the letter of reprimand, which he asserted was discriminatory based on race and sex. *Id.*, ¶ 23; *see also* ECF No. 45-6 at 8. He filed the Second EEO Complaint on September 18, 2015, alleging that he was discriminated against based on race when his request to telework was denied and when he was issued the letter of reprimand. ECF No. 45-2, ¶ 23; *see also* ECF No. 45-6 at 3. That complaint was amended multiple times (the sixth and last time on June 24, 2016, after Plaintiff's termination, *see* ECF No. 45-6 at 14) and ultimately charged that Plaintiff was subjected to discrimination based on race, sex, and reprisal when (1) Plaintiff's and Maldonado's requests to telework were denied, (2) Plaintiff was issued the letter of reprimand, (3) Plaintiff was twice denied permission to use his purchase card, (4) Plaintiff was not permitted to become a Disaster Alternative Approving Official, (5) Plaintiff was not given signature authority for timecards and travel authorizations, (6) Plaintiff received an unfair performance evaluation in February 2016, (7) Plaintiff was directed to demobilize from the Jefferson City deployment on April 1, 2016, (8) Plaintiff and a Hispanic co-worker were instructed to physically bring in equipment assigned to the office for inspection, (9) Plaintiff was denied permission in April 2016 to attend a training session, (10) Plaintiff was denied a coach evaluator, and (11) Plaintiff's appointment was terminated in May 2016.[35] ECF No. 45-2, ¶ 26.

On October 18, 2017, the Office of Equal Rights sent Plaintiff a letter informing him that "the investigation of [his] complaint"—that is, the Second EEO Complaint—"may not be completed within the 180-day time frame" and, if it were not, he could either request a hearing before

---

[35] As noted, *see supra* note 7, by failing to respond to Defendant's arguments that any claims based on Plaintiff's allegations related to (7) the order to demobilize on April 1, 2016, (8) the order to bring equipment in for inspection, and (9) the denial of approval to attend a training session, Plaintiff has conceded those arguments before this Court. Defendant is therefore entitled to summary judgment on those claims.

an EEOC administrative judge or file a civil action "in an appropriate U.S. District Court."  ECF

No. 45-7 at 4; *see also* ECF No. 45-2, ¶ 27.  Plaintiff requested a hearing.  ECF No. 45-2, ¶ 28.

The administrative judge dismissed Plaintiff's Second EEO Complaint without prejudice on Au-

gust 14, 2018, to allow the agency to complete its investigation.  *Id.*, ¶ 29.  FEMA completed the

investigation on October 28, 2018.  ECF No. 45-3, ¶ 21.

Meanwhile, on August 23, 2017, Plaintiff filed a motion with the EEOC to amend the First

EEO Complaint "to add a retaliation claim based on allegations that he received a job offer from

the agency on May 15, 2014[,] and that it was rescinded 30 minutes later."  ECF No. 45-29 at 2.

The EEOC administrative judge denied the motion initially in August 2018 and on reconsideration

in October of that same year.  *See id.*  As to the timing of the amendment, he explained that Plaintiff

had "repeatedly raised a potential motion to amend the complaint dating years back," that "there

were various delays in the process which were not attributable to [Plaintiff]," and that the previ-

ously assigned judge had granted Plaintiff permission "to file the motion in 2017 when he did."

*Id.* at 3.  On the merits, however, the administrative judge found that the proposed claim based on

rescission of the May 2014 job offer was not "like or related to the original complaint" as is re-

quired for claim to be added to an earlier EEO complaint.  *Id.*; *see also, e.g.*, 29 C.F.R. §

1614.106(d) ("After requesting a hearing, a complainant may file a motion with the administrative

judge to amend a complaint to include issues or claims like or related to those raised in the com-

plaint.").  He therefore denied the motion to amend.  ECF No. 45-29 at 4.

At some point, the First EEO Complaint and the Second EEO Complaint were consolidated

for the purposes of the EEOC's consideration.  *See, e.g.*, ECF No. 45-30 at 2 (EEOC order with

both case numbers).  On March 8, 2019, they were dismissed without prejudice "based on [Plain-

tiff's] inability to proceed . . . due to valid personal reasons." *Id.* Plaintiff was allowed the opportunity to resubmit a request for a hearing by mid-June 2019.[36] *Id.* When he did not, the administrative judge found that Plaintiff's "hearing request must be dismissed . . . based on [Plaintiff's] failure to prosecute the case." ECF No. 45-31 at 2. On November 1, 2019, the Department of Homeland Security's Office of Civil Rights and Civil Liberties issued its final order "implement[ing] the [administrative judge's] decision" and issued notice of Plaintiff's right to appeal or to sue on federal court. *See generally* ECF No. 45-32. FEMA has no record of Plaintiff initiating any further EEO counseling or of filing a complaint alleging discrimination based on the May 2014 job offer rescission. *See* ECF No. 45-2, ¶¶ 32, 78.

2.    Federal Court Proceedings

Plaintiff, through counsel, filed the Complaint in this district against the then-Acting Secretary of the Department of Homeland Security on January 14, 2020. *See* ECF No. 1. He alleged racial discrimination in employment in violation of Title VII and 42 U.S.C. §§ 1981 and 1983 (Count One); sex and gender discrimination in employment in violation of Title VII and 42 U.S.C. §§ 1981 and 1983 (Count Two); retaliation in violation of Title VII and 42 U.S.C. §§ 1981 and 1983 (Count Three); retaliation in violation of the False Claims Act, 31 U.S.C. § 3730(h) (Count Four); a hostile work environment in violation of Title VII and 42 U.S.C. §§ 1981 and 1983 (Count Five); and conspiracy in violation of 42 U.S.C. § 1985(3) (Count Six). *See id.*, ¶¶ 66–103.

In May 2020, the government sought dismissal for failure to state a claim of (1) the claim under 42 U.S.C. § 1981 based on gender discrimination, (2) all claims under 42 U.S.C. § 1983, (3)

---

[36] The order has a typographical error. It asserts that Plaintiff must file the request by "June 14, 2018," but from the context—not least that the order was issued in March 2019—it is clear that the year should be 2019. ECF No. 45-30 at 2.

the False Claims Act retaliation claim, (4) the hostile work environment claims, and (5) the con-

spiracy claim.  *See* ECF No. 10 at 1, 3; *see also id.* at 7 (arguing that "Plaintiff's section 1983

claim should be dismissed from each of the counts in which it has been asserted" because, among

other things, the provision "does not create a cause of action against federal officials").  Judge

Amy Berman Jackson interpreted the motion as seeking dismissal of

> those portions of the race discrimination claim in Count One and the retaliation
> claim in Count Three that are predicated on section 1983; that portion of the gender
> discrimination claim in Count Two that is predicated on section 1981; and Counts
> Four (retaliation in violation of the False Claims Act); Five (hostile work environ-
> ment), and Six (section 1985 conspiracy).

*Wilson*, 2021 WL 230136, at *1.  Judge Jackson granted the motion.  *See id.*  As to the claims

under Section 1981 and 1983, Judge Jackson reasoned that "it is clear from the plain language of

the statute that section 1983 does not apply to federal officials" and found "[t]he invocation of

section 1981 [was] problematical" because "it too is . . . a section of the Civil Rights Act aimed at

the conduct of state officials."  *Id.* at *4–5.  She therefore dismissed "the portions of Counts One

and Three based on section 1983[,] the portion of Count Two based on section 1981," and the

hostile work environment claim under both provisions.  *See id.* at *6, *8.  She also dismissed the

remainder of the hostile work environment claim (Count Three) brought under Title VII and

Counts Four (False Claims Act retaliation) and Five (conspiracy).  *Id.* at *8.  That is, although the

government sought dismissal of *all* claims under Section 1983 (it is not clear why it limited its

motion to the gender discrimination claims based on Section 1981, but it did) and the reasoning in

Judge Jackson's opinion would apply to *all* claims under *both* Section 1983 and Section 1981, the

ruling on the motion to dismiss preserved the following claims: Count One to the extent that it

claims racial discrimination under Title VII and Section 1981 (but not Section 1983), Count Two

to the extent it claims gender discrimination under Title VII and Section 1983 (but not Section

1981), and Count Three to the extent it claims retaliation in violation of Title VII and Section 1981 (but not Section 1983).

Thereafter, the parties consented to the jurisdiction of a magistrate judge.  ECF No. 21. Defendant filed its motion for summary judgment on October 13, 2023, and the motion was fully briefed on April 26, 2024.  *See* ECF Nos. 45, 49, 59.  That briefing narrows the pending claims further.  As noted above in notes 7 and 35, by failing to address Defendant's arguments in favor of summary judgment, Plaintiff has conceded that dismissal is appropriate for any claims arising from alleged orders that (1) Plaintiff alone lift equipment that required two people to lift, (2) he bring in equipment for inventory and inspection, (3) he demobilize from a deployment in Jefferson City, Missouri, and (4) from a supervisor's alleged refusal to approve Plaintiff's request to attend a FEMA training course.

Similarly, Plaintiff has conceded that the remaining claims under 42 U.S.C. §§ 1981 and 1983 must be dismissed.  Defendant argues that such claims cannot survive because (1) the statutes apply only "'to persons acting under color of "any State or Territory, or . . . District of Columbia" law' and there is no evidence in the record to establish that federal officials in this matter were acting under color of state law" and (2) the Court lacks subject matter jurisdiction because federal government has not waived its sovereign immunity for suits under those statutory provisions.  ECF No. 45-1 at 23–24 (alterations in original) (quoting *Bai v. Graves*, No. 21-cv-390, 2022 WL 123880, at *1 (D.D.C. Jan. 13, 2022)).  Plaintiff does not respond to those arguments and asserts— admittedly erroneously, as shown above—that any claims under those statutes were already dismissed by Judge Jackson.  *See* ECF No. 49-1 at 48.  The Court finds that he has conceded that subject matter jurisdiction is lacking for those claims by failing to respond to Defendant's arguments that the United States has not waived sovereign immunity.  *See, e.g.*, *Jean-Baptiste v. U.S.*

*Dep't of Just.*, No. 23-cv-432, 2024 WL 1253858, at *4 (D.D.C. Mar. 25, 2024) ("There is nothing in the text of Sections 1981 [or] 1983 . . . that suggests the United States has waived its immunity to suit under these statutes.  In fact, courts have expressly held the opposite."), *aff'd*, Order, *Jean-Baptiste v. U.S. Dep't of Just.*, No. 24-5070. 2024 WL 5495581 (D.C. Cir. Oct. 29, 2024).

Finally, Plaintiff explicitly concedes in the briefing that "the evidence is insufficient to support disparate treatment gender discrimination."  ECF No. 49-1 at 16.  Accordingly, Court will also dismiss Plaintiff's gender discrimination claims.  *See, e.g.*, *Herrion v. Children's Hosp. Nat'l Med. Ctr.*, 786 F. Supp. 2d 359, 366 (D.D.C. 2011) (dismissing a claim based on the plaintiff's "explicit concession" that it should be dismissed).  That leaves only the claims under Title VII for racial discrimination and retaliation in Counts I and III of the Complaint.

On June 28, 2024, the Court granted Plaintiff's counsel's motion to withdraw; Plaintiff now proceeds *pro se*.  *See* ECF No. 60; Minute Order (June 28, 2024).

## II.    LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment is appropriate when the moving party demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party.'"  *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Initially, the moving party has the burden of demonstrating the absence of a genuine dispute as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met this burden, the non-moving party must designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324. To establish that a fact is or is not genuinely disputed, a party must (a) cite specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). While the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-movant's favor, *Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 23–24 (D.C. Cir. 2013), the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his or her position; instead, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252. Moreover, the non-moving party "'may not rest upon mere allegation or denials of his pleading' but must present 'affirmative evidence' showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (quoting *Anderson*, 477 U.S. at 256–57); *Ass'n of Flight Attendants–CWA, AFL–CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009) (conclusory assertions without support from record evidence cannot create a genuine dispute). Indeed, a moving party may succeed on summary judgment simply by pointing to the absence of evidence proffered by the non-moving party. *Anderson*, 477 U.S. at 249–50 ("If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (internal citations omitted)).

It is well established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (quoting

*Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010)).  Indeed, a court's role in

deciding a summary judgment motion is not to "determine the truth of the matter, but instead [to]

decide only whether there is a genuine issue for trial."  *Id.* (quoting *Pardo-Kronemann*, 601 F.3d

at 604)  Moreover, district courts approach summary judgment motions in employment discrimi-

nation or retaliatory action cases with "special caution" due to the "potential difficulty for a plain-

tiff . . . to uncover clear proof of discrimination or retaliatory intent."  *Nurriddin v. Bolden*, 40 F.

Supp. 3d 104, 115 (D.D.C. 2014) (quoting *Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 879–80 (D.C.

Cir. 1997), *vacated on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc)).  Nonetheless, a

plaintiff is still obligated to support his or her allegations by competent evidence.  *Id.*  Accordingly,

a plaintiff may not avoid summary judgment through "conclusory allegations and speculation."

*Id.*

### B.    Discrimination and Retaliation Based on Discrete Acts

The federal sector provision of Title VII provides that "[a]ll personnel actions affecting

[federal] employees or applicants for [federal] employment . . . shall be made free from any dis-

crimination based on race, color, religion, sex, or national origin."  42 U.S.C. §§ 2000e-16(a).  The

government is also prohibited from retaliating against an employee or applicant for engaging in

protected activities such as filing an EEO complaint alleging employment discrimination.  *See*

*Rochon v. Gonzales*, 438 F.3d 1211, 1216 (D.C. Cir. 2006).

When a Title VII plaintiff does not offer direct evidence of discrimination, courts apply the

three-step burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411

U.S. 792 (1973).  *See Holcomb v. Powell*, 433 F.3d 889,895 (D.C. Cir. 2006).  Under that frame-

work, the plaintiff must initially establish a *prima facie* case by a preponderance of the evidence.

*McDonnell Douglas*, 411 U.S. at 802.  The three essential elements of a Title VII disparate treatment claim are that the plaintiff (1) is a member of a protected class; (2) suffered adverse employment action; and (3) was treated differently from similarly situated employees outside the protected class.  *See, e.g.*, *Nichols v. Billington*, 402 F. Supp. 2d 48, 65 (D.D.C. 2005), *aff'd*, No. 05-5326, 2006 WL 3018044 (D.C. Cir. Mar. 7, 2006); *see also Augustus v. Locke*, 934 F. Supp. 2d 220, 230 (D.D.C. 2013).  Similarly, to establish a *prima facie* case of retaliation, a plaintiff must show that (1) she engaged in statutorily protected activity, (2) she suffered materially adverse employment action, and (3) a causal connection exists between the protected activity and the challenged retaliatory act.  *Rochon*, 438 F.3d at 1219–20.  Once the plaintiff succeeds in making her *prima facie* showing, the burden of production shifts to the employer, who must articulate a legitimate, non-discriminatory or non-retaliatory reason for the challenged action.  *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981).  If the employer successfully does so, the burden shifts back to the plaintiff to prove that the employer's proffered reason is a pretext masking discrimination or retaliation.  *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).

   In employment discrimination and retaliation cases, summary judgment usually focuses on whether the employer can articulate non-discriminatory or non-retaliatory reasons for its actions. Where an employer has done so, "the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case."  *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (italics in original).  Even in *Brady*, however, the D.C. Circuit implicitly recognized that the plaintiff must "suffe[r] an adverse employment action" before the reasons for that action, benign or discriminatory, can be evaluated.  *Id.*  Both the courts of this District and subsequent panels of the D.C. Circuit have recognized that proceeding to the *Brady* analysis may be premature when the defendant contests whether an adverse employment action occurred at all.

*See, e.g., Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008); *Beckham v. Nat'l R.R. Passenger Corp.*, 736 F. Supp. 2d 130, 146 (D.D.C. 2010); *cf. Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019) ("*Brady*'s suggested preference for merits resolution on the third prong [of the *McDonnell Douglas* framework] is just that—a suggestion, which the District Court should follow only when feasible.").

If an adverse employment action occurred, the "central question" on summary judgment then becomes whether the employee "produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory or non-retaliatory reason was not the actual reason and that the employer intentionally discriminated or retaliated against the employee." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (quoting *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015)). The Court of Appeals has clarified that, in answering the central inquiry of *Brady*, a district court should consider "whether the jury could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer." *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (alteration in original) (quoting *Aka*, 156 F.3d at 1289); *cf. Brady*, 520 F.3d at 494 n.2 (noting that the question of whether a plaintiff was treated differently from a similarly situated employee who was not a member of the protected class is "relevant to the determination at summary judgment or trial whether intentional discrimination occurred").

A plaintiff may carry his rebuttal burden with evidence demonstrating that "the employer is lying about the underlying facts" that formed the predicate for the employment action, *Brady*, 520 F.3d at 495, or otherwise by "presenting enough evidence to allow a reasonable trier of fact to

conclude that 'the employer's proffered explanation is unworthy of credence,'" *Desmond v. Mukasey*, 530 F.3d 944, 962 (D.C. Cir. 2008) (quoting *Burdine*, 450 U.S. at 256). But "[i]f the employer's stated belief about the underlying facts is reasonable in light of the evidence, . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying." *Brady*, 520 F.3d at 495. A plaintiff may also come forward with comparative evidence that persons who are similarly situated to the plaintiff but are of a different race, sex, or age have been treated more favorably by the employer. *Id.*

Showing pretext requires more than simply criticizing the employer's decision-making process. "Title VII, it bears repeating, does not authorize a federal court to become 'a super-personnel department that reexamines an entity's business decisions.'" *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting *Dale v. Chi. Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986)). Indeed, a court "may not 'second-guess an employer's personnel decision absent demonstrably discriminatory [or retaliatory] motive.'" *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982)).

## III.    DISCUSSION

Omitting claims Plaintiff has conceded (or has been deemed to have conceded) must be dismissed, Plaintiff continues to press claims that he was subject to racial discrimination and/or retaliation in violation of Title VII based on the following conduct: (1) his October 7, 2011, transfer from the Hewlett Field Office to the Kirkwood Feld Office; (2) his January 3, 2012, designation as a Trainee for the position of Logistics System Specialist; (3) his February 17, 2012, demobilization from the Kirkwood Field Office; (4) the May 5, 2014, job offer rescission; (5) the March 2015 denial of his requests to telework; (6) the June 11, 2015, letter of reprimand; (7) the September and October 2015 restrictions on his use of a FEMA purchase card; (8) the September 2015

and March 2016 denials of his requests to become a Disaster Alternative Approving Official; (9) his supervisors' refusal to delegate authority for him to sign his staff's time cards and travel vouchers; (10) his supervisors' refusal to permit him to sign off on his subordinates' Position Task Books; (11) the February 19, 2016, performance rating; (12) his supervisors' failure to allow him access to a coach evaluator during his 2015–2016 Jefferson City deployment; and (13) his May 20, 2016, termination.

As discussed below, Defendant will be granted summary judgment in its favor on most of Plaintiff's remaining claims either because they are unexhausted, the event to which Plaintiff objects is not actionable, or Plaintiff has failed to provide sufficient evidence to allow a reasonable jury to find that Defendant's explanation for the action was a pretext concealing discrimination or retaliation. However, Plaintiff's racial discrimination claim based on his October 2012 transfer from the Hewlett Field Office to the Kirkwood Field Office survives, as does his retaliation claim based on the February 2012 demobilization.

### A.    Exhaustion

Defendant contends that Plaintiff's discrimination and retaliation claims based on the January 3, 2012, designation as a Trainee Logistics System Specialist and the rescinded 2014 job offer must be dismissed because they are not administratively exhausted.

"A plaintiff may file a Title VII . . . action in federal court only after exhausting . . . administrative remedies before the relevant federal agency for each allegedly discriminatory act." *Smith v. Lynch*, 106 F. Supp. 3d 20, 41 (D.D.C. 2015). The first step of the process for a federal employee who believes that he has been subject to discrimination by his employer requires him to "initiate contact with [an EEO] Counselor within 45 days of the date of the matter alleged to be discrimi-

natory." *Tyes-Williams v. Whitaker*, 361 F. Supp. 3d 1, 10–11 (D.D.C. 2019) (alteration in original) (quoting 29 C.F.R. § 1614.105(a)(1)).  If the issue is not resolved informally in counseling, the complainant must file a formal complaint with "with the agency that allegedly discriminated against the complainant."  29 C.F.R. § 1614.106(a); *see also, e.g.*, *Blue v. Jackson*, 860 F. Supp. 2d 67, 73 (D.D.C. 2012) ("In order to exhaust administrative remedies, a complainant must file [] a formal complaint[.]").  "After filing a written complaint, the employee may file a civil action after the agency issues an adverse final decision or 180 days elapse without a decision, whichever happens first."  *Blue*, 860 F. Supp. 2d at 73 (citing 42 U.S.C. § 2000e-16(c)).  Where the agency issues a decision, the complaint must be filed within 90 days of that decision.  29 C.F.R. § 1614.407(a).

"The primary purpose of the exhaustion requirement is to provide the agency with sufficient notice to begin the investigative process."  *Hernández v. Mao*, 235 F. Supp. 3d 172, 177 (D.D.C. 2017).  Although the rules of exhaustion "should not be construed to place a heavy, technical burden" on employee-plaintiffs, *Fennell v. AARP*, 770 F. Supp. 2d 118, 126 (D.D.C. 2011) (quoting *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995)), a failure to exhaust administrative remedies "will ordinarily bar a judicial remedy," *Bowe–Connor v. Shinseki*, 923 F. Supp. 2d 1, 5 (D.D.C. 2013).

In *Park*, the D.C. Circuit endorsed a "continuing violation" theory, which held that claims "like or reasonably related to the allegations of the [EEO] charge and growing out of such allegations" can proceed even if not included in an EEO complaint.  71 F.3d at 906–07 (quoting *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)).  "Under that standard, claims must 'arise from the administrative investigation that can [be] reasonably expected to follow the charge of discrimination.'"  *Klotzbach-Piper v. Nat'l R.R. Passenger Corp.*, 373 F. Supp. 174, 185

(D.D.C. 2019) (alteration in original) (quoting *Park*, 71 F.3d at 911). After *Park*, courts construed its already-expansive exhaustion standard broadly and "permitted a plaintiff to bring suit and recover for all related incidents, even those that were not specifically exhausted" in an EEOC charge. *Mount v. Johnson*, 36 F. Supp. 3d 74, 83 (D.D.C. 2014).

Seven years after the D.C. Circuit decided *Park*, the Supreme Court substantially undermined its core rationale in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). In that case, the Court "rejected the application of the continuing violation doctrine to discrete acts of discrimination or retaliation," *Klotzbach-Piper*, 373 F. Supp. 3d at 186, making clear that "claims based on discriminatory or retaliatory acts that occurred more than 180 or 300 days before the filing of [an] administrative charge are time-barred, regardless of whether they are 'like or reasonably related to' allegations contained in the administrative charge," *Smith-Thompson v. District of Columbia*, 657 F. Supp. 2d 123, 136 (D.D.C. 2009) (quoting *Morgan*, 536 U.S. at 113). Importantly, *Morgan* held that "discrete discriminatory acts are not actionable if time barred, *even when they are related to acts alleged in timely filed charges*." 536 U.S. at 113 (emphasis added). And although *Morgan* "dealt with timeliness rather than exhaustion," its rejection of the "like or reasonably related to" and continuing violation theories leaves *Park* on uncertain ground, as other courts in this Circuit have observed. *See, e.g.*, *Bain v. Off. of Att'y Gen.*, 648 F. Supp. 3d 19, 45 (D.D.C. 2022) ("For the reasons explained at greater length in [an earlier case], the Court concludes (once again) that 'the reasonably related rule no longer reflects the state of the law.'" (quoting *Hargrove v. AARP*, 205 F. Supp. 3d 96, 119 (D.D.C. 2016)); *Coleman–Adebayo v. Leavitt*, 326 F. Supp. 2d 132, 137 (D.D.C. 2004) (noting that "*Park* no longer reflects the state of the law" on administrative exhaustion), *amended on reconsideration in part on other grounds*, 400 F. Supp. 2d 257 (D.D.C. 2005). Indeed, although some courts continue to apply the reasonably related rule,

*see Mount*, 36 F. Supp. 3d at 83 (explaining the post-*Morgan* divergence between the majority and minority approaches in this Circuit), "[m]ost judges in this district have held that plaintiffs alleging discrete acts of discrimination or retaliation 'must exhaust the administrative process regardless of any relationship that may exist between those discrete claims and any others.'" *Rashad v. Washington Metro. Area Transit Auth.*, 945 F. Supp. 2d 152, 166 (D.D.C. 2013) (quoting *Coleman–Adebayo*, 326 F. Supp. 2d at 137–38); *see also Hartzler v. Mayorkas*, No. 20-cv-3802, 2022 WL 15419995, at *8–9 (D.D.C. Oct. 27, 2022) (applying the majority approach as "more concordant" with Supreme Court precedent), *aff'd*, No. 22-5310, 2024 WL 321989 (D.C. Cir. June 28, 2024) (per curiam); *Harris v. Mayorkas*, No. 21-cv-1083, 2022 WL 3452316, at *13 (D.D.C. Aug. 18, 2022) ("[T]he majority of courts in this jurisdiction now require plaintiffs to exhaust each discrete claim of retaliation." (quoting *Jones v. Granholm*, No. 20-cv-472, 2021 WL 2530677, at *7 (D.D.C. June 21, 2021)); *Moran v. Barr*, No. 18-cv-1986, 2020 WL 4286825, at *10 (D.D.C. July 27, 2020) (similar and collecting cases); *Klotzbach-Piper*, 373 F. Supp. 3d at 186 (similar).

Although the D.C. Circuit has on several occasions declined to expressly weigh-in on this issue or reconsider *Park*,[37] the Court finds the majority view more consistent with *Morgan*, which emphasized the severable nature of adverse employment decisions. *See, e.g.*, *Morgan*, 536 U.S. at 114 (explaining that "each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice'"); *see also Harris*, 2022 WL 3452316, at *13. Other circuits have reached the same conclusion and held that, following *Morgan*, each distinct instance of retaliatory or discriminatory conduct must be exhausted irrespective of their relation to one

---

[37] *See, e.g.*, *Webster v. Del Toro*, 49 F.4th 562, 568 (D.C. Cir. 2022) (noting that the Circuit has "twice reserved the question whether *Park* survives *Morgan*" and doing so again*); Haynes v. D.C. Water & Sewer Auth.*, 924 F.3d 519, 526 n.1 (D.C. Cir. 2019); *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010) (explaining that the court "need not decide whether *Morgan*" now requires individualized exhaustion of discrete claims); *Weber v. Battista*, 494 F.3d 179, 183–84 (D.C. Cir. 2007); *see also Hazel v. Washington Metro. Area Transit Auth.*, No. 02-cv-1375, 2006 WL 3623693, at *7 (D.D.C. Dec. 4, 2006) ("[T]he D.C. Circuit has not weighed in expressly on the precise reach of *Morgan*.").

another. *See Richter v. Advance Auto Parts*, 686 F.3d 847, 851–52 (8th Cir. 2012); *Martinez v. Potter*, 347 F.3d 1208, 1210–11 (10th Cir. 2003) ("*Morgan* abrogates the continuing violation doctrine as previously applied to claims of discriminatory or retaliatory actions by employers, and replaces it with the teaching that each discrete incident of such treatment constitutes its own 'unlawful employment practice' for which administrative remedies must be exhausted."); *see also Shaw v. Aramark Mgmt. Servs. Ltd. P'ship*, 903 F. Supp. 2d 413, 421 n.7 (E.D. Va. 2012) (noting that "*Martinez* is a persuasive argument for applying *Morgan*" to the exhaustion analysis), *aff'd*, 516 F. App'x 269 (4th Cir. 2013). More, "[r]equiring a plaintiff to exhaust each discrete claim of discrimination or retaliation" makes sense, as it "'comports with the purpose of the exhaustion doctrine to give the agency notice of a claim and [the] opportunity to handle it internally and ensures that only claims plaintiff has diligently pursued will survive.'" *Romero–Ostolaza v. Ridge*, 370 F. Supp. 2d 139, 149 (D.D.C. 2005) (second alteration in original) (quoting *Velikonja v. Mueller*, 315 F. Supp. 2d 66, 74 (D.D.C. 2004)). As the D.C. Circuit has emphasized more generally concerning exhaustion, "[a]llowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge." *Marshall v. Fed. Express Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997) (quoting *Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 127 (7th Cir. 1989)). And although the exhaustion requirement "should not be construed to place a heavy technical burden" on would-be plaintiffs, neither is it "a 'mere technicality,'" and courts "cannot allow liberal interpretation of an administrative charge to permit a litigant to bypass the . . . administrative process." *Park*, 71 F.3d at 907 (quoting *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1111 (7th Cir. 1992)). After all, "the employing agency [has] a 'crucial administrative

role' in addressing alleged violations," which "rigorous exhaustion requirements" aid in preserving. *Webster*, 49 F.4th at 566 (quoting *Brown v. GSA*, 425 U.S. 820, 833 (1976)).

For these reasons, the Court will apply the majority approach articulated above to Defendant's exhaustion arguments. Such application simplifies the analysis here. Plaintiff does not contest that he did not initiate EEO counseling regarding the January 3, 2012, Trainee designation and admits that he "did not include [the January 2012 Trainee designation] claim in the First EEO Complaint."[38] ECF No. 49-1 at 45; *see* ECF No. 45-2, ¶ 32 ("FEMA has no record of Plaintiff initiating EEO counseling on any other dates beside November 18, 2011, the day when Plaintiff initiated EEO counseling for claims included in his First EEO Complaint, and on July 17, 2015, the day when Plaintiff initiated his EEO counseling for claims included in his Second EEO Complaint."); *Davis v. Mnuchin*, No. 08-cv-447, 2018 WL 8584035, at *19 (D.D.C. Nov. 13, 2018) (stating that "[w]here a defendant has presented evidence that a claim was not exhausted, such as a declaration by a person with personal knowledge that the relevant files do not contain records of

---

[38] Confusingly, Plaintiff asserts that "this claim occurred after Plaintiff was reassigned [to the Kirkwood Field Office] in October 2011 and filed his EEO Complaint in November 2011." ECF No. 49-1 at 45. Some courts have suggested that "[w]hether the *Morgan* test applies . . . may depend on whether the unexhausted discriminatory [or retaliatory] events took place . . .after [the plaintiff] filed [an] administrative complaint." *McCallum v. Mayorkas*, No. 21-cv-1911, 2023 WL 3203011, at *8 (D.D.C. May 2, 2023). But that would not help Plaintiff here because the record is clear that he did *not* file an EEO complaint in November 2011; rather, it is undisputed that he filed the First EEO Complaint on January 18, 2012, which post-dates the designation, which occurred on January 3, 2012. *See* ECF No. 45-2, ¶ 15 (Defendant stating that the First EEO Complaint was filed on January 18, 2012); ECF No. 49-3, ¶ 13 (Plaintiff stating that "[o]n or about January 20, 2012, [he] filed an Individual Complaint of Employment Discrimination" with FEMA's Office of Equal Rights); ECF No. 59-3 at 2 (Plaintiff's First EEO Complaint dated January 18, 2012). And, although Plaintiff did initiate EEO *counseling* in November 2011, it is undisputed that he did not assert a claim related to his designation as a Trainee—he could not have, because it had not yet occurred.

a grievance or complaint" a genuine issue of fact is not created by "vague assertions without sup-

porting details that the plaintiff exhausted [the] claim"), *report and recommendation adopted sub*

*nom. Davis v. Yellen*, 2021 WL 2566763 (D.D.C. Jan. 22, 2021).

Similarly, Plaintiff does not allege that he successfully amended the First EEO Complaint

to include the 2014 rescission of the job offer; he argues, rather, that the "act[] of retaliation in

2014" was "like or reasonably related to the claims" in the First EEO Complaint and that FEMA

had notice of the claim, "and by inference opportunity to resolve [it], which served the substantial

purpose of administrative exhaustion."  ECF No. 49-1 at 45–46.  Under the *Morgan* regime, a

showing that an unexhausted claim is similar to an exhausted one is insufficient.[39]  *See, e.g.*, *Rich-*

*ter*, 686 F.3d at 852 ("Here, as in *Morgan*, 'our most salient source for guidance is the statutory

text.'  We recognize that *Morgan* concerned discrete acts of an employer that occurred *prior* to the

filing of an EEOC charge, rather than discrete acts of an employer that occurred thereafter, but the

meaning of the phrase 'unlawful employment practice' does not vary based on the timing of the

alleged unlawful acts.  The term 'practice' no more subsumes multiple discrete acts when one of

---

[39] Even if the Court applied the "like or reasonably related to" standard, this claim would still be unexhausted.  For an unexhausted claim to be like or reasonably related to an exhausted one, it "must arise from 'the administrative investigation that can reasonably be expected to follow the charge of discrimination.'"  *Park*, 71 F.3d at 907 (quoting *Chisholm v. U.S. Postal Serv.*, 665 F.2d 482, 491 (4th Cir. 1981)).  Courts have held that unexhausted alleged acts of discrimination or retaliation that occur significantly later than the allegations investigated by the agency cannot be like or reasonably related to that earlier conduct because "the investigation could not have reasonably been expected to uncover" the subsequent conduct.  *Redding v. Mattis*, 327 F. Supp. 3d 136, 141 (D.D.C. 2018).  Thus, an alleged act of retaliation that occurred "almost a year" after the conduct the agency investigated was not exhausted under the like or reasonably related standard.  *Id.*  Here, the May 2014 job offer rescission occurred more than two years after the latest allegedly retaliatory act in the First EEO Complaint—the February 2012 demobilization from the Kirkwood Field Office.  FEMA's "investigation could not [therefore] have been reasonably expected to uncover [it], because of the temporal distance between [it] and the allegations in [the] EEO charge that were actually investigated."  *Id.*

those acts occurs after the filing of an EEOC charge than it does when all acts occur before the charge is filed."); *see also, e.g.*, *Martinez*, 347 F.3d at 1210–11 (similar).

As to Plaintiff's "notice" argument, the D.C. Circuit indicated 40 years ago that "notice may be adequate where a claim is brought to the agency's attention 'during the course of the administrative proceeding' and 'before it issued its final decision' even if the argument or claim is not clearly set out in the [administrative] complaint." *Brown v. Marsh*, 777 F.2d 8, 13 (D.C. Cir. 1985) (quoting *President v. Vance*, 627 F.2d 353, 361 (D.C. Cir. 1980)). However, "[t]he vitality" of that decision "is questionable in light of the Supreme Court's subsequent decision in *Morgan*." *Wright v. Barr*, No. 17-cv-1081, 2020 WL 13598000, at *15 (D.D.C. June 8, 2020), *report and recommendation adopted sub nom. Wright v. Garland*, 2022 WL 17584011 (D.D.C. Dec. 12, 2022)). And, in any case, there is no support for Plaintiff's hypothesis that FEMA or the EEOC had the "opportunity to resolve" the claim. As discussed above, the May 2014 rescission so post-dated the conduct included in the First EEO Charge that the investigation cannot reasonably have been expected to uncover it. And, "as the District of Columbia Circuit has emphasized, '[a]llowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role . . .'" *Lee v. McDonough*, No. 22-cv-319, 2024 WL 3858820, at *5 (D.D.C. Aug. 19, 2024) (first alteration in original) (quoting *Marshall*, 130 F.3d at 1098). Indeed, in *Redding* the court found claims unexhausted where the plaintiff had—as did Plaintiff here—"attempted to exhaust" them by unsuccessfully seeking permission from the EEOC administrative judge to amend her administrative complaint. 327 F. Supp. 3d at 141. Similarly, in *Lee*, the court found a claim unexhausted where the EEOC rebuffed plaintiff's attempts to raise it, finding that "the EEOC was not given 'an opportunity to handle [the] matter[]

40

internally.'" 2024 WL 3858820, at *5. (alterations in original) (quoting *Niskey v. Kelly*, 859 F.3d 1, 7 (D.C. Cir. 2017)).  So it is here.

Accordingly, the Court finds that Plaintiff's claims based on his January 2012 designation as a Trainee Logistics System Specialist and the rescinded May 2014 job offer are unexhausted.

### B.    The Merits

This case has now been whittled down to claims that the following conduct violated Title VII's prohibition on racial discrimination and/or retaliation in federal employment:  (1) Plaintiff's October 7, 2011, transfer from the Hewlett Field Office to the Kirkwood Field Office; (2) his February 17, 2012, demobilization from the Kirkwood Field Office; (3) the March 2015 denial of his requests to telework; (4) the June 11, 2015, letter of reprimand; (5) the September and October 2015 restrictions on his use of a FEMA purchase card; (6) the September 2015 and March  2016 denials of his requests to become a Disaster Alternative Approving Official; (7) his supervisors' refusal to delegate authority for him to sign his staff's time cards and travel vouchers; (8) his supervisors' refusal to permit him to sign off on his staff's Position Task Books; (9) the February 19, 2016, performance rating; (10) his supervisors' failure to allow him access to a coach evaluator during his 2015–2016 Jefferson City deployment; and (11) his May 20, 2016, termination.  The government argues that much of that conduct does not constitute adverse employment action sufficient to sustain a discrimination or retaliation claim.  It further contends that Plaintiff has not adduced evidence sufficient for a reasonable jury to find that any of the conduct at issue was motivated by discriminatory animus or retaliation.

### 1.    Adverse Employment Action

As noted above, notwithstanding *Brady*'s exhortation that where the employer has provided a non-discriminatory reason for the conduct that allegedly violates Title VII, *"the district

court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case," 520 F.3d at 494, courts have nevertheless addressed the preliminary question of whether an adverse employment action has occurred before proceeding to the essential question of whether the employee produced enough evidence to for a reasonable jury to find that the employer's reason was mere pretext for intentional discrimination or retaliation. *See, e.g.*, *Wright*, 2020 WL 13598000, at *9 (collecting cases). Defendant maintains that many of the actions at issue is insufficient to constitute adverse employment actions under Title VII. Specifically, it asserts that the denial of Plaintiff's requests to telework; the June 2015 letter of reprimand; the restrictions on Plaintiff's use of his purchase card; the refusal to permit Plaintiff to sign the timecards, travel vouchers, or Position Task Books, and the February 2016 performance rating do not qualify under the standards applicable to either claims of discrimination or claims of retaliation. *See* ECF No. 45-1 at 39–43. Plaintiff disagrees and argues that those actions are sufficiently adverse to meet the requirements of both a discrimination and retaliation claim under Title VII. *See* ECF No. 49-1 at 19–21, 38.

This analysis is complicated by two factors. First, the standard by which a court measures whether an employment action is adverse differs depending on whether the claim is one for intentional discrimination or for retaliation. Second, although the parties agree on the standard for retaliation claims, they disagree on the standard applicable to intentional discrimination claims. The Court tackles the latter—and more complicated—question first.

### a.    *Intentional Discrimination*

Title VII uses different language when describing the types of employment actions that are prohibited in federal-sector employment and in non-federal-sector employment. The provision applicable to non-federal employers makes it an unlawful employment practice "to fail or refuse

to hire or to discharge any individual, or otherwise to discriminate against any individual *with respect to his compensation, terms, conditions, or privileges of employment*, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1) (emphasis added). The provision applicable to the federal government, on the other hand, requires that "[a]ll *personnel actions* affecting employees or applicants for employment . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." *Id.* § 2000e-16(a). Notwithstanding this difference in language, D.C. Circuit precedent has long held that "the two [provisions] contain identical prohibitions." *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007); *see also, e.g.*, *Bundy v. Jackson*, 641 F.2d 934, 942 (D.C. Cir. 1981) ("Despite the difference in language between these two sections, we have held that Title VII places the same restrictions on federal . . . agencies as it does on private employers . . . ."); *Barnes v. Costle*, 561 F.2d 983, 988 (D.C. Cir. 1977) ("[I]t is beyond cavil that Congress legislated for federal employees essentially the same guarantees against . . . discrimination that previously it had afforded private employees.").

The government contends that the Supreme Court abrogated that precedent in 2020 when it decided *Babb v. Wilkie*, 589 U.S. 399 (2020). In that case, the Court addressed whether the federal-sector provision of the Age Discrimination in Employment Act ("ADEA")—which "provides (with just a few exceptions) that 'personnel actions' affecting individuals aged 40 and older 'shall be made free from any discrimination based on age'"—"imposes liability only when age is a 'but-for cause' of the personnel action in question." *Babb*, 589 U.S. at 402 (quoting 29 U.S.C. § 633a(a)). In holding that, under that provision of the ADEA, "age must be a but-for cause of

discrimination—that is, of differential treatment—but not necessarily a but-for cause of a personnel action itself," the Supreme Court observed that

> Section 633a(a) concerns "personnel actions," and while the ADEA does not define this term, its meaning is easy to understand. The Civil Service Reform Act of 1978, which governs federal employment, broadly defines a "personnel action" to include most employment-related decisions, such as appointment, promotion, work assignment, compensation, and performance reviews. That interpretation is consistent with the term's meaning in general usage, and we assume that it has the same meaning under the ADEA.

*Babb*, 589 U.S. at 405–06 (internal citation omitted) (citing 5 U.S.C. § 2302(a)(2)(A)).  From this, the government argues that because the federal-sector provision of Title VII also uses the term "personnel actions," *see* 42 U.S.C. § 2000e-16(a), only adverse personnel actions as defined by the Civil Service Reform Act are actionable under that provision.  *See* ECF No. 45-1 at 36.  That is important because the Civil Service Reform Act includes in its definition of personnel actions "other, unenumerated 'change[s] in duties, responsibilities, or working conditions' only if they are 'significant.'"  *Id.* (alteration in original) (quoting 5 U.S.C. § 2302(a)(2)(A)(xii)); *see also* ECF No. 59 at 28 (maintaining that "for an event to be actionable under the federal sector provisions of Title VII . . . the identified event must either be an enumerated 'personnel action' under the Civil Service Reform Act or fall into that term's catch-all—i.e., 'any other *significant* change in duties, responsibilities, or working conditions'" (citations omitted) (quoting 5 U.S.C. § 2302(a)(2)(A)(xii))).  The requirement that changes in duties, responsibilities, or working conditions be "significant" to be actionable is a higher standard than that applied under 42 U.S.C.

§ 2000e-2 (the non-federal-sector provision of Title VII) as recently interpreted by the D.C. Circuit and the Supreme Court.[40]

In *Chambers v. District of Columbia*—a case alleging violations of the non-federal-sector provision of Title VII—the D.C. Circuit overruled its 1999 decision in *Brown v. Brody*—a case brought under the federal-sector provision of Title VII—and held that a plaintiff alleging intentional discrimination under Title VII need not show that an adverse employment decision caused "objectively tangible harm." *Chambers v. District of Columbia*, 35 F.4th 870, 875, 882 (D.C. Cir. 2022) (en banc) (quoting *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999)). Two years later, in *Muldrow v. City of St. Louis*—a non-federal-sector case—the Supreme Court clarified that to support a discrimination claim under Title VII, a plaintiff need not show that an adverse employment action caused harm that was "'significant' . . . [,] [o]r serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." 601 U.S. 346, 355 (2024) (quoting *Muldrow v. City of St. Louis*, 30 F.4th 680, 688 (8th Cir. 2022)).

---

[40] Interestingly, some courts have found that, if *Babb* were applied to Title VII claims, it would *expand* the universe of prohibited adverse employment actions. *See Fentress-Bussey v. Austin*, No. 23-cv-1080, 2024 WL 3823784, at *4 (E.D. Va. Aug. 14, 2024) (stating that judges in the Eastern District of Virginia have interpreted "the phrase 'personnel action' . . . [to be] a broader, more inclusive term than the ordinarily used 'adverse employment action.'" (quoting *Abdelhamid v. Sec'y of the Navy*, 525 F. Supp. 3d 671, 684 (E.D. Va. 2021))); *Pembleton v. USAF*, No. 22-cv-3989, 2023 WL 9521898, at *9 n.12 (D.S.C. Sept. 15, 2023) (stating that, in *Babb*, the Supreme Court "signaled that the federal-sector term 'personnel action' should be interpreted more broadly than its private-sector counterpart 'employment action'" because the Civil Service Reform Act defines the term without regard "to the impact [such actions] have on the employee's job responsibilities"). That may be true for actions like "appointment, promotion, transfer, reassignment, and performance evaluations," *id.*, but, as noted, the statute mandates that "other . . . changes in duties, responsibilities, or working conditions" must be "significant," 5 U.S.C. § 2302(a)(2)(A)(xii).

Rather, the plaintiff must show only "some harm respecting an identifiable term or condition of employment."[41]  *Id.* at 354–55.

This Court, like several before it, rejects the government's argument that *Babb* requires federal-sector Title VII plaintiffs to make a different showing than non-federal-sector Title VII plaintiffs to establish an adverse employment action.  As Judge Contreras explained:

> *Babb* is nothing new.  When the D.C. Circuit decided *Chambers*, it was certainly aware of the "usual rule . . . 'when the legislature uses certain language in one part of the statute and different language in another,'" courts should "assume[] different meanings were intended.  But that general principle is not absolute, the D.C. Circuit has consistently interpreted Title VII's federal-sector and private-sector language in parallel, and there is no sign that *Chambers* wedged those provisions apart.
>
> The Court also gives little weight to the Supreme Court's assumption that the Civil Service Reform Act's definition of "personnel actions" applied to the ADEA: the *Babb* Court did not hold that this definition was controlling, but merely commented that it was consistent with standard usage and moved on from the issue.  That observation has no effect on whether that definition must govern Title VII federal-sector claims.  Moreover, Defendant does not grapple with the fact that their argument would hold the federal government to a *lower* standard than the private-sector, which would be the opposite of *Babb*.  Defendant has not provided the compelling textual, structural, and historical evidence that would be necessary to convince this Court that Title VII's federal-sector provision should be a less-protective departure from the private-sector provision.  And regardless, because D.C. Circuit precedent binds this Court to construe the provisions together, *Chambers* applies to this action.

*Doe v. Austin*, No. 22-cv-3474, 2024 WL 864270, at *10 (D.D.C. Feb. 29, 2024) (alterations in original) (footnote omitted) (citations omitted) (quoting *DePierre v. United States*, 564 U.S. 70, 83 (2011)); *see, e.g.*, *Turner v. Buttigieg*, No. 23-cv-1665, 2024 WL 4346332, at *8 (D.D.C. Sept.

---

[41] There is some disagreement over whether the "some harm" standard set in *Muldrow* conflicts with the en banc decision in *Chambers*.  Justice Kavanaugh thought that it did, reasoning that the teaching of Chambers is that "[t]he discrimination is the harm" and "disagree[ing] with the Court's new some-harm requirement."  *Muldrow*, 601 U.S. at 364–65 (Kavanaugh, J., concurring in the judgment).  Still, he pointed out that the some-harm requirement is a "low bar" and opined that "the Court's approach and [his] preferred approach will land in the same place and lead to the same result in 99 out of 100 discriminatory-transfer cases, if not in all 100."  *Id.* at 365.  Courts in this district have similarly found that *Muldrow* and *Chambers* can comfortably co-exist.  *See, e.g.*, *Dixon v. Blinken*, No. 22-cv-2357, 2024 WL 4144105, at *2 (D.D.C. Sept. 11, 2024) ("*Muldrow* is consistent with the D.C. Circuit's decision in *Chambers* . . . ."); *see also, e.g.*, *Stewart v. U.S. Dep't of Agric.*, No. 23-cv-1194, 2024 WL 4332618, at *5 (D.D.C. Sept. 27, 2024) (applying *Chambers* post-*Muldrow*).

30, 2024) (rejecting the defendant's argument that "a federal-employee [Title VII] plaintiff may only bring a claim based on an adverse 'personnel action' as defined by the Civil Service Reform Act"); *Stewart*, 2024 WL 4332618, at *4 (following *Doe v. Austin* on this point); *Bain*, 648 F. Supp. 3d at 53–55 (continuing to interpret the federal-sector and non-federal sector provisions of Title VII congruently notwithstanding the difference in language); *see also McCray v. McDonough*, No. 22-cv-2154, 2023 WL 171927, at *7 n.8 (D. Kan. Jan. 12, 2023) ("*Babb* addressed a different act—the Age Discrimination in Employment Act of 1967.  And, as defendant concedes, this definition was proposed as dicta in *Babb*.  Our Circuit hasn't applied the list of 'adverse personnel actions' in Title VII cases since the Supreme Court decided *Babb*. Instead, post-*Babb*, our Circuit has continued to apply the 'adverse employment action' standard to federal sector Title VII claims."); *cf. Fentress-Bussey*, 2024 WL 3823784, at *4 ("Although neither this District Judge nor the Fourth Circuit ha[s] addressed the impact of the *Babb dicta*, other district judges within this District have recognized that it is unclear whether the 'personnel action' definition would apply to Title VII . . .").  Thus, the following discussion applies the *Muldrow/Chambers* regime to determine whether the conduct Defendant challenges constitutes adverse employment actions.[42]

### i.    Denial of Requests to Telework

*Muldrow* requires that, to establish an adverse employment action for the purposes of a Title VII discrimination claim, the plaintiff must show "some harm respecting an identifiable term

---

[42] The government appears to contend, at one point in its briefing, that the *Chambers/Mudrow* standard is congruent with the standard it advocates derived from *Babb*: "Objectively, if an event had no significant effect on Plaintiff's duties and responsibilities, or working conditions, then the same event cannot be construed as having any [e]ffect on Plaintiff's 'terms, conditions, or privileges of employment,' either."  ECF No. 45-1 at 41.  First, if that were the case, Defendant would not have needed to spill so much ink trying to convince the Court to apply a standard derived from *Babb*, because it would make no difference to the analysis.  More fundamentally, the government's statement is simply wrong.  That an event does not have a *significant* effect on a job's duties and responsibilities does not mean it has *no* effect on the terms, conditions, or privileges of employment.

or condition of employment." *Muldrow*, 601 U.S. at 347.  Although rescinding or suspending an employee's approved telework schedule or refusing to permit an employee to engage in telework to which he is otherwise entitled may well be an adverse employment action under that standard, merely refusing an employee's request to telework is not, because there is no "identifiable term or condition of employment" that has been harmed by the denial.  *Id.*  Recent caselaw[43] bears that out.  For example, in *Black v. Guzman*, the court found that the "suspension of plaintiff's telework benefits" was an adverse employment action because it was "an adverse change to plaintiff's 'terms, conditions, or privileges of employment,'" noting that being "forced . . . to work in person instead of remotely" was a "major change[]" to the plaintiff's conditions of employment.  No. 22-cv-1873, 2023 WL 3055427, at *8 (D.D.C. Apr. 24, 2023) (citations omitted) (first quoting *Chambers*, 35 F.4th at 876; and then quoting *Heavans v. Dodaro*, 648 F. Supp. 3d 1, 14 (D.D.C. 2022)).  The court contrasted the suspension of the ability to telework with the "denial of a request for changes in work schedule"—such as a request to begin teleworking—because such a denial was "not an effective change in [the] plaintiff's existing work schedule."  *Id.* at *8 n.8; *see also Kelso v. Vilsack*, No. 19-cv-3864, 2024 WL 5159101, at *3, *6 n.7 (D.D.C. Dec. 18, 2024) (finding that a supervisor's denial of three requests to telework on specific days from an employee who did not have a telework agreement did not constitute an adverse employment action); *cf. Dixon v. Blinken*, No. 22-cv-2357, 2024 WL 4144105, at *3 (D.D.C. Sept. 11, 2024) (finding that the denial of the plaintiff's "request to change his telework day on one occasion" was an adverse employment action because his "'approved telework schedule' was plainly a term, condition, or privilege of his position"); *Imhof v. N.Y.C. Hous. Auth.*, No. 23 Civ. 1880, 2024 WL 3376084, at *10 (S.D.N.Y. July 11, 2024) (finding that allegations that the plaintiff was prohibited from working remotely

---

[43] The caselaw from this district cited here all post-dates *Chambers*, which was issued on June 6, 2022; the caselaw from outside this district cited here all post-dates *Muldrow*, which was issued on April 17, 2024.

three days per week "in contravention of [the employer's] policy . . . plausibly pleaded an adverse employment action"); *Keith v. U.S. Gov't Accountability Off.*, No. 21-cv-2010, 2023 WL 6276635, at *9 (D.D.C. Sept. 26, 2023) (finding, on a motion to dismiss, that "it is plausible that revocation of that [telework] arrangement forced Keith to work in-person rather than remotely, and thus amounted to an adverse change to the terms, conditions, or privileges of her employment"). As a court in the Northern District of Illinois explained, because employees who telework rely on that arrangement, the "loss of telework" is an adverse "change[] [in] the structure of an employee's workday." *Miller v. O'Malley*, No. 20 C 2118, 2024 WL 4240443, at *4 (N.D. Ill. Sept. 19, 2024). Here, Plaintiff did not have an approved telework schedule and there is no evidence that he had a vested right to telework. He has therefore not shown "some harm respecting an identifiable term or condition of employment." *Muldrow*, 601 U.S. at 347.

ii.     Signature Authority for Position Task Books

Plaintiff has also not shown that any denial of the authority to sign off on subordinates' Position Task Books was an adverse employment action. To the contrary, he admitted in his deposition that such authority was not part of his job, that he never asked for such authority, and that he was not alleging that the denial of such authority was discriminatory or retaliatory. *See* ECF No. 45-8 at 28–29. Notwithstanding those admissions, Plaintiff's opposition brief inexplicably continues to press discrimination and retaliation claims based on the denial of the opportunity to "sign off on Plaintiff's staff Position Task Books." ECF No. 49-1 at 13; *see also id.* at 21, 28, 41.

The Court finds that Plaintiff has not shown "some harm respecting an identifiable term or condition of employment" by being denied an opportunity that he has admitted he was not qualified to perform. *Muldrow*, 601 U.S. at 347.

iii.    Signature Authority for Timecards and Travel Vouchers

It is a closer call whether supervisors' refusal to grant Plaintiff the authority to sign his subordinates' timecards and travel vouchers constitutes an adverse employment action. Plaintiff asserts that signing timecards and travel vouchers was among the duties and responsibilities of his position and a "necessary action in [his] job description." ECF No. 45-17 at 13; *see also* ECF No. 49-3, ¶ 44 (identifying signing off on timecards and travel vouchers as a "job duty"). Defendant acknowledges a slightly different point: that "ensur[ing] that all personnel time records [were] complete, accurate, and submitted within established timeframes was a common responsibility shared by all individuals with a supervisory position." ECF No. 45-2, ¶ 116. But Defendant points to *Baloch*, in which the plaintiff maintained (among other things) that he suffered an adverse employment action when his substantive duties changed upon the hiring of another employee with his job title. *See* 550 F.3d at 1196; ECF No. 45-1 at 40. The D.C. Circuit disagreed. It found that, although after the new hire "some of [the plaintiff's] previous responsibilities were no longer his," the change "did not constitute qualitatively inferior work requiring less skill or knowledge" and emphasized that the court was "hesitan[t] to engage in 'judicial micromanagement of business practices' by second-guessing employers' decisions about 'which of several qualified employees will work on a particular assignment.'" *Baloch*, 550 F.3d. at 1197 (quoting *Mungin v. Katten Muchin & Zavis,* 116 F.3d 1549, 1556 (D.C. Cir. 1997)). Defendant cites the case to show that the removal of the "shared duty or responsibility between [Plaintiff] and the Logistics Section

Chief" to "sign for staffs' timecards and travel vouchers . . . cannot be deemed adverse." ECF No. 45-1 at 40.

*Baloch*, of course, predates the change wrought by *Chambers* and *Muldrow*. More recent cases have suggested that a "stripping [an employee] of an organization of the duties normally associated with [his] post" will "clear[] the adverse-employment-action hurdle." *Yazzie v. Nat'l Org. for Women*, 712 F. Supp 3d 56, 79 (D.D.C. 2024); *Stewart*, 2024 WL 4332618, at *5 (quoting *Yazzie*). To be sure, Plaintiff never enjoyed the authority to sign off timecards or travel vouchers, so nothing was "stripp[ed]" from him, but he does assert that signing such documents was one of the duties associated with his job. *Cf. Imhof*, 2024 WL 3376084, at *10 (finding that prohibiting the plaintiff from enjoying one of the privileges of his job constituted an adverse employment action).

The government, however, asserts that that "nothing in the record can establish that this had a non-*de minimis*, let alone significant, effect on Plaintiff's duties and responsibilities or working conditions." ECF No. 45-1 at 40. But *Muldrow* did away with any requirement that an employment action have a "significant" deleterious effect to be considered adverse for the purposes of an intentional discrimination claim. *See* 601 U.S. at 355. And it is not clear whether an exception for de minimis harms survived *Chambers*—the en banc court declined to decide that question, *see* 35 F.4th at 875 ("[W]e need not decide today whether Title VII includes a de minimis exception . . . .")—or *Muldrow*. Indeed, the court in *Dixon*, while noting that *Muldrow* requires a showing of "some harm," also explained that "nothing in Title VII 'says anything about how much worse' or otherwise distinguishes between 'significant disadvantages and . . . not-so-significant ones.'" *Dixon*, 2024 WL 4144105, at *3 (alteration in original) (quoting *Muldrow*, 601 U.S. at 355). More, Defendant has not explained *why* the refusal to allow Plaintiff to perform a duty that

51

he avers was among his job duties should be considered a de minimis harm—it simply asserts that it is. *See* ECF No. 45-1 at 40. The Court will therefore assume that Plaintiff has shown enough to defeat summary judgment as to whether the denial of signature authority was an adverse employment action for the purposes of an intentional discrimination claim. *See Dixon*, 2024 WL 4144105, at *3 ("Here, [the plaintiff] alleges that he was treated 'worse' than his female co-worker . . . . That is all Title VII requires . . . .").

iv.    Use of Purchase Card

This is also a close call. It is undisputed that Plaintiff was provided a government credit card on May 26, 2015. *See* ECF No. 45-40 at 2–4. The memorandum accompanying the card asserts that Plaintiff was "appointed as a Cardholder with the authority to execute purchases in support" of FEMA's mission. *Id.* at 2. That is, it appears from the record in this case that Plaintiff was granted authority to make purchases with the card, as long as he obtained "written approval" and ensured there were sufficient funds available. *Id.* But Plaintiff testified at his deposition that Meyers refused to allow Plaintiff even to activate his card and thereafter denied two of Plaintiff's requests to make purchases. *See* ECF No. 45-8 at 21–22. Defendant does not counter that testimony. It appears from the record that those were the only two requests Plaintiff made. That is, although Plaintiff had been authorized to be a cardholder and make purchases (with approval), Meyers refused to allow him to activate his card and denied each of Plaintiff's later requests to make a purchase.

Defendant again supports its argument with caselaw that pre-dates *Chambers* and *Muldrow* and contends that the denial "on only two occasions[] could not have had a non-*de minimis*, let alone significant, effect on Plaintiff's duties and responsibilities or working conditions." ECF No.

52

45-1 at 40.  That bare-bones argument is no more successful here than it is in connection with the denial of signature authority discussed above.

There is little precedent on point, although in a recent case, the government withdrew an argument that the suspension of a government credit card was "not sufficiently adverse to sustain an employment discrimination claim" in the wake of *Chambers*.  *Cobb v. Del Toro*, No. 20-cv-3015, 2023 WL 6215037, at *7 (D.D.C. Sept. 25, 2023).  Because there is evidence in the record that indicates that Plaintiff had "authority" to make purchases with the government credit card and that he was denied that ability every time he asked to exercise it and—crucially—because Defendant's argument that the denials were not sufficiently adverse is wanting, the Court will not grant summary judgment for Defendant on that basis.

### v.      July 2015 Letter of Reprimand

Even post-*Chambers* (and post-*Muldrow*), courts have found that to be considered an adverse employment action, a letter of reprimand must lead to some deleterious change in the terms, conditions, or privileges of employment.  *See, e.g.*, *Holmes v. Washington Metro. Area Transit Auth.*, 723 F. Supp. 3d 1, 17 (D.D.C. 2024) ("[T]he D.C. Circuit 'has held that formal criticisms or reprimands, without additional disciplinary action such as a change in grade, salary, or other benefits, do not constitute adverse employment actions.'  A formal reprimand can be an adverse action, however, if it serves as 'a building block' that justifies an adverse action down the road." (citations omitted) (first quoting *Stewart v. Evans*, 275 F.3d 1126, 1136 (D.C. Cir. 2002); and then quoting *Robb v. Vilsack*, No. 20-cv-929, 2021 WL 3036796, at *13 (D.D.C. July 19, 2021)); *Rupard v. Mayorkas*, No. 22-cv-1806, 2023 WL 5650083, at *5 (D.D.C. Aug. 31, 2023) ("'Run-of the mine letters of reprimand are generally not adverse employment actions,' at least when they are not 'abusive and do not lead to disciplinary action.'" (quoting *Bell v. Fudge*, No. 20-cv-2209,

2022 WL 4534603, at *6 (D.D.C. Sept. 28, 2022)); *Mitchell v. Planned Parenthood of Greater New York, Inc.*, No. 23-cv-01932, 2024 WL 3849192, at *10 (S.D.N.Y. Aug. 16, 2024) ("[A] 'mere admonition by a supervisor without any formal consequences is not an adverse employment action because it does not represent any disadvantageous change in the terms or conditions of the plaintiff's employment.'" (quoting *Rios v. Centerra Grp. LLC*, 106 F.4th 101, 112–13 (1st Cir. 2024))).

Here, Defendant asserts that "nothing in the record . . . establishes that Plaintiff's . . . letter of reprimand had any effect on Plaintiff's terms, conditions, or privileges of employment such that it could appropriately be considered to be an [a]dverse action."[44]  ECF No. 45-1 at 42.  However, Plaintiff's notice of termination explicitly states that the June 11, 2015, reprimand "for similar misconduct" was "taken into consideration" when "determining the appropriate penalty to impose." ECF No. 49-21 at 7.  As such, it appears to have "serve[d] as 'a building block'" to "justif[y] an adverse action"—Plaintiff's termination—"down the road."  *Holmes*, 723 F. Supp. 3d at 17 (quoting *Robb*, 2021 WL 3036796, at *13); *see also Robb*, 2021 WL 3036796, at *13 (finding a letter of reprimand can constitute an adverse employment action where it is used as a reason to justify a later dismissal and the causal connection between the reprimand and the dismissal is not "too tenuous").  Defendant does not address that connection.  On this record, a reasonable jury

---

[44] The only letter of reprimand in the record is from 2015.  *See* ECF No. 45-7 at 11.  The Court assumes that Defendant's identification of a "2016 letter of reprimand" is a typographical error, especially since the record cite it provides leads back to a copy of the June 11, 2015, letter of reprimand.  *See* ECF No. 45-1 at 42 (Defendant citing, as support for its description of the content of the letter of reprimand, paragraph 97 of Defendant's Statement of Undisputed Facts, ECF No. 45-2, ¶ 97, which in turn cites ECF No. 45-7 at 11, which is the June 11, 2015, letter of reprimand)

could find that the letter of reprimand caused "some harm respecting an identifiable term or condition of employment," which is all *Muldrow* requires for the purposes of an intentional discrimination claim.[45] 601 U.S. at 354–55.

vi.    February 2016 Performance Evaluation

This analysis mirrors the prior one but—as happens with mirrors—comes out the other way. As above, post-*Chambers* caselaw from this district and post-*Muldrow* caselaw from other districts require a performance review to have some identifiable negative effect on the terms, conditions, or privileges of employment before it will be considered an adverse employment action for the purposes of an intentional discrimination claim. *See, e.g.*, *Johnson v. Hartogensis*, No. 19-cv-1998, 2023 WL 6479495, at *4 (D.D.C. Oct. 5, 2023), *aff'd*, No. 23-cv-5279, 2024 WL 3076788 (D.C. Cir. June 20, 2024) ("A lowered performance appraisal that is tied to lost compensation can constitute an adverse action."); *Keith*, 2023 WL 6276635, at *7 (finding that an allegation that a negative performance review with no supporting facts "suggesting the precise manner in which" it had an adverse impact on a term, condition, or privilege of employment did not make out an adverse employment action for an intentional discrimination claim); *Heavans*, 648 F. Supp. 3d at 14 (finding that poor performance reviews "[fell] into the category of a supervisor's ordinary workplace exercise of authority that did not adversely affect the conditions of [the] plaintiff's employment, though these actions undoubtedly caused tribulations, eroded [the] plaintiff's morale, and likely undermined his supervisory position . . . ."); *see also, e.g.*, *Knispel v. Haaland*, No. 21-cv-3015, 2025 WL 306426, at *14 (D.S.D. Jan. 27, 2025) ("An unfavorable evaluation alone is not an adverse employment action but may be actionable 'where the employer subsequently uses

---

[45] In *Bain*, the court dismissed the plaintiff's *retaliation* claim based on a letter of reprimand that the plaintiff alleged led to her dismissal years later, finding the letter did not "create a predictable and direct prospect of [tangible job] consequences," but allowed a discrimination claim based on the letter to go forward, at least until summary judgment. 648 F. Supp. 3d at 57. The case is discussed more fully in Section III.B.1.b.v.

the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment.'" (quoting *Spears v. Mo. Dep't of Corr. & Hum. Res.*, 210 F.3d 850, 854 (8th Cir. 2000)));

*Aly v. Yellen*, No. 23-cv-01699, 2024 WL 2053492, at *5 (D. Md. May 8, 2024) ("[A] poor performance evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." (alteration in original) (quoting *Dortch v. Cellco P'ship*, 770 F. App'x 643, 647 (4th Cir. 2019))).[46]

Defendant contends that "Plaintiff can point to nothing in the record that establishes that his 2016 performance evaluation had any effect on his terms, conditions, or privileges of employment." ECF No. 45-1 at 42. In this instance, it is correct. Plaintiff does not suggest that the evaluation—in which he received a satisfactory, if not stellar, rating—caused any adverse change in the terms, conditions, or privileges of his employment, *see, e.g.*, ECF No. 49-1 at 22, and the Court's review of the record has not revealed any such consequences. In short, Plaintiff has not

---

[46] The court in *Turner* found that an allegation that the plaintiff received "a performance rating of 'exceeds expectations,' rather than her usual rating of 'outstanding,' due to her race and sex" sufficiently pleaded an adverse employment action because, if the evaluation was lowered "due to discriminatory animus, it is actionable." 2024 WL 4346332, at *7–8. As support, the court turned to "[t]he following hypothetical from *Chambers* . . . : imagine 'an employer that provides doughnuts every week for employees but hangs a "whites only" sign over the doughnuts.'" Being subjected to such a blatantly discriminatory workplace policy (even if the policy is doughnut distribution) is itself a harmful condition of employment." *Id.* (citation omitted) (quoting *Chambers*, 35 F.4th at 878). But it is not clear whether that hypothetical still has vitality after *Muldrow*, which requires a showing of "some harm respecting *an identifiable term or condition of employment*." 601 U.S. at 354–55 (emphasis added). Justice Kavanaugh read the "some harm" requirement to mean some harm in addition to the discrimination itself: "I disagree with the Court's new some-harm requirement. No court has adopted a some-harm requirement, and no party or *amicus* advocated that requirement to this Court. More to the point, the text of Title VII does not require a separate showing of some harm. The discrimination is harm." *Id.* at 364–65 (Kavanaugh, J., concurring in the judgment). He also recognized that the statute requires another showing: "whether the relevant employment action changes the compensation, terms, conditions, or privileges of employment." *Id.* at 365. Leaving aside the doughnut hypothetical, it is not clear how a performance review that has no identifiable adverse consequences can be said to "change the compensation, terms, conditions, or privileges of employment." *Id.* at 354–55.

shown "some harm respecting an identifiable term or condition of employment." *Muldrow*, 601 U.S. at 347.

### b.    Retaliation

Although "the retaliation standard historically 'encompass[ed] a broader sweep of actions' than the discrimination standard did, the opposite is true after the D.C. Circuit's landmark decision in *Chambers*[,]" *Flores v. Crown Bldg. Maint., Co.*, No. 23-cv-275, 2024 WL 1795974, at *5 (D.D.C. Apr. 25, 2024) (alteration in original) (citation omitted) (quoting *Baloch*, 550 F.3d at 1198 n.4), which "limited its holding to discrimination claims and left the existing 'materially adverse action' standard in place for retaliation claims," *Leach v. Yellen*, No. 18-cv-3075, 2023 WL 2496840, at *6 (D.D.C. Mar. 14, 2023), *aff'd*, No. 23-5100, 2024 WL 4274378 (D.C. Cir. Sept. 24, 2024); *see also Heavans*, 648 F. Supp. 3d at 16(noting that post-*Chambers*, "courts still look for 'objective' materiality [when addressing retaliation claims] in much the same way that they used to require 'objectively tangible harm' in discrimination claims").   "To prove retaliation, the plaintiff generally must establish that he or she suffered (i) a materially adverse action (ii) because he or she had brought or threatened to bring a discrimination claim." *Baloch*, 550 F.3d at 1198. In *Muldrow*, the Supreme Court reaffirmed that "Title VII's anti-retaliation provision . . . applies only when the retaliatory action is 'materially adverse,' meaning that it causes 'significant' harm." 601 U.S. at 348 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).   The Court explained that "[t]he test was meant to capture those . . . employer actions serious enough to 'dissuade[] a reasonable worker from making or supporting a charge of discrimination.'   An action causing less serious harm will not deter Title VII enforcement and so falls outside the purposes of the ban on retaliation." *Id.* (quoting *White*, 548 U.S. at 68).   The standard is "objective and captures only 'significant,' rather than 'trivial,' harms," which "'[t]ypically . . . involve[] "a

significant change in employment status, such as hiring, firing, failing to promote, reassignment

with significantly different responsibilities, or a decision causing significant change in benefits.'''"

*Watkins v. Dep't of Just.*, No. 23-cv-766, 2024 WL 4362156, at *9 (D.D.C. Sept. 30, 2024) (first

and second alterations in original) (first quoting *White*, 548 U.S. at 68; and then quoting *Taylor v.

Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003))).

The Court now applies that standard to the six allegedly materially adverse actions ad-

dressed above.

### i.    Denial of Requests to Telework

As above, although the revocation of an existing telework arrangement may constitute a

materially adverse employment action and support a retaliation claim, the denial of an "initial

telework request" does not.  *Saunders v. Mills*, 172 F. Supp. 3d 74, 101 (D.D.C. 2016); *see also,

e.g.*, *Kirton v. Mayorkas*, No. 18-cv-1580, 2021 WL 981241, at *7 (D.D.C. Mar. 16, 2021) ("An

employer's decision to not grant the permission to telework, on its own, simply does not entail the

type of harm that is actionable under [the anti-retaliation provisions of] Title VII."); *Byrd v. Vil-

sack*, 931 F. Supp. 2d 27, 41 (D.D.C. 2013) ("[T]he denial of an employee's request to work from

home on a few occasions, without more, does not constitute an adverse employment action under

Title VII . . . under the . . . standard applicable to retaliation claims.").  That is especially true

where, as here, the request was ultimately granted.  *See Pauling v. District of Columbia*, 286 F.

Supp. 3d 179, 207 (D.D.C. 2017) (finding no materially adverse action where "although there was

a delay in providing the plaintiff with . . . telecommuting privileges, it is undisputed that she eventually received those benefits, even after filing an OHR complaint and initiating this lawsuit").

### ii.     Signature Authority for Position Task Books

As noted above, *see* Section III.B.1.a.ii, *supra,* Plaintiff admits that he was not qualified to sign off on subordinates' Position Task Books, so the fact that he was not allowed to do so did not cause even "some harm," let alone the significant harm necessary to support a retaliation claim. *Muldrow*, 601 U.S. at 348, 350.

### iii.     Signature Authority for Timecards and Travel Vouchers

As discussed above, Plaintiff asserts, without contradiction from Defendant, that signing timecards and travel vouchers was a duty and responsibility of his position that was withheld from him.  *See* Section III.B.1.a.iii, *supra*.  But the D.C. Circuit has held that "inconveniences" like "'alteration of job responsibilities [does] not rise to the level of adverse action' necessary to support a [retaliation] claim." *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (quoting *Stewart v. Evans*, 275 F.3d 1126, 1135 (D.C. Cir. 2002)).

### iv.     Use of Purchase Card

This analysis is like the one above.  It is undisputed that Plaintiff had the authority to make purchases with a government credit card with written approval from a supervisor and approval was withheld.  Nevertheless, that is precisely the kind of minor inconvenience that will not support a retaliation claim.  *See Searcy v. Locke*, No. 09-cv-1142, 2010 WL 3522967, at *8 (E.D. Va. Sept. 7, 2010) (finding that removing the plaintiff's responsibilities as a purchase card coordinator for

the U.S. Patent and Trademark Office was "not a materially adverse action within the meaning of *Burlington Northern*").

v.    June 2015 Letter of Reprimand

Generally, "letters of reprimand setting forth allegations of deficient work performance . . . are not materially adverse action[s]." *Stewart v. United States Dep't of Agric.*, No. 23-cv-1194, 2024 WL 4332618, at *6 (D.D.C. Sept. 27, 2024); *see also Flores*, 2024 WL 1795974, at *6 ("As our Circuit has held time and again, '[F]ormal criticisms or reprimands, without additional disciplinary action such as a change in grade, salary, or other benefits, do not constitute adverse employment actions.'" (alteration in original) (quoting *Stewart v. Evans*, 275 F.3d 1126, 1136 (D.C. Cir. 2002))).  Here, of course, the reprimand was considered in the decision to terminate Plaintiff almost one year later.  *See* ECF No. 49-21 at 7.  That does not cause the reprimand to rise to the level of a materially adverse employment action for the purposes of a retaliation claim, however.  In *Bain*, the plaintiff—a former immigration judge with the Department of Justice—made a retaliation claim alleging that counseling letters and "somewhat less positive [performance] review[s]" were materially adverse actions because "DOJ relied on them when taking more tangible actions against her, most notably terminating her."  648 F. Supp. 3d at 57–58.  Judge Moss disagreed.  He reasoned:

> [W]hether tangible job consequences eventually occurred is not the question.  The question is whether these consequences were foreseeable at the time the challenged actions occurred.  If the rule were otherwise, each instance of retaliation that fell short of an adverse action on its own would linger like some kind of Schrödinger's cat, either actionable or unactionable based on some future event that may or may not transpire.  Here, at the time Bain received the evaluations and counseling letters at issue, there was no reason to believe that these actions would provide support for her later dismissal. . . .  Even when it happened, Bain's removal was predicated on her conduct in certain immigration hearings with no connection to her evaluations and counseling letters.  The letters and evaluations came into play only when DOJ considered Bain's record to identify aggravating and mitigating factors—including whether she was on notice "regarding the expectations of professional behavior"—

60

for purposes of imposing a sanction. The connection between the events is thus apparent only in hindsight and would have been entirely speculative at the time Bain received the letters and evaluations. That does not suffice.

There are further reasons, doctrinal and practical, to reject the rearview-mirror understanding of adverse actions that Bain advances. For one thing, the notion that retaliatory acts that do not lead predictably and directly to tangible job consequences persist indefinitely as inchoate adverse actions pending some future conduct cannot be reconciled with *Morgan*'s admonition that discrete retaliation claims are just that: discrete. They therefore "occur" at a definite and knowable time, and the merits of those discrete claims do not turn on whether they may be "related to" any future acts. Nor is any such theory necessary to provide relief to plaintiffs. A retaliatory act that is not cognizable when it occurs provides an employee no entitlement to relief at that time. If, at a later date, an adverse action occurs that was caused by the prior retaliatory act, the employee can challenge that latter action. . . . And no matter what, a prior, non-cognizable retaliatory act can still provide evidence to support later claims based on acts that *are* sufficiently adverse. Here, Bain is free to use her counseling letters and performance evaluations as evidence in support of her claim related to her termination, among others.

*Id.* at 58–59 (internal citations omitted) (emphasis in original). Here, as in *Bain*, Plaintiff had no

reason to believe at the time the reprimand was issued it would provide support for his dismissal

months later, a dismissal predicated not on the behavior at issue in the June 2015 reprimand, but

rather on actions between November 2015 and April 2016. *See* ECF No. 49-21 at 2–3. And here,

as in *Bain*, the June 2015 reprimand was considered only in relation to the choice of sanction. *See*

*id.* at 7. And so "[t]he connection between the events is . . . apparent only in hindsight and would

have been entirely speculative at the time [Plaintiff] received the letter[] . . . .  That does not suffice."[47]  *Bain*, 648 F. Supp. 3d at 58.

vi.     February 2016 Performance Evaluation

A performance evaluation—even one "that is not negative or 'adverse in an absolute sense'"—can be materially adverse to support a retaliation claim if the plaintiff "present[s] evidence that the evaluation[] '[was] attached to' specific and tangible 'financial harms.'" *Bridgeforth v. Salazar*, 831 F. Supp. 2d 132, 143–44 (D.D.C. 2011) (first quoting *Weber v. Battista*, 494 F.3d 179, 185 (D.C. Cir. 2007); and then quoting *Taylor*, 571 F.3d at 1321, *aff'd in relevant part*, No. 12-5015, 2012 WL 2371601 (D.C. Cir. June 15, 2012) (per curiam), *and aff'd sub nom. Bridgeforth v. Jewell*, 721 F.3d 661 (D.C. Cir. 2013).  As noted above, Plaintiff has failed to present evidence linking his February 2016 performance rating to any tangible adverse consequence.  *See* Section III.B.1.a.vi, *supra*.  The performance rating cannot, therefore, support a retaliation claim.

2.     Pretext

To recap, any claims related to Plaintiff's designation as Trainee in January 2012 are unexhausted, as are any claims related to the rescinded May 2014 job offer.  The denials of Plaintiff's requests to telework, refusal to allow Plaintiff to sign off on subordinates' Position Task Books, and February 2016 performance evaluation are not adverse employment actions for the purposes of either an intentional discrimination claim or retaliation claim.  The refusal to allow Plaintiff to sign off on timecards and travel vouchers, failure to approve his use of a government credit card, and July 2015 reprimand can support an intentional discrimination claim but not a retaliation claim.

---

[47]Also like in *Bain*, here the Court has found that the same reprimand could be an adverse employment action for the purposes of an intentional discrimination claim.  *See Bain*, 648 F. Supp. 3d at 57 (allowing an intentional discrimination claim based on counseling letters to proceed to summary judgment).

Accordingly, intentional discrimination claims remain based on the following actions: (1) the October 2011 transfer from the Hewlett Field Office to the Kirkwood Field Office; (2) the February 17, 2012, demobilization from the Kirkwood Field Office; (3) the June 2015 letter of reprimand; (4) the September and October 2015 failure to approve Plaintiff's use of a government credit card; (5) the September 2015 and March 2016 denial of Plaintiff's requests to become a Disaster Alternative Approving Official; (6) the failure to delegate to Plaintiff the authority to sign off on subordinates' timecards and travel vouchers; (7) the denial of access to a coach evaluator; and (8) his May 2016 termination.  Retaliation claims remain based on the following actions: (1) the October 2011 transfer from the Hewlett Field Office to the Kirkwood Field Office; (2) the February 17, 2012, demobilization from the Kirkwood Field Office; (3) the September 2015 and March 2016 denial of Plaintiff's requests to become a Disaster Alternative Approving Official; (4) the denial of access to a coach evaluator; and (5) his May 2016 termination.  Defendant has proffered a non-discriminatory and/or non-retaliatory reason for each of those actions except for the October 2011 transfer.  As to that action, Defendant admits that the reason proffered by Alonso for the transfer (which was to save FEMA money) was false but asserts that Plaintiff has nevertheless failed to show that discrimination or retaliation was the true reason for the transfer.  Plaintiff contends that all reasons are pretextual.  The Court addresses those arguments below.

### a.    *Intentional Discrimination*

#### i.    2011 Transfer

As noted, Plaintiff was transferred to the Kirkwood Field Office from the Hewlett Field Office while Swindells, a Caucasian employee of the same rank as Plaintiff, was transferred to the Hewlett Field Office from the Kirkwood Field Office.  ECF No. 45-2, ¶ 36.  The reason given for the transfer was budgetary: Alonso asserted that, because Swindells lived close to the Hewlett

Field Office, transferring him there would save the government hotel charges and *per diem* payments that he received when in "travel status" working more than 50 miles from his home. *See id.*, ¶¶ 36–37; ECF No. 49-7 at 3 (explaining eligibility for *per diem* payments). It is undisputed that that explanation was false, and, in fact, Alonso and his deputy Swedlow provided misleading information that allowed Swindells to continue receiving such payments. *See* ECF No. 45-2, ¶¶ 42–44; *see also* ECF No. 45-34.

In *Aka v. Washington Hospital Center*, the D.C. Circuit addressed what more, if anything, is required of a plaintiff resisting summary judgment who has already shown that the employer's stated reason for an adverse employment action is false. *See* 156 F.3d 1284, 1289–94 (D.C. Cir. 1998) (en banc). The court held that a plaintiff who "discredit[s] . . . an employer's stated reason for its employment decision" will not "*always* be deemed to have presented enough evidence to survive summary judgment"; rather, "the court must consider all the evidence in its full context in deciding whether the plaintiff has met his burden of showing that a reasonable jury could conclude that he had suffered discrimination and accordingly summary judgment is inappropriate." *Id.* at 1290. The court provided examples of when showing the stated reason is pretextual would not be sufficient to survive summary judgment, including "a case in which the plaintiff calls the employer's explanation into question, but does so in a way that conclusively demonstrates that the real explanation for the employer's behavior is not discrimination, but some other motivation." *Id.* at 1291. Defendant fastens on that illustration and argues that a reasonable jury could not find that Alonso's reason for the transfer was racially discriminatory: "[E]ven if the real reason for Plaintiff's transfer in October 2011 was to defraud FEMA of money, Plaintiff's discrimination and retaliation claims still fail where the actual motivation for the transfer is not discrimination or retaliation." ECF No. 45-1 at 33. In its reply, the government asserts that "the undisputed record

shows that . . . Swindells was transferred because he lived in Long Island and therefore appeared like he would not have to be paid travel expenses, even though an investigation revealed that he and his supervisors continued to process and pay such travel expenses after the transfer."  ECF No. 59 at 21.  The government's problem is that the admissible evidence in the record does not "*conclusively demonstrate[]* that the real explanation" for the transfer was a plan to defraud the government.  *Aka*, 156 F.3d at 1291 (emphasis added).  Indeed, the Office of Special Counsel's report of its investigation found that the fraud was planned "in the span of 33 minutes on *October 7, 2011*," ECF No. 45-34 at 3 (emphasis added), which is *after* Plaintiff was informed of the transfer on October 6, 2011, *see* ECF No. 45-2, ¶ 38; *see also* ECF No. 59-3 at 17.  That evidence squarely contradicts Defendant's current theory that the non-discriminatory reason for the transfer was to facilitate the fraud.  Accordingly, it would not be inconsistent with the record for a reasonable jury to find that the reason for the transfer was discrimination.

The government does not argue that the circumstances of the transfer, in which a Caucasian colleague was allegedly treated more favorably than Plaintiff was, are insufficient to raise an *inference* of discrimination.  *See Brown v. Sessoms*, 774 F.3d 1016, 1022 (D.C. Cir. 2014) ("A plaintiff can raise an inference of discrimination by showing 'that [he] was treated differently from similarly situated employees who are not part of the protected class'" (quoting *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005))).  Rather, it faults Plaintiff for failing to "point[] to evidence of intentional discrimination to survive summary judgment" or to cite "support for the claim that the mere fact that he switched positions with someone who was not part of his protected class, alone, mean[s] that the transfer was intentionally discriminatory."  ECF No. 59 at 21.  Those points misunderstand the law.  *Aka* indicates that, here, Plaintiff need not point to additional evidence of intentional discrimination to create a genuine issue of material fact as to whether the transfer was

intentionally discriminatory. In *Aka*, the en banc court refused to endorse a rule that "plaintiffs are presumptively required to submit evidence over and above . . . a rebuttal [of the defendant's non-discriminatory reason for the employment action] in order to avoid summary judgment." 156 F.3d at 1292. To be sure, a plaintiff "cannot always avoid summary judgment by showing the employer's explanation to be false" but "such a showing does have considerable evidentiary significance." *Id.*

> First, when the plaintiff rebuts the employer's own explanation of its challenged acts, this eliminates the principal nondiscriminatory explanation for the employer's actions. Events have causes; if the only explanations set forth in the record have been rebutted, the jury is permitted to search for others, and may in appropriate circumstances draw an inference of discrimination.

*Id.* Second, "[i]f the jury can infer that the employer's explanation is not only a mistaken one in terms of the facts, but a lie, that should provide even stronger evidence of discrimination" because "according to ordinary evidentiary principles . . . , a lie is evidence of consciousness of guilt. The jury can conclude that an employer who fabricates a false explanation has something to hide; that 'something' may well be discriminatory intent." *Id.* at 1293; *see also id.* at 1294 ("In an appropriate case, '[t]he factfinder's disbelief of the reasons put forward by the defendant' will allow it to infer intentional discrimination. . . . If 'disbelief is accompanied by a suspicion of mendacity,' the likelihood of intentional discrimination is increased, permitting the factfinder to infer discrimination more readily." (alteration in original) (citations omitted) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993))). That is, *Aka* teaches that "in an appropriate case," a jury faced with evidence that the employer's non-discriminatory reason for an adverse employment action is "a lie" might reasonably conclude that the real reason is discrimination. *Id.* at 1293–94. This case, where there is not merely "a suspicion of mendacity," but *undisputed proof* that the reason Alonso gave for the transfer—saving FEMA money—was false, coupled with evidence contradicting the

government's newly-minted theory that the actual motive was to commit fraud, fits the bill.[48]  Accordingly—although it is perhaps a close call—Defendant is not entitled to summary judgment on this claim.

ii.    February 2012 Demobilization

For this claim, recall that, in a nutshell, Plaintiff's first-line supervisor Cole at the Kirkwood Field Office informed Plaintiff that he would be demobilized on February 24, 2012, pursuant to a directive from the Federal Coordinating Official to reduce personnel by twenty percent to save money.  ECF No. 45-2, ¶¶ 48–49.  Plaintiff was among those to be demobilized because he was an out-of-region employee being paid a *per diem*.  *Id.*, ¶¶ 51, 54, 56.  Plaintiff called Operations Director Bezou, who was outside Plaintiff's chain of command, to express concerns about the demobilization.  *Id.*, ¶¶ 52–53.  Logistics Chief Butkus decided to demobilize Plaintiff earlier on the basis that Plaintiff had breached the chain of command.  *Id.*, ¶¶ 58–59.  Plaintiff was demobilized on February 17, 2012.  *Id*, ¶ 60.  Swindells, who was not out-of-region, was not demobilized from the Hewlett Field Office.  *See* ECF No. 59-1 at 14–15.  At that time, however, Swindells was nevertheless receiving travel expenses, including a *per diem,* pursuant to the scheme discussed previously.  ECF No. 45-2, ¶¶ 42–43.

"A plaintiff can establish pretext masking a discriminatory motive by presenting 'evidence suggesting that the employer treated other employees of a different race . . . more favorably in the same factual circumstances."  *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir.

---

[48] This case is thus different from the cases Defendant cites.  In *Hendricks v. Geithner*, the court found that the plaintiff's evidence was insufficient to allow a reasonable jury to conclude that the employer's asserted reason for selecting a male to promote rather than her was pretext.  568 F.3d 1008, 1013–14 (D.C. Cir. 2009).  In *Brady*, somewhat similarly, the plaintiff alleged the employer's asserted non-discriminatory reason for demoting him—that he had previously engaged in sexual harassment—was falsified but failed to show that the employer did not honestly and reasonably believe that the incident occurred; he therefore failed to show pretext.  520 F.3d at 495–96.  Here, however, there is no question that the explanation Alonso offered was a fiction.[49]  Defendant does not argue that Swindells is an inappropriate comparator with regard to the October 2011 transfer.

2015) (alteration in original) (quoting *Brady,* 520 F.3d at 495). "At the summary judgment stage, the Court 'must rely on evidence substantiated by the record' to conclude that the plaintiff and an asserted comparator are similarly situated." *Burton v. District of Columbia*, 153 F. Supp. 3d 13, 67 (D.D.C. 2015) (quoting *Anyaso v. U.S. Capitol Police,* 39 F. Supp. 3d 34, 43 (D.D.C. 2014), *aff'd sub nom. Nelson v. District of Columbia,* 689 F. App'x 642 (D.C. Cir. 2017). "[I]f a reasonable jury would be unable to find that the plaintiff and the comparator were similarly situated, the court may decide, as a matter of law, that the two are not similarly situated." *Id.* "A plaintiff must . . . demonstrate that 'all of the relevant aspects of [his] employment situation were nearly identical to those of the [other]' employee." *Holbrook v. Reno,* 196 F.3d 255, 261 (D.C. Cir. 1999) (quoting *Neuren v. Adduci, Mastriani, Meeks & Schill,* 43 F.3d 1507, 1514 (D.C.Cir.1995)). "'[T]he similarly situated inquiry is not a mechanical comparison,' but 'requires enough common factors to determine if intentional discrimination was at play' by 'eliminating confounding variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable: complaints about discrimination.'" *Burton*, 153 F. Supp. 3d at 67 (quoting *Hnin v. TOA (USA), LLC,* 751 F.3d 499, 504–505 (7th Cir. 2014)).

Plaintiff identifies Swindells as his comparator. ECF No. 49-1 at 24. But Plaintiff has not shown that "all of the relevant aspects" of Swindells' employment situation were "nearly identical" to Plaintiff's at the time of the demobilization.[49] *Holbrook,* 196 F.3d at 261 (quoting *Neuren,* 43 F.3d at 1514). Plaintiff has not, for example, shown that the decision to demobilize Plaintiff and the decision to keep Swindells on were made by the same decisionmaker. *Ragsdale v. Holder*, 668 F. Supp. 2d 7, 25 (D.D.C. 2009) ("In order to show that []he was similarly situated to a fellow employee, [the] plaintiff must 'demonstrate that all of the relevant aspects of their employment

---

[49] Defendant does not argue that Swindells is an inappropriate comparator with regard to the October 2011 transfer.

situation are nearly identical,' including working under the same supervisor." (second alteration in original) (quoting *Childs-Pierce v. Utility Workers of Am*, 383 F. Supp. 2d 60, 70 (D.D.C. 2005)).  More, even if Plaintiff did show that, he has not pointed to any evidence that such a decisionmaker believed that Swindells and Plaintiff were similarly situated and yet treated Plaintiff more harshly.  It is undisputed that out-of-region employees, who were being paid a *per diem*, were to be demobilized first.  ECF No. 45-2, ¶¶ 56–57.  Plaintiff was an out-of-region employee; Swindells was not.  To be sure, at the time, Swindells, like Plaintiff, was receiving *per diem* payments.  But Plaintiff has not pointed to any evidence that any supervisor responsible for Plaintiff's demobilization knew that Swindells, too, was receiving *per diem* payments (whether fraudulent or otherwise).[50]  "[I]n assessing the pretextual nature of the proffered reason" for an adverse employment action—here, Plaintiff's demobilization for budgetary reasons—the court's task "is limited to determining whether the employer 'believe[d] in the accuracy of the reason given.'" *Cocuzzo v. Trader Joe's E. Inc.*, 121 F.4th 924, 932 (1st Cir. 2024) (second alteration in original) (quoting *Espinal v. Nat'l Grid NE Holdings 2, LLC*, 693 F.3d 31, 35 (1st Cir. 2012)).  Thus, "[a]n employer who makes a distinction between employees because that employer believes the employees are not similarly situated does not discriminate on an impermissible basis."  *Pennington v. City of Huntsville*, 93 F. Supp. 2d 1201, 1216 (N.D. Ala. 2000), *aff'd*, 261 F.3d 1262 (11th Cir. 2001).  So, to establish that Defendant's proffered reason for treating Plaintiff differently than Swindells was pretextual, Plaintiff would have to show not only that the decisionmaker "acted on an incorrect perception" of the facts (which he has done), but also that the decisionmaker "did not think the

---

[50] It is undisputed that Logistics Chief Alonso knew Swindells continued to receive such payments; Alonso, however, was no longer Logistics Chief in February 2012, having been demobilized on or before December 19, 2011.  *See* ECF No. 45-2, ¶ 35.  Swedlow, too, was no longer in the Logistics Section.  *See* ECF No. 59-3 at 18 (Logistics Section Organization Chart dated December 19, 2011).

proffered interpretation [of those facts] was correct." *Cocuzzo*, 121 F.4th at 933.  This, Plaintiff has not done.

Plaintiff has also failed to raise a genuine issue of fact as to whether his early demobilization on February 17, 2012, rather than February 24, 2012, was based on discriminatory animus. Logistics Chief Butkus stated that he accelerated Plaintiff's demobilization because Plaintiff broke the chain of command when he complained to Operations Director Bezou about the demobilization.  *See* ECF No. 45-2, ¶¶ 52–53, 58.  "Ultimately, it 'is not this Court's job to decide if defendant's proffered reasons were wise, fair, or correct, but rather, whether defendant honestly believed those reasons and acted in good faith upon those beliefs.'"  *Hartzler*, 2022 WL 15419995, at *19 (quoting *Crockett v. Richardson*, 127 F. Supp. 2d 40, 47 (D.D.C. 2001)).  Here, "the core inquiry" on summary judgment is "whether [Plaintiff] has produced sufficient evidence for a reason to find that FEMA did not 'honestly believe in the reasons it offer[ed]'" for demobilizing Plaintiff on February 17, 2012.  *Id.* (second alteration in original) (quoting *Fischbach*, 86 F.3d at 1183).  Plaintiff has, again, not done so.  His only attempt is a repeated assertion that Butkus "made clear that the acceleration of demobili[z]ation was motivated by [Plaintiff's] complaint to the [Office of Equal Rights]."  ECF No. 49-1 at 43; *see also id.* at 23, 32, 47.  Not only would that not support

an inference that the demobilization was based on racially discriminatory animus, but Plaintiff provides no evidence in support of it.[51]  The Court therefore disregards it.

Because Plaintiff has failed to raise a genuine issue of material fact as to whether the demobilization was discriminatory, Defendant is entitled to summary judgment on this claim.

### iii.    June 2015 Letter of Reprimand

Regarding the June 2015 reprimand, Plaintiff asserts (1) of the ten members of the IMAT team, he, the only African American, was the sole employee reprimanded, ECF No. 49-1 at 25; (2) the reprimand's allegations "were disputed and shown to be weak and inconsistent," *id.* at 28; and (3) the reprimand was "issued without warning or counselling as required by Defendant's policies," *id.* at 47.  None of those arguments defeats Defendant's motion for summary judgment.

First, as to the proposed comparators, the nine other members of the IMAT, Plaintiff has made no attempt to show that "'all of the relevant aspects of [his] employment situation were nearly identical to those of the [other]' employee[s]," including that "they were charged with offenses of comparable seriousness." *Burley*, 801 F.3d at 301 (first two alterations in original) (quoting *Holbrook,* 196 F.3d at 261).  Indeed, his sole argument as to comparators is the following paragraph:

> The IMAT Team consisted of a list of ten (10) individual with Mr. Wilson as the only African American. *See Id.* ¶ 47.  All the others were Caucasian Americans, except Mr. Maldanado who identified as of Hispanic background. *Id.*  None of the other members on the IMAT Team were reprimanded, denied Purchase Card Use, DAAO, Signature Authority for PTB and Concur WebTA, Coach and Evaluator

---

[51] The only record citations Plaintiff offers to support this allegation appear to reference paragraphs 15 and 17 of the December 2023 Wilson Affidavit or perhaps paragraphs 15 and 17 of Plaintiff's Statement of Material Facts—it is unclear, because the bulk of the citations in Plaintiff's briefs are "*id.*," but they often do not refer back to the immediately preceding citation. *See* ECF No. 49-1 at 43, 47.  None those paragraphs nor any other paragraph in the affidavit or Statement of Material Facts makes an assertion—whether in admissible form or not—that Butkus made such a statement.

> for Disaster and fired from the IMAT Team.  Mr. Wilson was the only one on the
> IMAT Team who had prior EEO activity at the time.

ECF No. 49-1 at 25.[52]  The record contains two charts that appear to identify other employees on

the IMAT, one including position title and the other including race and ethnicity, but neither in-

cluding more detailed information.  *See* ECF No. 49-9 at 19–20.  Thus, there is no information

about facts like the other employees' "experience, seniority, or expertise," *Budik v. Howard Univ.

Hosp.*, 986 F. Supp. 2d 1, 7 (D.D.C. 2013), or their "supervisors, responsibilities, or employment

situations," *Nurriddin v. Bolden*, 40 F. Supp. 3d 104, 125 (D.D.C. 2014), *aff'd*, 818 F.3d 751 (D.C.

Cir. 2016).  And the job-related information provided—position title—shows that each of the pu-

tative comparators had a different title than Plaintiff.  *See* ECF No. 49-9 at 19.  His attempt to

show pretext with comparator evidence therefore fails.  *See, e.g.*, *Moreno-Livini v. AFL-CIO Hous-

ing Inv. Tr.*, No. 24-cv-1392, 2024 WL 4144112, at *3 (D.D.C. Sept. 11, 2024) (noting that differ-

ences in job titles and duties are indications that two employees are not similarly situated).

Second, Plaintiff's contention that the evidence supporting the reprimand was "weak" and

"disputed" appears to be an argument that the performance issues enumerated in the reprimand

were false.  For such an argument to succeed in showing pretext, "the plaintiff must establish a

---

[52] "DAAO" stands for Disaster Alternative Authorizing Official; "PTB" stands for Position Task Book; Concur and WebTA are timecard and travel voucher programs.

It is unclear what Plaintiff cites here as support in his opposition brief.  Tracing back from the "*Id.*" to the immediately prior non-"*id.*" citation suggests that Plaintiff is referencing *Tennant v. District of Columbia*, No. 19-cv-2949, 2023 WL 5094916, at *21 (D.D.C. Aug. 9, 2023), but that cannot be right.  The immediately prior non-"*id.*" citation to the record—coming thirteen pages before the citation at issue—is ECF No. 45-1 at 14, a page from De-fendant's opening brief cited as support for the statement that Plaintiff's "2015 performance evaluation was issued in February 2016," ECF No. 49-1 at 12, so that cannot be right either.  The next previous non-"*id.*" citation to the record is four pages before that (on the second substantive page of Plaintiff's brief) and identifies Plaintiff's Statement of Material Facts as its source.  *See* ECF No. 49-1 at 8.  Paragraph 47 of that document reads, "On April 25, 2016, Mr. Meyers and or Mr. Tewes denied Mr. Wilson training for the E/L 06011-FEMA Incident Workforce Academy (FIWA), Tier II for Command and General Staff at the Emergency Management Institute (EMI) scheduled for Sep-tember 12-16, 2016."  ECF No. 49-2, ¶ 47.  The Court will not root through the hundreds of pages of records filed in connection with this summary judgment motion to find factual support to fill in this evidentiary gap. *Jones v. Kirch-ner*, 835 F.3d 74, 83 (D.C. Cir. 2016) ("We apply forfeiture to unarticulated [legal and] evidentiary theories not only because judges are not like pigs, hunting for truffles buried in briefs or the record, but also because such a rule ensures fairness to both parties." (quoting *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 137 (D.C. Cir. 2011))).

basis to conclude that the employer has lied about the reason or, more directly, that the reason was discriminatory." *Desmond v. Mukasey,* 530 F.3d 944, 963–64 (D.C. Cir. 2008)). "And a plaintiff's subjective assessment of his own performance is not sufficient evidence of pretext." *Bruder v. Moniz*, 51 F. Supp. 3d 177, 188 (D.D.C. 2014). The record contains Plaintiff's rebuttal to the three charges in the reprimand. As to the charge that Plaintiff failed to attend a training course as instructed, *see* ECF No. 45-7 at 11, Plaintiff's rebuttal admits he "cancel[ed] and pull[ed] out of attendance," ECF No. 45-6 at 6; as to the charge that Plaintiff failed to provide requested information by the end of the May 14, 2015, workday, ECF No. 45-7 at 11, Plaintiff's rebuttal does not contradict that charge, but rather explains that his day was consumed with dealing with other important issues, *see* ECF No. 45-6 at 7; as to the charge that Plaintiff "lacked candor in continuing to pursue" permission for a FEMA Reservist to deploy to the regional office after the request had already been denied by higher-ups, ECF No. 45-7 at 11, Plaintiff does not contradict the representations but merely states that he kept his supervisor "informed both verbally and through emails," ECF No. 45-6 at 7. As noted, "it 'is not this Court's job to decide if defendant's proffered reasons were wise, fair, or correct, but rather, whether defendant honestly believed those reasons and acted in good faith upon those beliefs.'" *Hartzler*, 2022 WL 15419995, at *19 (quoting *Crockett*, 127 F. Supp. 2d at 47). Plaintiff has not presented a sufficient factual basis for a reasonable jury to find otherwise.

Finally, "[a] plaintiff may support an inference that the employer's stated reasons were pretextual, and the real reasons were prohibited discrimination or retaliation, by citing . . . its deviation from established procedures or criteria." *Walker*, 798 F.3d at 1092. Plaintiff asserts that he was not counseled or warned prior to the reprimand as required by FEMA's policies. ECF No. 49-1 at 47. However, there is no evidence in the record regarding FEMA's policies as to letters of

reprimand—just a bald statement by Plaintiff that some unidentified policy required either counseling or warning or, perhaps, both, prior to issuance of such a letter. "But 'a plaintiff cannot create a factual issue of pretext with mere allegations or personal speculation, but rather must point to genuine issues of material fact in the record' . . . ." *SaintPreux v. Mayorkas*, No. 19-cv-01364, 2021 WL 3912180, at *4 (D.D.C. Sept. 1, 2021) (quoting *Accurso v. FBI*, No. 19-cv-2540, 2021 WL 411152, at *8 (D.D.C. Feb. 5, 2021)), *aff'd* No. 21-5221, 2022 WL 1177328 (D.C. Cir. Apr. 14, 2022). More fundamentally, the record contains a letter entitled "Formal Counseling Regarding Your Failure to Follow Specific Instructions" dated May 20, 2015, that includes a discussion of each of the incidents included in the reprimand. *See* ECF No. 49-9 at 82–83.

Defendant is entitled to summary judgment on this claim.

#### iv.    Use of Purchase Card

Defendant asserts that Plaintiff was denied the ability to use his government credit card because he had not demonstrated that he understood the ordering and receiving process, failed to maintain copies of transaction information, and failed to ensure that receiving reports for all shipments were completed. ECF No. 45-2, ¶ 102. Logistics Section Chief Meyers explained that, considering this failure to "understand the basic procedures for procurement and receiving," Plaintiff would not be "allowed to make things worse by making additional purchases without maintaining copies of his requests for equipment and supplies, as well as corresponding funding documents, receipts, and purchase card transaction documentation." ECF No. 45-23 at 9.

Plaintiff again asserts that none of the other nine members of the IMAT were denied use of a purchase card. ECF No. 49-1 at 25. And again, he does not even attempt to show that "'all of the relevant aspects of [his] employment situation were nearly identical to those of the [other]' employee[s]." *Burley*, 801 F.3d at 301 (first two alterations in original) (quoting *Holbrook,* 196

F.3d at 261).  He also asserts that the denials were contrary to FEMA policy but cites nothing in the record reflecting a policy related to the use of a government credit card or supporting the claim that the denials violated such a policy.  *See* ECF No. 49-1 at 29.  Indeed, the closest thing to a policy in the record is the purchase card agreement, which provides that his appointment as a cardholder could be revoked at any time "for cause or no cause," indicating that supervisors had wide discretion as to the card's use.  ECF No. 45-40 at 4.

Plaintiff indicates that IMAT Team Lead Tewes was involved in this denial (as well as many other adverse employment actions discussed here).  *See* ECF No. 49-2, ¶¶ 37 (use of purchase card), 38 (Disaster Alternative Approving Official), 44 (signature authority for timecards and travel vouchers), 49 (coach evaluator), 50 (termination).  He also contends that, "[o]n one occasion" prior to Plaintiff's termination, Tewes reported to Seymour—the Office of Equal Rights official deployed to Jefferson City in January 2016—that Plaintiff was lazy, which Seymour understood to be a racially derogatory comment.  *Id.*, ¶ 41.  Even assuming Seymour's interpretation of Tewes' comment was correct, the D.C. Circuit has found that "an isolated race-based remark unrelated to the relevant employment decision [cannot], without more, permit a jury to infer discrimination."  *Morris v. McCarthy*, 825 F.3d 658, 669–70 (D.C. Cir. 2016); *see also Hendricks*, 568 F.3d at 1014 (finding evidence that a decision-making manager had a history of making misogynist comments was insufficient for a jury to conclude that the non-discriminatory reason offered by the defendant for the adverse employment action was pretext, "much less that [the plaintiff] was not selected because of her sex"); *McDaniel v. Vilsack*, No. 12-cv-723, 2016 WL 5349198, at *5–6 (D.D.C. Sept. 23, 2016) (finding that an isolated statement by the decision-making supervisor that the plaintiff should "stop acting white" was neither direct nor circumstantial evidence of discrimination when it was not explicitly linked to the adverse employment action

alleged), *aff'd sub nom. McDaniel v. Perdue*, 717 F. App'x 5 (D.C. Cir. 2017).  That is what Plaintiff's evidence amounts to—a single (and somewhat oblique) race-based remark that Plaintiff has failed to link to the denial of use of the purchase card or to any of the other adverse employment actions at issue.

Defendant is entitled to summary judgment on Plaintiff's intentional discrimination claim related to the purchase card.

v.    Denial of Requests to Become Disaster Alternative Approving Official

Defendant offers three reasons for the denial of Plaintiff's requests to become a Disaster Alternative Approving Official.  Plaintiff's first request (in September 2015) was denied by Logistics Section Chief Meyers because Plaintiff lacked an understanding of the ordering and receiving process; his second request (in March 2016) was denied by Deputy Logistics Section Chief Turnis because Plaintiff lacked judgment and failed to follow directions; Team Lead Tewes also explained that there were a sufficient number of officials with approval authority on the Jefferson City Deployment.  *See* ECF No. 45-2, ¶¶ 107–111.  Plaintiff's arguments are identical to those above: only he out of the ten IMAT members was denied the opportunity to become a Disaster Alternative Approving Official and the denial violated FEMA policy.  *See* ECF No. 49-1 at 25, 29.  They again fail because Plaintiff has not shown that any of the other IMAT members are appropriate comparators and has pointed to no policy that would require supervisors to appoint him a Disaster Alternative Approving Official.  True, it is undisputed that Meyers asked Plaintiff to complete training for the position.  *See* ECF No. 45-2, ¶ 106–07.  But there is nothing in the record indicating that completion of that training entitled him to be appointed to the position and nothing to show that the supervisors who denied that appointment "did not 'honestly believe in the

76

reasons [they] offer[ed]'" for the denial.  *Hartzler*, 2022 WL 15419995, at *25 (second alteration in original) (quoting *Fischbach*, 86 F.3d at 1183).

The fact that an investigation determined that some payments were approved by individuals who had not received training to be Disaster Alternative Approving Officials, *see* ECF No. 45-2, ¶¶ 112–113, does not create a genuine issue of material fact as to whether the non-discriminatory reasons provided for denial of Plaintiff's requests to become a DAAO were pretextual—and Plaintiff makes no argument that it does.  In any case, the investigation says nothing about whether Meyers and Turnis reasonably believed the performance-related reasons given for denying Plaintiff's requests.  On the other hand, the investigation *supports* Tewes' assertion that there were sufficient officials with signature authority on that deployment.  It found that "approval authority was vested in several different agency representatives" and that "proper procedures were followed."  ECF No. 45-43 at 4.  Defendant shall be granted summary judgment on this ground.

vi.    Signature  Authority  for  Timecards  and  Travel Vouchers

Defendant explains that Plaintiff was denied the authority to sign off on subordinates' timecards and travel vouchers because it was unnecessary for him to have that authority:  Logistics Chief Meyers had authority to sign those records for the small number of people deployed to the Logistics Section in Jefferson City and when he left that deployment in February 2016, Deputy Logistics Chief Turnis took over.  *See* ECF No. 45-2, ¶¶ 114, 118–120.  Again, Plaintiff asserts that only he was denied such signature authority without establishing that any of the other nine individuals on the team are appropriate comparators and that the denial violated FEMA policy

without providing any evidence of such a policy. He has not shown that Defendant's explanation was a pretext concealing discrimination.

### vii.    Coach Evaluator

According to Defendant's Statement of Undisputed Facts, Plaintiff was assigned a coach evaluator when deployed to Jefferson City, but the official could not himself deploy immediately to that location. ECF No. 45-2, ¶¶ 139, 141. Logistics Section Chief Meyers therefore asked to have other coach evaluators deployed to Jefferson City but was told that none were available. *Id.*, ¶ 142. Indeed, at the time of the deployment, fewer than one percent of staff were designated coach evaluators. *Id.*, ¶ 143. More, coach evaluators were not deployed merely to serve in that capacity; they had to be working on the same disaster as their assigned trainee to perform that function. *Id.*, ¶¶ 140, 144.

Plaintiff's arguments that his denial of a coach evaluator was discriminatory are the same as those made above, *see* ECF No. 49-1 at 25 (asserting that none of the other IMAT team members were denied a coach evaluator with no further detail), 29 (asserting that the denial was inconsistent with FEMA policy with no further detail), and fail for the same reasons.

### viii.    Termination

Plaintiff was terminated on May 20, 2016, with a letter outlining two charges—failure to follow instructions and negligent performance of duties—with a total of nine specifications. *See* ECF No. 49-21. To the extent he seeks to rely on comparator evidence, that strategy, too, fails for the reasons already discussed. Plaintiff also points to a rebuttal he submitted, *see* ECF No. 49-1 at 30–31, but that document makes clear that he admitted all the charges (while offering explanations). *See* ECF No. 49-9 at 75–81. Specifically, he admitted that (1) on November 3, 2015, he failed to timely provide "missing receipts and/or receiving reports" requested by Logistics Chief

Meyers, explaining that "improper procedures related to" the requested files made the task "impossible to accomplish"; (2) on December 4, 2015, he failed to generate documents related to the extension of an occupancy agreement requested by Meyers, explaining that he was out sick prior to and after that date and had other duties that consumed his time, but nevertheless completed the task on December 11, 2015; (3) on December 7, 2015, he failed to provide a copy of a performance appraisal requested by Meyers because it was not his responsibility to do so, but he nevertheless completed the task on December 14, 2015; (4) on December 8, 2015, he failed to provide a copy of an inventory requested by Meyers because, although "a valid request" it was "very low on the priority list" and was completed on December 18, 2015; (5) he failed to follow established procedures for contacting vendors as instructed by Meyers on December 8, 2015, explaining that he had permission from a different official to contact the vendor directly and that he "did not alter, amend or obligate . . . any financial commitment" of the federal government "for goods and services with th[at] vendor"; (6) on January 23, 2016, he failed to correct his timesheets as instructed by Meyers because Plaintiff had left for the weekend before Meyers emailed those instructions and he did not check his emails until the following Monday; (7) on February 2, 2016, he issued an iPhone without a barcode or serial number as required by agency policy, explaining that it was "an honest mistake"; (8) on February 25, 2016, he initiated a mission assignment without authority, explaining that he was asked to do so by a supervisor and had not been "briefed or counseled . . . regarding th[e] [proper] procedure"; and (9) on April 11, 2016, he failed to return equipment to its proper location, explaining that he was "in travel status" and could not fit all the equipment (which he had accumulated over his seven-month deployment) in his "compact vehicle" but that all equipment was returned by May 31, 2016. *Id.* at 75–80. Where a plaintiff "[does] not contravene—and

in fact admit[s]— . . . the deficiencies the defendants cite[] concerning [the plaintiff's] perfor-

mance, [he] fail[s] to establish" pretext. *Waterhouse v. District of Columbia*, 298 F.3d 989, 995

(D.C. Cir. 2002); *see also id.* at 994 (plaintiff did not establish pretext where she "admitted that

she missed the deadlines" and "[h]er only defense was that . . . she should have received greater

support from outside contractors"); *McGrath v. Clinton*, 666 F.3d 1377, 1384–85 (D.C. Cir. 2012)

(finding that where the plaintiff did not dispute that he "failed to heed [] instruction[s]" given to

him and "failed to perform his assigned tasks," but argued that "there were extenuating circum-

stances and there were some positive attributes to [his] performance," the responses did not demon-

strate that his termination was retaliatory (third alteration in original) (quoting *Waterhouse*, 298

F.3d at 995)).  Additionally, Plaintiff has once again failed to show that a reasonable jury could

find that FEMA did not 'honestly believe in the reasons it offer[ed]'" for terminating him.  *Hartz-*

*ler*, 2022 WL 15419995, at *25 (alteration in original) (quoting *Fischbach*, 86 F.3d at 1183); *see*

*also id.* at *19 ("Ultimately, it 'is not this Court's job to decide if defendant's proffered reasons

were wise, fair, or correct, but rather, whether defendant honestly believed those reasons and acted

in good faith upon those beliefs.'" (quoting *Crockett*, 127 F. Supp. 2d at 47)).  Rather, the bulk of

his explanations amount to his subjective assessment that, in spite of the admitted deficiencies, he

was adequately performing his duties.  *See, e.g.*, ECF No. 49-9 at 76 (contending that he generated

the documents related to the extension of the occupancy agreement prior to their due date on De-

cember 11, 2015, prior to their due date on December 15, 2015), 77 (contending that "nothing was

impacted by [his] delay" in providing the inventory to Meyers), 78 (asserting that his failure to

follow protocols regarding contacting vendors had no financial impact on the federal government

and that his failure to issue an iPhone with a bar code was "an honest mistake" that was corrected

the next day).  However, Plaintiff's "own personal opinion [of his performance] is inadequate by

itself to create an issue for the jury." *Walker*, 798 F.3d at 1094; *see also, e.g.*, *Congress v. Gruenberg*, 643 F. Supp. 3d 203, 236 (D.D.C. 2022) ("[A]n employee's personal opinion as to an employer's assessment of [her] does not matter.").

   *b.* *Retaliation*

   Generally, the methods a plaintiff can use to undermine an employer's asserted non-retaliatory reason for an adverse employment action are the same as the methods for showing a non-discriminatory reason was pretext. *See, e.g.*, *Walker*, 798 F.3d at 1092 ("A plaintiff may support an inference that the employer's stated reasons were pretextual, and the real reasons were prohibited discrimination *or retaliation*, by citing the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." (emphasis added)). The analyses from the section above also apply to three of the five remaining allegedly retaliatory actions—(1) the September 2015 and March 2016 denial of Plaintiff's requests to become a Disaster Alternative Approving Official; (2) the denial of access to a coach evaluator; and (3) the May 2016 termination—and will not be repeated here. For the reasons stated above, Plaintiff's retaliation claims based on that same conduct fail. However, the October 2011 transfer and the February 2012 demobilization require additional discussion.

   i. October 2011 Transfer

   Plaintiff alleges that the October 2011 transfer occurred "after [his] complaint about . . . his supervisor's treatment of an incident." ECF No. 49-1 at 22. He does not explain what "incident" he is referring to nor whether the "complaint" constituted protected activity. The only "incident"

in the record that predates the October 7, 2011, transfer is the contretemps on October 6, 2011, involving the breaking down of three disaster recovery centers in New York City, which culminated in a conference call with Alonso, apparently also on October 6, 2011, in which he blamed Plaintiff for delays and failing to assist other crew members. *See* ECF No. 49-3, ¶¶ 5–6. As for Plaintiff's "complaint," in order "to constitute 'protected activity,' the employee 'must in some way allege unlawful discrimination.'" *Payne v. Salazar*, 899 F. Supp. 2d 42, 52 (D.D.C. 2012) (quoting *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006)); *see also, e.g.*, *Arias v. Marriott Int'l, Inc.*, 217 F. Supp. 3d 189, 195–96 (D.D.C. 2016) ("Protected activity includes having 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' *on the basis of discrimination . . . .*" (emphasis added) (quoting *Jones v. Billington*, 12 F.Supp.2d 1, 13 (D.D.C. 1997))). Plaintiff points to no evidence to meet his burden to show that he did so on the October 6, 2011, call. *See, e.g.*, *Holbrook*, 196 F.3d at 263 (noting that the plaintiff has the burden to show that he engaged in protected activity). Indeed, there is no indication that Plaintiff made any complaint of discrimination until he contacted the Office of Equal Rights on November 18, 2011. *See* ECF No. 49-3, ¶ 10; *see also* ECF No. 49-1 at 34 (Plaintiff identifying his November 18, 2011, contact with the Office of Equal Rights as the first "protected activity" in which he engaged). Because the October 7, 2011, transfer pre-dates Plaintiff's first protected activity, it cannot serve as the basis for a retaliation claim—there was nothing to retaliate against at that time. *See, e.g.*, *Harris*, 2022 WL 3452316, at *14 (collecting cases). Therefore, Plaintiff cannot show that retaliation was the true reason for the transfer.

ii.    February 2012 Demobilization

Plaintiff is more successful here. He filed the First EEO Complaint on January 18, 2012. ECF No. 45-2, ¶ 15. Less than one month later, on February 10, 2012, he received the initial order

82

from Logistics Group Supervisor Cole requiring his February 24, 2012, demobilization (pursuant to a directive from the Federal Coordinating Officer) and, on approximately February 14, 2012, he received the subsequent order from Logistics Chief Butkus requiring his February 17, 2012, demobilization. *See id.*, ¶ 49; ECF No. 49-3, ¶ 17. Such temporal proximity is sufficient to permit an inference of causation for the purposes of a *prima facie* case, *see, e.g., Mitchell v. Powell*, No. 17-cv-182, 2017 WL 6735800, at *7–8 (D.D.C. Dec. 24, 2018), but Defendant contends that "while mere proximity may be enough at the motion to dismiss stage, more is required to survive summary judgment," ECF No. 59 at 24 (quoting *Harris v. Trs. of Univ. of D.C.*, 567 F. Supp. 3d 131, 160 (D.D.C. 2021)). Plaintiff has provided more here. Specifically, he has asserted that he reported the demobilization order to an official from the Office of Equal Rights—Florence Nelson—who stated that the demobilization order "appeared to be in retaliation" for the First EEO Complaint "and that the claim about saving money for FEMA was an excuse." ECF No. 49-3, ¶ 17. As discussed in note 18, *supra*, that statement is non-hearsay under Rule 801(d)(2)(D) of the Federal Rules of Evidence. More, similar statements from EEO officials have been held sufficient to defeat a motion for summary judgment on a discrimination or retaliation claim. *See, e.g., Ritchie*, 196 F. Supp. 3d at 64–65 (finding evidence that an EEO counselor stated that the employer had taken the race and gender of the plaintiff into account when failing to offer him a position to which he applied sufficed to overcome a motion for summary judgment on a discrimination claim); *Klein v. Derwinski*, 869 F. Supp. 4, 9 (D.D.C. 1994) (finding evidence that an EEO counselor believed that a supervisor's "hostile reaction" upon finding out that the plaintiff had visited the

EEO office "was a breach of EEO principles" sufficient to overcome a motion for summary judg-
ment on a retaliation claim). That is, Plaintiff does have positive evidence of retaliation—thin as
it may be—sufficient to defeat Defendant's motion for summary judgment on this claim.

In its reply, Defendant asserts that Plaintiff has not shown that either the Federal Coordi-
nating Official or Butkus knew of Plaintiff's prior protected activity. *See* ECF No. 59 at 23. Its
opening brief made no such argument. That submission mentions only once whether the deci-
sionmakers had knowledge of Plaintiff's protected activity:

> Plaintiff may point to the fact that his demobilization was retaliatory because he
> had just filed his First EEO Complaint on January 18, 2012, a month before he was
> instructed to demobilize. *But even if Plaintiff claims that Cole and Butkus knew
> about this Complaint*, the undisputed record cannot establish that any retaliatory
> animus Plaintiff alleges, no matter how thinly supported, was the but-for reason for
> Plaintiff's instruction to demobilize alongside twenty percent of the workforce.

ECF No. 45-1 at 34 (emphasis added) (internal citations omitted). That italicized clause is not
sufficient to present the issue of the decisionmakers' knowledge of Plaintiff's protected activity to
the Court for analysis, *see Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019) ("Mentioning an
argument 'in the most skeletal way, leaving the court to do counsel's work, create the ossature for
the argument, and put flesh on its bones' is tantamount to failing to raise it." (quoting *Schneider v.
Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005)), and arguments raised first in a reply brief are
generally considered forfeited, *see, e.g.*, *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C.
Cir. 2008) ("We need not consider this argument because plaintiffs have forfeited it on appeal,
having raised it for the first time in their reply brief."). In any event, Defendant's argument in its
reply is sparce, at best: it asserts that Plaintiff fails to "point to . . . evidence that the Field Coordi-
nating Officer, who made the decision to reduce staff by twenty percent in February 2012, and
Plaintiff's supervisor, Mr. Butkus, knew of Plaintiff's prior protected activity to support any retal-
iation claim," quoting *Celotex* for the proposition that "[t]he moving party is 'entitled to judgment

84

as a matter of law' [when] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which [it] has the burden of proof."  ECF No. 59 at 23 (second alteration in original) (quoting *Celotex*, 477 U.S. at 322).  But it is hardly surprising that Plaintiff did not marshal evidence or make argument on the issue in its opposition, as it was not squarely raised in the government's opening brief; indeed, the statement in Defendant's opening brief regarding knowledge, directs attention *away* from the issue of knowledge and toward the question of retaliation *vel non*.[53]  *See* ECF No. 45-1 at 34 ("[E]ven if Plaintiff claims that Cole and Butkus knew about this Complaint, the undisputed record cannot establish that any retaliatory animus Plaintiff alleges . . . was the but-for reason for Plaintiff's instruction to demobilize alongside twenty percent of the workforce.").  Therefore, the Court deems that, for the purposes of this motion for summary judgment, Defendant has forfeited any argument that it is entitled to judgment as a matter of law on this claim because Plaintiff failed to establish that the decisionmakers had knowledge of his protected activity.

Accordingly, Defendant is not entitled to summary judgment on Plaintiff's claim that his February 2012 demobilization was retaliatory.

*    *    *    *    *

Summing up, the government is entitled to summary judgment on all but two of Plaintiff's Title VII claims.  The claims that survive are his discrimination claim based on the October 2011

---

[53] It is worth noting, too, that "[t]o survive summary judgment, . . . [a plaintiff] needn't provide direct evidence that his supervisors knew of his protected activity; he need only offer circumstantial evidence that could reasonably support an inference that they did." *Jones*, 557 F.3d at 679.

transfer to the Kirkwood Field Office and his retaliation claim based on the February 2012 demobilization from that office.

## IV.    CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that Plaintiff's claims under 42 U.S.C. §§ 1981 and 1983 are **DISMISSED** for lack of jurisdiction.  It is further

**ORDERED** that Defendant's motion for summary judgment, ECF No. 45, is **GRANTED IN PART AND DENIED IN PART** as discussed above.  It is further

**ORDERED** that the parties shall confer and on or before May 5, 2025, file a joint status report addressing (1) the parties' preference for alternative dispute resolution, such as private mediation or a referral to a Magistrate Judge, Judge Teel, or the Circuit Mediator for settlement; and (2) a proposal for further proceedings in this case.  At the request of Plaintiff, the Court may appoint an attorney to represent Plaintiff *pro bono* for the purposes of mediation.

**SO ORDERED.**


Date:   April 3, 2025

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE